# EXHIBIT 1

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA - CIVIL DIVISION**

D.C. Superior Court
10/29/2021 17:33PM
Clerk of the Court

The George Washington University

                                    Plaintiff

                                                        Case No.: 2021 CA 003837 B

                                        *vs.*

Factory Mutual Insurance Company

                                    Defendant

## AFFIDAVIT OF SERVICE

I, Vance M. Warren, Sr., a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Initial Order and Addendum; Summons in English and Spanish; Information Sheet; Complaint for Breach of Contract, Declaratory Relief, and Money Damages with Exhibit A; and Plaintiff's Corporate Disclosure Statement in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 10/26/2021 at 11:51 AM, I served Factory Mutual Insurance Company c/o CT Corporation System, Registered Agent at 1015 15th Street, NW, Suite 1000, Washington, DC 20005 with the Initial Order and Addendum; Summons in English and Spanish; Information Sheet; Complaint for Breach of Contract, Declaratory Relief, and Money Damages with Exhibit A; and Plaintiff's Corporate Disclosure Statement by serving Ami Pineda, Agent, authorized to accept service on behalf of CT Corporation System.

Ami Pineda is described herein as:

Gender: Female   Race/Skin: White   Age: 36   Weight: 150   Height: 5'5"   Hair: Brown   Glasses: No

I declare under penalty of perjury that this information is true and correct.

Sworn to before me on 10/27/2024

_____
Angela H. Croson
Notary Public, District of Columbia
My Commission Expires: March 31, 2024

_____
Vance M. Warren, Sr.

Client Ref Number:030619.00002
Job #: 1595405

 **CT Corporation**

**Service of Process Transmittal**
10/26/2021
CT Log Number 540481990

**TO:**     Robert Brunelli
            Factory Mutual Insurance Company
            270 Central Ave
            Johnston, RI 02919-4923

**RE:**     **Process Served in District of Columbia**

**FOR:**    Factory Mutual Insurance Company   (Domestic State: RI)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | THE GEORGE WASHINGTON UNIVERSITY vs. FACTORY MUTUAL INSURANCE COMPANY |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified<br>Case # 2021CA003837B |
| **NATURE OF ACTION:** | Insurance Litigation |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/26/2021 at 03:32 |
| **JURISDICTION SERVED :** | District of Columbia |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/26/2021, Expected Purge Date: 10/31/2021 |
| | Image SOP |
| | Email Notification,  Robert Brunelli  robert.brunelli@fmglobal.com |
| | Email Notification,  Roma Pritza  roma.pritza@fmglobal.com |
| | Email Notification,  Donna Rega-Pascale  donna.regapascale@fmglobal.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>1015 15th Street, NW<br>Suite 1000<br>Washington, DC 20005<br>866-401-8252<br>EastTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                     Tue, Oct 26, 2021

**Server Name:**              Drop Service

| Entity Served | FACTORY MUTUAL INSURANCE COMPANY |
|---------------|----------------------------------|
| Case Number   | 2021CA003837B                    |
| Jurisdiction  | DC                               |





**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telephone: (202) 879-1133 • Website: www.dccourts.gov

THE GEORGE WASHINGTON UNIVERSITY
    Vs.
FACTORY MUTUAL INSURANCE COMPANY

C.A. No.    2021 CA 003837 B

## INITIAL ORDER AND ADDENDUM

**Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:**

(1) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

**Chief Judge Anita M. Josey-Herring**

Case Assigned to: Judge JASON PARK
Date:     October 22, 2021
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, January 21, 2022
Location:   Courtroom 519
          500 Indiana Avenue N.W.
          WASHINGTON, DC 20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,    "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.    Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

CAIO-60

### Civil Remote Hearing Instructions for Participants

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**

**Option1:** **(AUDIO ONLY/Dial-in by Phone):**

Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.

* *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise. If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the Audio Alternative

**Option 2:** **(LAPTOP/ DESKTOP USERS 1):**

Open Web Browser in Google Chrome and copy and paste following address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX

**Option 3:** **(LAPTOP/ DESKTOP USERS 2):**

Open Web Browser in Google Chrome and copy and paste following address https://dccourts.webex.com   Select **Join**, enter the Meeting ID from the next page

AUDIO ALTERNATIVE: Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window. Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video.



**Option 4:** **(Ipad/SMART PHONE/TABLET):**

* Go to App Store, Download WebEx App (Cisco WebEx Meetings)
* Sign into the App with your Name and Email Address
* Select Join Meeting
* Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
* Click join and make sure your microphone is muted and your video is unmuted (if you need to be
* seen). If you only need to speak and do not need to be seen, use the audio only option.
* When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #2**

CAIO-60

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726 (toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom. Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | WebEx Direct URL | WebEx Meeting ID |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

CAIO-60

| 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|---|---|---|---|
| 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
| 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
| 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
| 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
| 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
| JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
| A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
| B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
| B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
| B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
| B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |

CAIO-60



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
Telephone: (202) 879-1133 Website: www.dccourts.gov

## The George Washington University
Plaintiff

vs.

Case Number **2021 CA 003837 B**

## Factory Mutual Insurance Company
Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Schlesinger (D.C. Bar No. 429689)

Name of Plaintiff's Attorney

850 Tenth Street, NW

Address
Washington DC, 20001

(202) 662-6000

Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date **10/22/2021**

如需翻譯,請打電話 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오    የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

The George Washington University
_____
                    Demandante

                contra

Factory Mutual Insurance Company                    Número de Caso: _____
_____
                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le requiere entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le requiere presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Matthew J. Schlesinger (D.C. Bar No. 429689)          *SECRETARIO DEL TRIBUNAL*
_____
Nombre del abogado del Demandante

850 Tenth Street, NW                      Por: _____
_____                            Subsecretario
Dirección
Washington, DC 20001

(202) 662-6000                            Fecha _____
_____
Teléfono

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202)879-4828로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

The George Washington University

vs

Factory Mutual Insurance Company

Case Number: **2021 CA 003837 B**

Date: October 21, 2021

☐ One of the defendants is being sued
in their official capacity.

---

Name: *(Please Print)*
Matthew J. Schlesinger

Firm Name:
Covington & Burling LLP

Telephone No.:         Six digit Unified Bar No.:
(202) 662-6000              429689

**Relationship to Lawsuit**

☒ Attorney for Plaintiff

☐ Self (Pro Se)

☐ Other: _____

---

TYPE OF CASE: ☐ Non-Jury        ☐ 6 Person Jury        ☒ 12 Person Jury

Demand: $ in excess of $10,001 _____        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____    Judge: _____    Calendar #:_____

Case No.:_____    Judge: _____    Calendar#:_____

---

NATURE OF SUIT:        *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☒ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
    Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
    Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
    Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
    Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
    Under $25,000 Consent Denied

---

**B. PROPERTY TORTS**

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
    Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
    Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

---

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D. REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial.Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

October 21, 2021
_____
Date

MATTHEW J. SCHLESINGER
RALPH M. MUOIO
MARIANNA F. JACKSON
ALLISON C. HAWKINS
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5906
Email: mschlesinger@cov.com
rmuoio@cov.com
mjackson@cov.com
ahawkins@cov.com

Attorneys for Plaintiff

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE GEORGE WASHINGTON UNIVERSITY, <br><br> 1918 F Street NW <br> Washington, DC 20052 <br><br>     Plaintiff, <br><br>     v. <br><br> FACTORY MUTUAL INSURANCE COMPANY, <br><br> 270 Central Ave <br> Johnston, RI, 02919-4923 <br><br>     Defendant. | Docket No. **2021 CA 003837 B** |

## PLAINTIFF'S CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Superior Court Rule of Civil Procedure 7.1, Plaintiff hereby certifies that

The George Washington University has no parent corporation and that no publicly held corporation

owns 10% or more of the stock of The George Washington University.

Dated: October 21, 2021

Respectfully submitted,

By:    */s/ Matthew J. Schlesinger*
Matthew J. Schlesinger
D.C. Bar No. 429689
Covington & Burling LLP
One CityCenter
850 Tenth Street Northwest
Washington, DC 20001
(202) 662-6000
mschlesinger@cov.com

Filed
D.C. Superior Court
10/22/2021 15:28PM
Clerk of the Court

MATTHEW J. SCHLESINGER
RALPH M. MUOIO
MARIANNA F. JACKSON
ALLISON C. HAWKINS
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5906
Email: mschlesinger@cov.com
rmuoio@cov.com
mjackson@cov.com
ahawkins@cov.com

Attorneys for Plaintiff

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE GEORGE WASHINGTON UNIVERSITY,<br><br>1918 F Street NW<br>Washington, DC 20052<br><br>     Plaintiff,<br><br>     v.<br><br>FACTORY MUTUAL INSURANCE COMPANY,<br><br>270 Central Ave<br>Johnston, RI, 02919<br><br>     Defendant. | Docket No. **2021 CA 003837 B**<br><br>**CIVIL ACTION**<br><br>**COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY RELIEF, AND MONEY DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

                                                                    **Page**

NATURE OF THE ACTION ................................................................ 1

THE PARTIES ................................................................................ 7

JURISDICTION AND VENUE ........................................................... 7

FACTUAL ALLEGATIONS ............................................................... 8

I.    GWU PURCHASED BROAD INSURANCE TO PROTECT ITSELF AGAINST
      CATASTROPHES ................................................................... 8

      A.    RELEVANT POLICY PROVISIONS ................................... 9

II.   COVID-19 AND THE COVID-19 VIRUS CAUSE COVERED PHYSICAL
      LOSS AND DAMAGE ............................................................ 18

      A.    COVID-19 Is a Deadly Communicable Disease. .................... 19

      B.    The COVID-19 Virus Can Be Transmitted in Many Ways ......... 20

      C.    The COVID-19 Virus Causes Physical Loss And Damage, in Part by
            Rendering Air and Property Unsafe and Unusable ..................... 24

III.  GWU SUFFERED THE TYPES OF LOSSES THE ALL RISKS POLICY
      INSURES AGAINST. ............................................................. 30

      A.    GWU's Insured Properties Suffered Physical Loss and Damage ....... 31

      B.    The COVID-19 Virus Damage Forced GWU to Repair and Restore Its
            Property and to Take Expensive Measures to Mitigate Its Losses. ...... 34

      C.    Government Orders Resulting From Viral Damage Prevented In-Person
            Learning. ............................................................... 36

      D.    In Short, COVID-19 and the COVID-19 Virus Caused Physical Loss and
            Damage to GWU's Insured Locations for Three Independent Reasons ...... 39

IV.   GWU SUFFERED HUNDREDS OF MILLIONS OF DOLLARS IN LOSSES ........... 40

V.    THE ALL RISKS POLICY COVERS GWU's LOSSES. ......................... 42

      A.    The All Risks Policy Covers GWU's Property Damage and Repair Costs ....... 43

      B.    The All Risks Policy Covers GWU's Massive Business Interruption
            Losses and Extra Expenses. ........................................... 44

**TABLE OF CONTENTS**

Page

C. The All Risks Policy Covers GWU's "Civil Authority" Losses. .......................... 46

D. The All Risks Policy Covers the Losses GWU Sustained Given the
Danger Of Accessing Insured Locations Due to Nearby Viral Property
Damage and Loss. ............................................................................................ 48

E. The All Risks Policy Covers the Losses GWU Sustained to Protect Its
Property and Mitigate Its Losses. .................................................................... 50

F. Numerous Other Provisions of the All Risks Policy Cover GWU's Losses. ....... 50

FIRST CAUSE OF ACTION (For Breach of Contract Against Factory Mutual) ........................ 51

SECOND CAUSE OF ACTION (For Declaratory Relief Against Factory Mutual) ................... 52

PRAYER FOR RELIEF ............................................................................................................. 54

Plaintiff, The George Washington University ("GWU" or "the University"), brings this action to compel its property insurer, Defendant Factory Mutual Insurance Company ("Factory Mutual"), to honor its promise to protect the University against damage to and loss of its property and attendant loss of income resulting from COVID-19.

## NATURE OF THE ACTION

1.      GWU was founded in 1821 to fulfill President George Washington's vision of a thriving university in the nation's capital dedicated to educating and preparing future leaders. For the past 200 years, GWU has embodied that vision, providing world-class education to students, including at its residential campuses in and around Washington, D.C.

2.      As of the beginning of the Spring 2020 semester, GWU enrolled over 11,000 undergraduate students, over 14,500 graduate students, and over 500 non-degree students. The overwhelming majority of these students took classes and lived on and around GWU's residential campuses.

3.      GWU has three campuses: its Foggy Bottom Campus in the heart of Washington, D.C., its Mount Vernon Campus, located in a residential neighborhood of Washington, D.C., and its Virginia Science and Technology Campus in Ashburn, Virginia. Additionally, GWU offers master's and certificate programs at its Arlington Graduate Education Center in Arlington, Virginia, and its Alexandria Graduate Education Center in Alexandria, Virginia.

4.      On March 10, 2020, in light of increasing COVID-19 cases and transmission in Washington, D.C., GWU announced that, starting on March 22, 2020 (following the University's spring break), it would move classes online for at least two weeks. Students were instructed to go home for spring break if at all possible and stay there, and were informed that after March 20, 2020, only those students who applied for and were granted permission would be allowed to remain in their on-campus housing. On March, 16, 2020, after the District of Columbia had

1

prohibited gatherings of fifty or more people, GWU announced it was ending in-person instruction for the remainder of the Spring semester.

5.      However, even these strict measures were not enough to prevent the danger posed by COVID-19 to GWU's campuses. On or about March 13, 2020, the University became aware of a teaching assistant who had tested positive for COVID-19 and who had been present in at least six campus buildings while infectious. From March to June 2020, many more individuals with COVID-19 were on GWU's campuses (and in and around insured property), including at Ross Hall, Thurston Hall, Phillips Hall, Munson Hall, Somers Hall, Francis Scott Key Hall, the Smith Center, the Law School, the Webb Building, 1957 Eye Street NW, and 805 21st Street NW.

6.      On March 16, 2020, due to the COVID-19 virus and COVID-19, and restrictions on gatherings put in place by orders of the mayor of Washington, D.C., and the governor of Virginia, GWU was no longer able to offer in-person instruction to its undergraduate and graduate students. On March 24, 2020, the mayor of Washington, D.C. issued an order that closed all non-essential businesses and defined universities as essential businesses only for the purpose of "[f]acilitating distance learning and facilitating distance operations; or [m]odifying facilities to provide support for addressing COVID-19 or providing support for efforts to address the public emergency and public health emergency declared by the Mayor." This restriction remained in place for the duration of the 2019–2020 academic year.. For over a year, until August 2021, GWU was unable to allow its student body to return to its classrooms and campuses due to the dangers posed by COVID-19.

7.      The University purchased—at significant expense—a best-in-class "all risks" business interruption insurance policy from Factory Mutual ("the All Risks Policy"). The All

Risks Policy broadly covers "All Risk of Physical Loss or Damage," except as specifically and unambiguously excluded. The All Risks Policy promises to protect GWU against loss of revenue and certain expenses if it cannot use its classroom buildings, libraries, residence halls, or other insured properties due to the impact of some external physical peril. These covered perils include both known and, more importantly, novel, risks. COVID-19 and the COVID-19 virus are exactly these types of perils.

8.     COVID-19 and the COVID-19 virus caused unprecedented physical loss and damage to GWU's properties, at levels far worse than the physical loss and damage caused by many "traditional" natural disasters like hurricanes, floods, or tornadoes. COVID-19 and the COVID-19 virus caused physical changes to the air, surfaces, and interior spaces of the classroom buildings, libraries, residence halls, dining facilities, athletic facilities, and other insured properties and rendered such properties physically unusable for their intended purposes. COVID-19 and the COVID-19 virus resulted in government orders forbidding access to the insured properties due to the damage caused, and risks posed by, COVID-19 and the COVID-19 virus.

9.     Factory Mutual sold GWU expansive coverage specifically designed to cover such losses. The All Risks Policy covers: (a) lost income resulting from "physical loss or damage of the type insured" to GWU's properties; (b) lost income that GWU suffered as a result of orders of "civil or military authority" that limit, restrict, or prohibit access to classrooms, libraries, residence halls, dining facilities, athletic facilities, and other insured properties due to physical damage—such as that caused by COVID-19—in the vicinity of the insured properties; and (c) the costs to "repair" property that is lost or damaged due to physical loss or damage such as COVID-19 and the COVID-19 virus.

3

10.     In addition to selling broad coverage, Factory Mutual—in an effort to make its policies more marketable—chose not to include the broad virus or pandemic exclusion that numerous other insurers used to remove coverage for all losses in any way related to viruses or pandemics. Rather, Factory Mutual adopted under the All Risks Policy a narrower and fundamentally different exclusion (called either a "contamination exclusion" or "pollution exclusion"), which does not bar coverage for the types of COVID-19 losses suffered by GWU.

11.     As explained below, the COVID-19 virus caused physical loss or damage to critical, insured properties essential for GWU's in-person educational experience. This resulted in students not being able to, among other things, attend in-person classes together, study in libraries together, eat in dining facilities together, or cheer on the Colonials at sporting events together. Likewise, until March 2020, all first-, second-, and third-year undergraduate students were required to live in on-campus housing. The primary purpose of GWU's residence halls and Greek housing is to house large numbers of students in communal living spaces. In March 2020, due to the COVID-19 virus and COVID-19, it became impossible for the student body to live and learn in GWU's buildings. GWU was able to open its doors again for in-person instruction in the 2021–2022 academic year, but only after it undertook substantial safety measures, including modifications and repairs to property, and only after vaccines were widely available— and required—for all students, faculty, and staff. Given the prevalence of COVID-19 in the population, to allow students to return to in-person learning before undertaking these substantial safety measures, and before the wide availability of vaccines, would have resulted in continuously exposing the insured properties to even more damage from the COVID-19 virus.

12.     Infected individuals spew COVID-19 and the COVID-19 virus into the air where some hangs in the air and some falls to surfaces. The presence of COVID-19 and the COVID-19

4

virus in GWU's academic buildings, residence halls, dining halls, athletic facilities, and other insured properties, along with a further influx of the COVID-19 virus that would come with students, faculty, and staff entering those properties (prior to the wide availability of vaccines) had two effects: (a) it caused physical loss and damage to the insured properties (as detailed below in Paragraphs 86–96), and (b) it made the physical use of those insured properties impossible for their intended purpose—to house students, host lectures, and provide physical spaces for in-person learning.

13.     Additionally, numerous, unprecedented government orders were issued that prohibited and/or restricted GWU from carrying out in-person instruction, due to the presence of the COVID-19 virus and the dangers COVID-19 poses to public health (prior to the wide availability of effective vaccines).

14.     GWU was forced to spend millions to rebuild, repair, and replace various parts of its insured properties to restore them to the same operating capacity they had prior to physical loss and physical damage caused by COVID-19. Those steps were necessary to make the properties ready to operate under the same physical and operating conditions that existed prior to that loss and damage. Such steps included installation of new, or modification of existing HVAC systems, the installation of barriers (for example, Plexiglas), and rearrangement of interior spaces to limit or reduce the spread of the COVID-19 virus. It also required continuous disinfection. GWU was also forced to spend significant sums on, *e.g.*, enhanced technology platforms, to prepare faculty, staff, and students for learning in a remote environment.

15.     In selling the All Risks Policy to GWU, Factory Mutual promised to pay up to $1 billion for each "occurrence," defined to include the losses "arising out of or caused by one discrete event of physical loss or damage," with no cap on the number of such occurrences.

16.     Factory Mutual also correctly argued in litigation before the pandemic began that the term "physical loss or damage" covers the physical loss of use of insured property caused by an external peril, even without a physical alteration of that property. *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, No. 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 at 3 n.1 ("loss of functionality . . . constitutes physical loss or damage," and "[a]t best for defendant Federal, 'physical loss or damage,' which is undefined, is susceptible of more than one reasonable interpretation and is therefore ambiguous"). COVID-19 is precisely such an external peril.

17.     However, when called upon by GWU to comply with its contractual obligations, Factory Mutual took the opposite position—that structural damage is required—and preemptively denied coverage on the flawed view that COVID-19 and the COVID-19 virus do not cause physical loss or damage within GWU's insured properties. Factory Mutual made this determination precipitously, without adequately investigating the ways in which COVID-19 and the COVID-19 virus caused loss and damage to GWU's properties. This is despite Factory Mutual advertising that it would "work closely with [GWU] *before*, *during*, and *after* a loss."[1] Faced with a deadline in the All Risks Policy to file suit, GWU asked Factory Mutual to enter into a tolling agreement to extend such deadline. Factory Mutual refused, leaving GWU with no choice but to file this action.

18.     Because GWU suffered massive losses covered under the All Risks Policy, and because Factory Mutual refuses to honor its promise, GWU asks this Court to issue declaratory relief and to award money damages for Factory Mutual's breach of its contracted commitments.

---

[1]     FM Global, *Why FM Global? Creating Resilience Means Creating Success*, https://www.fmglobal.com/about-us/why-fm-global (last visited Oct. 19, 2021) (emphasis in original).

**THE PARTIES**

19.    Plaintiff The George Washington University is a Congressionally-chartered institution of higher education, with its principal place of business in the District of Columbia.

20.    GWU, directly or indirectly, has management control over, or an economic interest in, entities that both are also insureds under the All Risks Policy and have suffered covered losses as a result of the events described herein.

21.    Defendant Factory Mutual Insurance Company ("Factory Mutual") is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Johnston, Rhode Island. At all times relevant hereto, Factory Mutual was licensed to do business, and was doing and transacting business in the District of Columbia.

**JURISDICTION AND VENUE**

22.    The Court has subject matter jurisdiction over the claims asserted in this Complaint pursuant to D.C. Code § 11-921.

23.    The Court has personal jurisdiction over Factory Mutual pursuant to D.C. Code § 13-423 because it is an insurance company registered with the Department of Insurance, Securities, and Banking, licensed to provide insurance in the District of Columbia, and it contracted to provide an insurance policy to GWU, which is located in the District of Columbia, and this suit arises from a dispute over this policy.

24.    Factory Mutual also, by the express terms of its All Risks Policy, consented to the jurisdiction of the United States of America, which includes the District of Columbia.

25.    GWU has suffered substantial losses in the District of Columbia. The University has two campuses in the District of Columbia with academic buildings, residence halls, dining facilities, athletic facilities, and other insured properties. Due to COVID-19-related cancellations

7

and restrictions in the District of Columbia, GWU has suffered substantial losses in the District
of Columbia.

     26.     Venue is proper in this Court pursuant to D.C. Code § 31-1303 as the obligations
under the contracts at issue were to be performed, the defendants do business, and the events that
led to this dispute occurred, in large part, in the District of Columbia.

**FACTUAL ALLEGATIONS**

**I.      GWU PURCHASED BROAD INSURANCE TO PROTECT ITSELF AGAINST
       CATASTROPHES.**

     27.     To protect its significant property and business income interests, and in exchange
for a very high premium, GWU purchased a best-in-class, all risks policy from Factory Mutual
(the "Policy" or the "All Risks Policy"), for which Factory Mutual has for many years collected
many millions in premiums.

     28.     For decades, Factory Mutual (like its predecessor companies) has marketed and
sold property and business interruption insurance to large policyholders such as GWU. Over the
years, as property and business interruption coverage has expanded in scope (as described in
further detail below), Factory Mutual has offered increasingly expansive coverage.

     29.     Moreover, as other insurers have competed with Factory Mutual to sell property
and business interruption to the largest policyholders, Factory Mutual expanded its coverage in
many significant ways, particularly during the "soft" markets of the late 1990s and early 2010s.
Thus, Factory Mutual adopted new, more expansive forms, increased the limits of liability it was

8

willing to sell, and advertised its promises of broad coverage. Today, Factory Mutual advertises

its policy as "one of the broadest in the insurance market."[2]

### A.    RELEVANT POLICY PROVISIONS

30.    The All Risks Policy, No. 1056630 (attached to and made part of this Complaint

at Exhibit A), was issued for the policy period July 1, 2019 to July 1, 2020.

31.    The All Risks Policy insures GWU.

32.    All risks insurance policies cover just that: *all* risks of physical loss or damage,

including risks that are, by definition, novel, unknown or unforeseen, unless the policy

specifically and conspicuously excludes that risk. The All Risks Policy covers loss resulting

from natural and man-made disasters that physically impair the operations of a business. GWU's

All Risks Policy covers up to $1 billion in losses for any one "occurrence," and covers an

unlimited number of "occurrences."[3] So, it provides significantly more than $1 billion in

coverage assuming more than one event causes physical loss or damage in any particular policy

period.

33.    The All Risks Policy expressly promises coverage for the wide array of massive

losses GWU now faces due to COVID-19, including, for example, losses from a communicable

disease; losses sustained when a communicable disease physically alters air and surfaces within

GWU's properties, making them unfit for their intended uses; losses sustained when government

---

[2]    *See* FM Global, *The FM Global Advantage® All-Risk Policy*,
https://www.fmglobal.com/products-and-services/products/the-fm-global-advantage-all-risk-policy (last visited Oct. 19, 2021).

[3]    The All Risks Policy defines "occurrence" in pertinent part as "the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage." Said otherwise, the All Risks Policy's limits of liability apply on a "per occurrence" basis, and if more than one "occurrence" takes place, then Factory Mutual may have to pay up to its full $1 billion in limits for each such occurrence.

orders prohibit or restrict in-person learning and residential education; and losses sustained when viral damage makes travel to or from GWU's properties dangerous and difficult.

34.    The All Risks Policy provides a basic coverage grant which "covers [insured] property . . . against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except" as specifically and conspicuously excluded. Ex. A at 8. The All Risks Policy nowhere defines, and thus nowhere narrows the meaning, of either "ALL RISKS" or "PHYSICAL LOSS OR DAMAGE."

35.    This trigger of coverage provided by the All Risks Policy was purposefully expanded by Factory Mutual over the years to compete with other insurers that have similarly expanded the insuring agreements of property and business interruption policies. As the coverage sold primarily to small and mid-sized businesses grew broader over the decades,[4] Factory Mutual—which marketed its policies to major companies that demanded even broader coverage than that available to small businesses—similarly expanded its coverage to compete in the marketplace. For example, a Factory Mutual 1977 policy provided that business interruption coverage was triggered only by "physical damage." But later policies—including the one issued to GWU—broadened this trigger of coverage to extend to "all risks of physical loss or damage."

36.    Recognizing the broad scope of insuring agreements such as that in the All Risks Policy, courts have long interpreted such policies to cover perils such as carbon monoxide, mold, gasoline fumes, and odors. During this time, Factory Mutual has not sought to restrict or limit the insuring agreement contained in the All Risks Policy. Instead, Factory Mutual itself has

---

[4]    When the Insurance Services Office—an industry trade group that writes standardized form policies sold primarily to small and mid-sized businesses—first started selling business interruption insurance decades ago, that coverage was triggered only when the insured property was "damaged or destroyed." Subsequently, this coverage was expanded to provide coverage for lost business income during a "suspension" of the insured's business operations "caused by direct physical loss or damage."

*agreed* with these courts that "physical loss or damage" does not require that a policyholder

show "demonstrable structural damage or alteration to property." *See Factory Mut. Ins. Co. v.*

*Federal Ins. Co.*, 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 at 6. Factory Mutual has

asserted in court that a "loss of functionality" alone constitutes such physical loss or damage,

even when the property is not physically altered. *Id.* at 3 ("Numerous courts have concluded that

loss of functionality or reliability under similar circumstances constitutes physical loss or

damage."). Factory Mutual has told insurance regulators that "the presence of and spread of

communicable disease will be considered direct physical damage."[5]

37.     The All Risks Policy that Factory Mutual sold to GWU also covers business

interruption losses, in a section captioned "Time Element." Specifically, the All Risks Policy

covers "TIME ELEMENT loss . . . directly resulting from physical loss or damage of the type

insured[] to," *inter alia*, "Real Property" and "Personal Property." Ex. A at 35. This coverage is

referred to as "Time Element" coverage because the length of the time period when, for example,

ordinary business operations are curtailed (called "the Period of Liability") is an element that

bears on the amount of the loss.

38.     The Period of Liability starts at "the time of physical loss or damage" in question

and ends "when with due diligence and dispatch the building and equipment could be: (i)

repaired or replaced; and (ii) made ready for operations, *under the same or equivalent physical*

*and operating conditions that existed prior to the damage*." Ex. A at 41 (emphasis added). The

All Risks Policy also includes an "Extended Period of Liability" that extends certain time

element coverages "for such additional length of time," up to 365 days, "as would be required

---

[5]      Factory Mutual Insurance Company, Form FMG7446 (Aug. 2011); Factory Mutual
Insurance Company Filing FMIC-2011-13, Explanatory Filing Memorandum.

with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened." *Id.* at 59.

39.    The Time Element provision of the All Risks Policy covers GWU's financial losses due to its inability to operate normally or use GWU's property normally because of physical losses and damage, including the physical loss and damage COVID-19 and the COVID-19 virus cause.

40.    Covered losses include, among others, the "Actual Loss Sustained," that is, the lost "total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured." Ex. A at 36.  They also include Extra Expense, the "extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business" during the interruption.  Ex. A at 46.

41.    The All Risks Policy also extends Time Element coverage to include losses incurred when, among other things:

- GWU suffers loss due to an order of *civil authority* that limits, restricts, or prohibits partial or total access to an insured location if the order is the direct result of physical damage of the type insured at or within five statute miles of an insured location;

- GWU suffers loss when *ingress to or egress from* insured locations is partially or totally prevented, interrupting GWU's business "whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to the property of the type insured";

- GWU must make *rental payments* made on property that is wholly or partially untenantable or unusable;

- GWU incurs *lost rent*; and

- GWU suffers loss because of physical loss or damage at the location of customers, suppliers, contract manufacturers or contract service providers, and the location of any company under a royalty, licensing fee, or commission agreement with the Insured (known as "**contingent time element locations**").

42.     Unlike most property policies, the All Risks Policy sold by Factory Mutual to GWU adds two additional coverages: one for costs incurred to clean up "communicable disease," and another for revenue losses resulting from such disease. "Communicable Disease" is defined in part as a disease which is "transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges." Ex. A at 72.

43.     Factory Mutual has conceded that COVID-19 meets the All Risks Policy's definition of a "Communicable Disease," recognized there was coverage under these provisions for a portion of GWU's losses related to COVID-19, and issued payment to GWU on May 6, 2021. However, in doing so, Factory Mutual incorrectly took the position that its obligations were limited to the relatively small sublimit applicable to the Communicable Disease coverage extensions.

44.     Losses that fall under, and are able to satisfy the requirements of, both the coverage for Time Element losses and the coverage for communicable disease are covered by **both** coverage provisions. Some losses would satisfy only the Communicable Disease coverage, and would thus be subject to that sublimit. However, the All Risks Policy nowhere says that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as GWU's COVID-19 losses—satisfy both the Communicable Disease coverage promise and other coverage promises. Nor does the All Risks Policy state that other coverages do not apply if the Communicable Disease coverage does.

45.     By contrast, Factory Mutual included such limiting language in other provisions within the very same All Risks Policy. For example, the provision relating to Data Programs and Software explicitly states that losses covered under that section are "excluded from coverage elsewhere in this Policy." *See, e.g.*, Exhibit A at 23–24; *see also id.* at 37 (Terrorism coverage

including identical language); *id.* at 51–52 (Off Premises Data Services Time Element coverage including identical language). Factory Mutual chose to omit that limiting language from both Communicable Disease provisions. Thus, business interruption loss for a communicable disease (if it causes physical loss or damage) is covered under the Time Element provisions even if also covered under the Communicable Disease provisions.

46.   No exclusion in the All Risks Policy precludes coverage for GWU for losses or damage due to communicable disease, including COVID-19, or due to the virus that causes COVID-19.

47.   In fact, Factory Mutual chose not to use either a pandemic or virus exclusion such as the Insurance Services Office's ("ISO") virus exclusion, which has been used by numerous insurers since 2006.

48.   ISO drafted the virus exclusion in response to the SARS pandemic, which led to millions of dollars in business interruption claims.[6] Recognizing that property and business interruption claims could result because "disease-causing agents may render a product impure (change its quality or substance), or enable the spread of the disease by their presence on interior building surfaces or the surfaces of personal property," ISO drafted an "Exclusion of Loss Due to Virus or Bacteria" and made it available to its members.

49.   As ISO explained to insurance regulators in October 2006, much as mold infestation is considered "property damage," its new exclusion was needed because "other

---

[6]      Todd C. Frankel, *Insurers Knew the Damage a Viral Pandemic Could Wreak on Businesses. So They Excluded Coverage*, WASH. POST (Apr. 2, 2020) (detailing a $16 million payment for SARS to a hotel chain under a property and business interruption policy), https://www.washingtonpost.com/business/2020/04/02/insurers-knew-damage-viral-pandemic-could-wreak-businesses-so-they-excluded-coverage/ (last visited Oct. 19, 2021).

known substances (such as rotovirus)" could be "alleged to be property damage" and "could be used in an effort to trigger other coverage, such as business income coverage."

50.     The broad "Exclusion of Loss Due to Virus or Bacteria" drafted by ISO states: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." The ISO exclusion is used in most property and business policies in the market. The ISO exclusion specifies that it applies to "all forms and endorsements," including "forms or endorsements that cover business income, extra expense or action of civil authority."

51.     Factory Mutual deliberately omitted the ISO virus exclusion from its policies, including the one it sold to GWU. A policyholder would reasonably expect that the omission of that exclusion meant something, and that Factory Mutual's decision to sell policies to insureds such as GWU using different wording meant that the All Risks Policy did not exclude losses "caused by or resulting from any virus."

52.     Another broad virus exclusion—used by other insurance companies but not used by Factory Mutual— removes coverage for "loss, damage, or expense caused directly or indirectly or resulting from . . . disease, sickness, any conditions of health, bacteria, or virus." *Boulevard Carroll Ent. Grp., Inc. v. Fireman's Fund Ins. Co.*, 2020 WL 7338081, at *1 (D.N.J. Dec. 14, 2020) (internal quotations omitted). That language further excludes virus-related losses "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *Id.* A policyholder would reasonably expect that Factory Mutual's deliberate omission of language removing coverage for "loss, damage or expense caused directly or indirectly from . . . virus" meant that physical loss and damage resulting from viruses was covered.

15

53.     Factory Mutual chose not to include the aforementioned exclusionary language in its policies.  As is relevant here, the All Risks Policy contains only a narrow "contamination exclusion," understood by insurers and policyholders alike to apply narrowly and only to "environmental pollution," as that phrase is traditionally understood.  The exclusion provides in relevant part:

> D.     This Policy excludes the following **unless directly resulting from other physical damage not excluded by this Policy:**
>
> 1)     contamination, and any **cost** due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If contamination due only to the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy, then only physical damage caused by such contamination may be insured.
>
> Ex. A at 21 (emphasis added; bolding of defined terms omitted).

54.     Because the All Risks Policy specifically covers communicable disease (such as COVID-19), this exclusion does not apply to communicable disease or any virus that causes communicable disease (such as the COVID-19 virus).

55.     The All Risks Policy defines "contamination" as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."  Ex. A at 72.  While this definition refers to "virus" and "disease causing or illness causing agent," it does not refer to "communicable disease," which is expressly covered by the All Risks Policy.  Indeed, Factory Mutual readily concedes that the exclusion does not apply to communicable diseases.  Thus, the exclusion may apply to non-communicable disease viruses (of which there are many, and which may cause

16

extensive physical loss or physical damage),[7] but it does not apply to viruses that cause communicable disease (such as COVID-19).

56.     In addition to not applying to communicable disease, the exclusion also does *not* apply to "loss" or lost revenue—the key loss at issue here. Quoting the All Risks Policy, the exclusion applies to "Contamination, and the cost of contamination . . . ." (The exclusion then goes on to give several examples of excluded "costs of contamination."). Neither the first part of the exclusion (the word "Contamination") nor the second part of the exclusion (the phrase "cost of contamination") apply to lost earnings.

57.     The first word in the exclusion, "contamination," is a defined term that refers to the "condition of property" due to that property being contaminated by certain specified substances. When property is in a contaminated "condition" (for instance, because of an environmental pollutant), it will often be worth less than before such contamination. Such diminished value due to a degraded condition would normally be covered by the All Risks Policy.[8] However, if such diminution in value results from a "condition of property" (as set forth in the definition of "contamination") caused by one of the contaminants listed in the exclusion, then that diminution in value is not covered.

58.     Nor does the second part of the exclusion—the phrase "cost of contamination"—apply to lost earnings. That phrase excludes a wide array of otherwise covered expenditures,

---

[7]     For example, the viruses that cause cholera, hantavirus, rabies, salmonella, and West Nile Disease do not satisfy the All Risks Policy's definition of "communicable disease" because they are not transmissible from human to human. Plant and landscaping viruses also cause significant damage and are not transmissible from human to human.

[8]     Specifically, the All Risks Policy's Property Damage Valuation section provides that the policyholder may recover the "selling price" of property just before the insured event (*i.e.*, just before the contamination) or the "actual cash value" (*i.e.*, how much it would cost to replace the contaminated property, less depreciation). Ex. A at 22.

most notably the money commonly spent to clean up contamination from environmental

pollutants (which can amount to very large sums). However, such costs do not include lost

revenue. A "cost" is an out of pocket amount paid out by the policyholder.[9] In contrast, a loss

of earnings is money that the policyholder never received.[10] A loss of future earnings or profits

that the insured never received due to the inability to continue normal operations is simply not

the same as expenditures paid or spent out of pocket by the insured.

59.     Neither the phrase "contamination" (*i.e.*, a "condition of a property") nor "cost

due to contamination" encompasses earning loss by the plain meaning of those phrases. Indeed,

the contamination exclusion does not mention "loss" and does not seek to exclude "loss."

Factory Mutual knew how to clearly exclude "loss," as it did so in other exclusions in the All

Risks Policy. But Factory Mutual chose not to include any such exclusion for "loss" in the

contamination exclusion in the All Risks Policy.

## II.      COVID-19 AND THE COVID-19 VIRUS CAUSE COVERED PHYSICAL LOSS AND DAMAGE.

60.     Factory Mutual itself acknowledges in its own guidance that a virus can cause

physical damage. In "Talking Points" that Factory Mutual distributed to its claim personnel,

Factory Mutual stated that "[a] virus will *typically* not cause physical damage" (emphasis added).

Putting aside the accuracy of this statement, the COVID-19 virus is not typical. The COVID-19

virus has clearly caused physical loss and damage, and has caused significant physical loss and

damage to GWU's property.

---

[9]      Black's Law Dictionary (11th ed. 2019) (defining "cost" as the "amount paid or charged for something").

[10]     Black's Law Dictionary (11th ed. 2019) (defining "loss" as the "amount of financial detriment caused by . . . an insured property's damage").

61.    But before even receiving GWU's insurance claim, Factory Mutual denied that the COVID-19 virus causes physical loss or damage to property. It did so, upon information and belief, without consulting any epidemiologists, chemists, medical doctors, or specialists in viral disease, or assessing the damage the COVID-19 virus causes to air and surfaces. Scientific research and plain observation confirm that the dangerous and potentially fatal COVID-19 virus damages and alters property, including in indoor air and surfaces, by rendering that property lost, unsafe, and unfit for normal use.

**A.    COVID-19 Is a Deadly Communicable Disease.**

62.    COVID-19 is a deadly communicable disease caused by a coronavirus known as SARS-CoV-2 (referred to herein as "SARS-CoV-2" or "the COVID-19 virus").

63.    The COVID-19 virus can cause serious systemic illness and death.[11] As of October 18, 2021, there have been over 240 million confirmed cases of COVID-19 (over 44 million of them in the United States) and over 4.8 million deaths worldwide. Due to the rapid spread and pervasive presence of COVID-19 across the planet, the COVID-19 virus was presumed to be present or imminently present everywhere.

64.    Images depict SARS-CoV-2 as looking like a golf ball with protrusions called "spike proteins," which are the main components of the virus that interact with other surfaces.[12]

---

[11]    *See* John A. Lednicky et al., *Viable SARS CoV-2 In the Air of a Hospital Room With COVID-19 Patients*, 100 INTERNATIONAL JOURNAL OF INFECTIOUS DISEASES 476 (Sept. 15, 2020), https://www.ijidonline.com/article/S1201-9712(20)30739-6/fulltext (last visited Oct. 19, 2021).

[12]    *See* Nancy Fliesler, *Capturing SARS-CoV-2's Shape-shifting Spike Protein*, Boston Children's Hospital (July 21, 2020), https://answers.childrenshospital.org/sars-cov-2-spike-protein/ (last visited Oct. 19, 2021).



65.     Not all viruses cause communicable diseases or are even harmful.  Many viruses do not infect humans, and many that do cannot be transmitted from human to human.  Further, not all viruses that cause communicable disease cause the type of loss or damage to property that the COVID-19 virus causes (making common surfaces and indoor air sufficiently dangerous as to make large gatherings unsafe without significant precautions and widely available vaccines), or prompt authorities to issue shelter in place orders or other civil restrictions.  The COVID-19 virus is a rare exception that, due to its particular nature and characteristics, meets all of these criteria:  it causes disease; the disease is communicable; it causes physical loss and damage; and has thereby led to hundreds of orders prohibiting anything other than very small gatherings (prior to the wide availability of effective vaccines).

**B.      The COVID-19 Virus Can Be Transmitted in Many Ways.**

66.     As has become known during the pandemic, the COVID-19 virus is uniquely dangerous, both due to the dangers of exposure and due to the many ways it can be transmitted, and is particularly harmful to indoor air and surfaces—both of which are property capable of being damaged.

67.     Persons with COVID-19 expel the COVID-19 virus as they talk, yell, cheer, sing, cough, sneeze, or even just breathe.  It has been reported that such individuals release tiny virus

bearing particles that can remain suspended "for indefinite periods;"[13] a single sneeze releases a cloud of viral droplets;[14] and normal breathing and talking can spread the virus six feet or more.[15] Many of these particles make contact, adhere to, and physically alter, thereby damaging, the surfaces of nearby property and the air within the property, as explained below. Infected individuals also deposit these particles by touching surfaces after touching their eyes or nose. Research has shown that because the risk of disease transmission increases substantially in enclosed environments, the COVID-19 virus poses a significant risk to indoor spaces.[16] And because the virus renders otherwise inert materials dangerous, viral contact with property, and the air within the property, means significant damage and loss.

---

[13]     Kevin P. Fennelly, *Particle Sizes of Infectious Aerosols: Implications for Infection Control*, 8 LANCET RESPIRATORY MED. 914, 914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Oct. 19, 2021).

[14]     *See* Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions*, JAMA Insights (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Oct. 19, 2021).

[15]     *See How COVID-19 Spreads*, CDC (July 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Oct. 19, 2021).

[16]     *See* Jianyun Lu et al., *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited Oct. 19, 2021); *see also* Keun-Sang Kwon et al., *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://pubmed.ncbi.nlm.nih.gov/33258335 (last visited Oct. 19, 2021); Shin Young Park et al., *Coronavirus Disease Outbreak in Call Center, South Korea*, 26 EMERGING INFECTIOUS DISEASES, 8 (Aug. 2020), https://wwwnc.cdc.gov/eid/article/26/8/20-1274_article (last visited Oct. 19, 2021); Lea Hamner et al., *High SARS-CoV-2 Attack Rate Following Exposure at a Choir Practice — Skagit County, Washington, March 2020*, 69 MORBIDITY AND MORTALITY WEEKLY REPORT 19 (May 15, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e6.htm (last visited Oct. 19, 2021); Leah F. Moriarty et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships—Worldwide, February-March 2020*, 69 MORBIDITY AND MORTALITY WEEKLY REPORT 12 (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Oct. 19, 2021).

68.     Expelled respiratory secretions typically take on two main forms:  (1) droplets of

respiratory fluids containing the virus, and (2) aerosol particles (also called "droplet nuclei") that

likewise contain the virus.  In addition to the virus, both droplets of respiratory fluids and droplet

nuclei largely consist of water and mucus.  Droplet nuclei are usually smaller than 5 microns,

invisible to the naked eye, and remain suspended in the air ("aerosolized") for significant

periods.  Droplets are similarly invisible to the naked eye, but due to their larger size, they

typically come to rest on nearby surfaces.  We refer herein to droplets of respiratory fluids and

droplet nuclei as "viral droplets."

69.     It has been reported that the incubation period for COVID-19—*i.e.*, the time

between exposure to the COVID-19 virus and symptom onset—can be up to 14 days,[17] and other

sources recognize the potential for longer "pre-symptomatic" periods.  Recent studies have found

that "viral loads"—that is, the concentration of virus in an infected person—in pre-symptomatic

individuals can be even higher than the viral loads among symptomatic individuals.[18]  The

Centers for Disease Control and Prevention ("CDC") estimates that 30% of infected individuals

never show symptoms of infection (called "asymptomatic" carriers).[19]  Similar to pre-

symptomatic individuals, the viral loads of asymptomatic individuals can be higher than the

---

[17]     *See Coronavirus Disease 2019 (COVID-19) Situation Report—73*, World Health Organization (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf (last visited Oct. 19, 2021).

[18]     *See* Melissa M. Arons et al., *Presymptomatic SARS-CoV-2 Infections and Transmission in a Skilled Nursing Facility*, NEW ENGLAND JOURNAL OF MEDICINE (Apr. 24, 2020), https://www.nejm.org/doi/full/10.1056/NEJMoa2008457 (last visited Oct. 19, 2021); Monica Ghandi et al., *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19* (Apr. 24, 2020), https://www.nejm.org/doi/full/10.1056/nejme2009758 (last visited Oct. 19, 2021).

[19]     *See COVID-19 Pandemic Planning Scenarios*, CDC (Mar. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited Oct. 19, 2021).

loads among symptomatic carriers.[20] The CDC estimates that the majority of COVID-19

transmission results from pre- and asymptomatic carriers.[21] The CDC estimates that the number

of people in the United States who have been infected with COVID-19 is likely to be 10 times

higher than the number of reported cases.[22] For example, in June 2020—shortly after GWU was

forced to cease in-person learning—the CDC estimated that the number of people infected with

COVID-19 was 10 times greater than the 2.4 million cases reported at the time.[23] The extent of

the damage the COVID-19 virus can cause to air and surfaces has become apparent, in part,

through retrospective analysis of events held in the early days of the pandemic that were later

determined to have caused the widespread proliferation of COVID-19.[24]

      70.    One need look no further than various reported "superspreader" events to

understand the damage the COVID-19 virus causes to air and surfaces—absent various

---

[20]    *See supra* note 18.

[21]    *See* Michael A. Johansson et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Network (Jan. 7, 2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707 (last visited Oct. 19, 2021); *see also* Seyed M. Moghadas et al., *The Implications of Silent Transmission for the Control of COVID-19 Outbreaks*, 117 PNAS 17, 513 (July 28, 2020), https://www.pnas.org/content/117/30/17513 (last visited Oct. 19, 2021).

[22]    Lena H. Sun and Joel Achenbach, *CDC Chief Says Coronavirus Cases May Be 10 times Higher Than Reported*, WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited Oct. 19, 2021).

[23]    *Id.*

[24]    *See, e.g.*, Lea Hamner et al., *supra* note 16; Roni Caryn Rabin, *C.D.C. Traces Covid Outbreaks in Gyms, Urging Stricter Precautions*, N.Y. TIMES (Feb. 24, 2021), https://www.nytimes.com/2021/02/24/health/coronavirus-gyms-outbreaks.html (last visited Oct. 19, 2021); Ian Pray et al., *COVID-19 Outbreak at an Overnight Summer School Retreat — Wisconsin, July–August 2020*, 69 MORBIDITY AND MORTALITY WEEKLY REPORT 43, 1600-04 (Oct. 30, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6943a4-H.pdf (last visited Sept. 20, 2021); Jacob E. Lemieux et al., *Phylogenetic analysis of SARS-CoV-2 in Boston highlights the impact of superspreading events*, SCIENCE (Dec. 10, 2020), https://pubmed.ncbi.nlm.nih.gov/33303686/ (last visited Oct. 19, 2021).

mitigation efforts and now the vaccine—and the resulting harm to humans.[25]  For example, a single international biotechnology conference held in Boston, Massachusetts, in February 2020 is estimated to have caused up to 300,000 cases of COVID-19 in the United States and abroad.[26] GWU had to discontinue in-person learning (which requires the sharing of air and surfaces) and dorm-living (which also requires the sharing of air and surfaces) to prevent that type of spread at GWU.

### C.   The COVID-19 Virus Causes Physical Loss And Damage, in Part by Rendering Air and Property Unsafe and Unusable.

71.    The COVID-19 virus directly causes physical loss and damage to property by, among other things: (1) physically altering both indoor air and property surfaces, making them unfit for their intended use, and (2) altering the molecular structure of, and changing from safe to dangerous, the physical surfaces of otherwise inert property.[27]

72.    COVID-19 and the COVID-19 virus were present at GWU's academic and nonacademic buildings, residence halls, dining facilities, athletic facilities, and other insured locations, and caused all of these types of physical loss and damage to those  insured locations. As a result, GWU was unable use its properties for their intended purpose—to provide a residential, in-person college education, for faculty to conduct research in GWU facilities, and for clinical physicians to see patients in-person—for significant portions of 2020 and 2021, absent extensive repairs and remedial measures and, now, the wide availability of effective vaccines.  In fact, the presence of COVID-19 and the COVID-19 virus, and the physically

---

[25]    *See, e.g.,* Hamner et al., *supra* note 16; Rabin, *supra* note 24; Pray et al., *supra* note 24.

[26]    *See* Lemieux et al., *supra* note 24.

[27]     Edris Joonaki et al., *Surface Chemistry Can Unlock Drivers of Surface Stability of SARS-CoV-2 in a Variety of Environmental Conditions,* 6 NATIONAL LIBRARY OF MEDICINE 9 (Sept. 10, 2020), https://pubmed.ncbi.nlm.nih.gov/32838053/ (last visited Oct. 19, 2021).

deleterious effects they have on closed-air spaces and property, caused civil authorities to impose

unprecedented restrictions, prohibiting large gatherings, which made in-person instruction and

fan attendance at collegiate sporting events, among other things, impossible.

### 1. The COVID-19 Virus Damages Air in Enclosed Spaces.

73.     As set forth above, studies have shown that the COVID-19 virus physically alters

the air—particularly indoor air—rendering it unsafe. *See supra* Paragraphs 71–82. The COVID-

19 virus changes the chemical composition of air. Specifically, air is a combination of a number

of gases (nitrogen, oxygen, carbon dioxide and others), liquids (water vapor, other aerosols) and

solids (dust, particulates from car engines and the like). The content and composition of the air

changes when viral droplets are expelled into it. That change amounts to, and the lay person

would understand it to amount to, damage.

74.     COVID-19 virus studies have also found that the virus can spread through the air

and settle on surfaces. One study found that air flow caused by an HVAC system likely led to

virus deposits in places where immobile patients did not go, such as under the bed or on the

windowsill.[28] Based on "epidemiological evidence suggestive of [COVID-19 virus]

transmission through aerosol,"[29] the Environmental Protection Agency ("EPA"), the

Occupational Safety and Health Administration ("OSHA"), and the CDC called for the

modification of ventilation and HVAC systems by, for example, increasing ventilation with

---

[28]     *See* Joshua L. Santarpia, et al., *Aerosol and Surface Contamination of SARS-CoV-2 Observed in Quarantine and Isolation Care*, Scientific Reports (July 29, 2020), https://www.nature.com/articles/s41598-020-69286-3 (last visited Oct. 19, 2021); Yuan Liu et al., *Aerodynamic Analysis of SARS-CoV-2 in Two Wuhan Hospitals*, 582 NATURE 557 (Apr. 27, 2020), https://www.nature.com/articles/s41586-020-2271-3 (last visited Oct. 19, 2021).

[29]     *Indoor Air and COVID-19 Key References and Publications*, United States Environmental Protection Agency (2021), https://www.epa.gov/coronavirus/indoor-air-and-covid-19-key-references-and-publications (last visited Oct. 19, 2021) (capitalization omitted).

outdoor air.[30] Similarly, the Epidemic Task Force for the American Society of Heating, Refrigerating, and Air Conditioning Engineers—which is the professional society for experts in building air engineering—recommended increasing ventilation rates, increasing use of clean "outdoor air," "flushing" the air in spaces between occupied periods, and using filters or air cleaners at or above a certain grade to remove virus from building air.[31] Medical researchers have advised that specialized air filtration systems be used to restore the air to its pre-COVID-19 infected state.[32] The purpose of these suggestive measures is to attempt to physically restore the composition of the air by, among other things, diluting the concentration of virus particles or by trapping and removing them.

### 2. The COVID-19 Virus Physically Damages and Alters Otherwise Safe Surfaces.

75. The COVID-19 virus damages property—including at GWU's insured locations—by adhering to and altering the structure of its surface. Specifically, it has been reported that the virus changes the surfaces of that property as its spike proteins become entangled with, bound to, and part of the molecular surface of the materials with which it comes

---

[30]    *Indoor Air and Coronavirus* (COVID-19), United States Environmental Protection Agency (2020), https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19 (last visited Oct. 19, 2021); *COVID-19 Employer Information for Office Buildings*, Centers for Disease Control (Apr. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/office-buildings.html (last visited Oct. 19, 2021); *Guidance on Preparing Workplaces for COVID-19*, Occupational Safety and Health Administration (2020), https://www.osha.gov/Publications/OSHA3990.pdf (last visited Oct. 19, 2021).

[31]    ASHRAE Epidemic Task Force, Core Recommendations for Reducing Airborne Infectious Aerosol Exposure (2021), https://www.ashrae.org/file%20library/technical%20resources/covid-19/core-recommendations-for-reducing-airborne-infectious-aerosol-exposure.pdf (last visited Oct. 19, 2021).

[32]    Zeynep Tufekci, *We Need to Talk About Ventilation*, THE ATLANTIC (July 30, 2020), https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairbornetransmission/614737/ (last visited Oct. 19, 2021).

into contact. When that happens, the surfaces change in scientifically measurable and quantifiable ways. Moreover, as studies have shown, these materials then become infectious when touched, making them unfit for use.[33] This is a form of physical damage.

76. Different surfaces are comprised of different molecules, and the differences in the molecular makeup of surfaces impacts the ability, or inability, of viruses in general to interact with, bind to, and physically change those surfaces. The molecules of the spike protein and its glycan shield—a sugary barrier that helps the virus evade the immune system—however, can interact with and bind to many different types of surfaces, meaning they can impair new surfaces quickly.

77. In particular, the virus and its spike protein can bind to surfaces of common objects, including those found in GWU's insured locations, through noncovalent interactions such as electrostatic interaction, hydrogen bonding and van der Waals forces. Such bonds create new molecular species that have markedly different properties and physical characteristics than the original components. In the case of the COVID-19 virus, the virus will bind to metals, plastics and woods through all these various types of noncovalent interactions, and this process creates a new surface on those materials, a surface with quantifiably different physical properties, particularly if the property already has other materials (sweat, skin oil or the like) on its surface.

78. Studies by the National Institutes of Health ("NIH") and other researchers have found that the COVID-19 virus remains viable—*i.e.*, capable of infecting persons who come in contact with it—for at least seven days on a range of common surfaces (glass, stainless steel, and

---

[33] Similar deposits of viral droplets on surfaces could be made by an infected person through touching (*e.g.*, sneezing or coughing into hand and then grabbing a railing).

money) left at room temperature,[34] and parts of the virus can remain for far longer, even after cleaning.

79.     Surfaces already infected by the COVID-19 virus can further spread the virus. This mode of transmission—via objects and surfaces—is known as "fomite transmission." Fomite transmission has been demonstrated as a highly efficient mode of transmission for viruses, to spread both from object-to-hand and from hand-to-mouth.[35] Studies have shown fomites transform the surface of property into a potentially deadly COVID-19 virus transmission vector.[36]

80.     The WHO has described fomite transmission as follows:

> Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites . . . .. Viable SARS-CoV-2 virus and/or RNA . . . can be found on those surfaces for periods ranging from hours to days, depending on the ambient environment (including temperature and humidity) and the type of surface, . . . . Therefore, transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person . . . .[37]

---

[34]     *See* Shane Riddell et al., *The Effect of Temperature on Persistence of SARS-CoV-2 on Common Surfaces*, 17 VIROLOGY J. 145 (Oct. 7, 2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited Oct. 19, 2021); Guenter Kampf et al., *Persistence of Coronaviruses on Inanimate Surfaces and Their Inactivation with Biocidal Agents*, 104 J. OF HOSPITAL INFECTION 3 (Feb. 6, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited Oct. 19, 2021).

[35]     Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Oct. 19, 2021).

[36]     Avery Meiksin, *Dynamics of COVID-19 Transmission Including Indirect Transmission Mechanisms: A Mathematical Analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 23, 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-ofcovid19-transmission-including-indirect-transmission-mechanisms-a-mathematicalanalysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited Oct. 19, 2021).

[37]     *Transmission of SARS-CoV-2: Implications for Infection Prevention Precautions*, World Health Organization (July 9, 2020), https://www.who.int/news-

81.    In addition to the studies cited by the WHO, numerous other articles have acknowledged fomites as a mode of virus transmission, including:  (1) a study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall;[38] (2) a NIH study finding that the COVID-19 virus survives for extended periods on copper, plastic, and stainless steel, and suggesting that people may contract the virus through the air and after touching contaminated objects;[39] and (3) a CDC research letter concluding that "fomite transmission might be an important source of risk for SARS-CoV-2."[40]

82.    While vaccines, masks, and personal protective equipment help reduce the risk of fomite transmission, effective prevention or reduction of fomite transmission also requires "a comprehensive package of preventive measures" and extraordinary "environmental cleaning and disinfection."[41]  CDC guidance recommends the sanitization of public surfaces.[42]  Critically, it has been reported that ordinary disinfection aimed at cleaning the virus cannot entirely and adequately remove the virus, as portions of the virus remain, and thus the physical impacts of the

---

room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Oct. 19, 2021).

[38]    Cai et al., *supra* note 35.

[39]    *New Coronavirus Stable for Hours on Surfaces*, National Institutes of Health (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited Oct. 19, 2021).

[40]    Alicia Kraay et al., *Risk for Fomite-Mediated Transmission of SARS-CoV-2 in Child Daycares, Schools, Nursing Homes and Offices*, 27 EMERGING INFECTIOUS DISEASES 4 (Apr. 2021), https://pubmed.ncbi.nlm.nih.gov/33755002/ (last visited Oct. 19, 2021).

[41]    *Supra* note 37.

[42]    *See, e.g.*, *Guidance for Cleaning and Disinfecting, Public Spaces, Workplaces, Businesses, Schools, and Homes*, Centers for Disease Control (Sept. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/pdf/reopening_america_guidance.pdf (last visited Oct. 19, 2021).

virus on surfaces remain.[43]  As the CDC explained, although cleaning and disinfection procedures may help "reduce" fomite transmission risk, at least one study had found that "surface disinfection once- or twice-per-day had little impact on reducing estimated risks."[44]

## III.   GWU SUFFERED THE TYPES OF LOSSES THE ALL RISKS POLICY INSURES AGAINST.

83.   The physical loss and damage caused by COVID-19 and the COVID-19 virus described in the preceding paragraphs occurred at GWU's academic buildings, residence halls, dining facilities, athletic facilities, and other insured locations.

84.   GWU's revenue depends in large part on tuition payments, housing contracts, meal plans, on-campus events, and other costs associated with students living, learning, playing, and working on campus.

85.   GWU sustained significant physical damage to and loss of its property as a result of the COVID-19 virus (*see* Section III.A below), and that physical damage and loss resulted in the loss of significant revenue and forced GWU to undertake significant, costly steps to resume and continue operations (*see* Section III.B below).  In addition, as a result of property damage and loss proximate to GWU's property, local governments issued orders that prevented or curtailed GWU's operations (*see* Section III.C below).

---

[43]       Nicolas Castaño et al., *Fomite Transmission and Disinfection Strategies for SARS-CoV-2 and Related Viruses*, Cornell University (May 23, 2020), https://arxiv.org/abs/2005.11443 (last visited Oct. 19, 2021).

[44]       Centers for Disease Control *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, (Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (last visited Oct. 19, 2021).

A.      **GWU's Insured Properties Suffered Physical Loss and Damage**

86.     As detailed below, numerous individuals infected with COVID-19 were present at GWU's insured properties.

87.     Reported local prevalence rates in the District of Columbia, Maryland, and Virginia demonstrate that the COVID-19 virus reached materially dangerous levels by early 2020. Since the start of the pandemic in March 2020, the District of Columbia has had over approximately 62,000 reported cases of COVID-19 and over 8,900 deaths; Maryland has had over approximately 550,000 reported cases of COVID-19 and over 9,000 deaths; and Virginia has had over 900,000 reported cases of COVID-19 and over 10,500 deaths.[45]

88.     Furthermore, these reported prevalence rates significantly understate actual prevalence of COVID-19 in the District of Columbia, Maryland, and Virginia given limited testing and other logistical issues, particularly in the early days of the pandemic. The COVID-19 virus was circulating in the United States earlier than initially reported. A retrospective serological study across nine U.S. states found antibodies for the COVID-19 virus in blood samples taken between December 13 to December 16, 2019.[46] Thus, there were likely many more people infected in the early stages of the COVID-19 pandemic than had been reported, but

---

[45]     *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2021/us/covid-cases.html (last visited Oct. 19, 2021).

[46]     *See* Sridhar V. Basavaraju et al., *Serologic Testing of US Blood Donations to Identify Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2)–Reactive Antibodies: December 2019–January 2020*, 72 CLINICAL INFECTIOUS DISEASES 12 (Nov. 30, 2020), https://academic.oup.com/cid/article/72/12/e1004/6012472 (last visited Oct. 19, 2021); *see also* Keri N. Althoff et al., *Antibodies to Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) in All of Us Research Program Participants, 2 January to 18 March 2020*, CLINICAL INFECTIOUS DISEASES (June 15, 2021), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciab519/6294073 (last visited Oct. 19, 2021).

at that time, scientists lacked both the means to detect them and an understanding of the need to do so.[47]

89.     Between January 1, 2020 and March 13, 2020, approximately 19,500 students attended GWU's campuses in Washington, D.C. and Virginia.

90.     Infectious individuals can release significant amounts of the virus, and as explained above (*see supra* Paragraphs 66–70), release of the virus was present at, damaged and caused the loss of property at GWU likely before but certainly by March 17, 2020.

91.     Some examples of the instances in which infectious individuals were present at GWU's properties are detailed below.

92.     For example, on March 17, 2020, GWU was made aware of a teaching assistant who had tested positive for COVID-19. Prior to this positive test, and while infectious, the teaching assistant had been in at least six campus buildings. As a result, GWU notified approximately 200 faculty, staff, and students of potential exposure.

93.     In addition, upon information and belief, numerous infectious individuals were present at other insured properties owned or used by GWU, causing damage to and loss of those properties as well. For example, from March to June of 2020, numerous specific students and staff located in Ross Hall, Thurston Hall, Phillips Hall, Munson Hall, Somers Hall, Francis Scott Key Hall, the Smith Center, the Law School, the Webb Building, 1957 Eye Street NW, and 805 21st Street NW (among other insured locations) tested positive for COVID-19. The results of these tests have previously been furnished to Factory Mutual.

---

[47]     *Id.*

32

94.     Additionally, the Foggy Bottom-GWU metro station is located on GWU's campus. In February 2020 alone, over 19,000 people used this metro stop on a daily basis.[48]  The George Washington University Hospital and The GW Medical Faculty Associates ("MFA") also have facilities located on GWU's campus and had numerous confirmed COVID-19 cases on-site.

95.     Because numerous infectious individuals carried the COVID-19 virus in and onto each of GWU's campuses, i.e., in and onto insured properties, each of those properties sustained physical loss and damage.  In particular, while on the insured properties, numerous infectious individuals (through such activities as breathing, talking, coughing, shouting, and touching) expelled and/or spread the COVID-19 virus into the air and onto the surfaces of the insured properties.  That in turn led to the virus (a) physically altering both the indoor air and surfaces of the insured properties, (b) changing such properties from a safe condition to a condition that was unsafe for normal use, and (c) making such properties physically unfit for their intended use (all as more fully explained in Paragraphs 83–102).

96.     Had GWU continued to provide in-person instruction, the air and surfaces in the insured properties would have continually been infected and would have been unsafe.  And because until only recently GWU had not been able to open its campus to students, faculty, and staff, without an influx of COVID-19 and the COVID-19 virus, its insured properties have been physically harmed and physically unavailable for use for their intended purpose or safe occupancy, all of which led to precisely the lost revenue that are insured by the All Risks Policy.

---

[48]     *See Rail Ridership Data Viewer,* Washington Metropolitan Area Transit Authority, https://www.wmata.com/initiatives/ridership-portal/Rail-Data-Portal.cfm (last visited Oct. 19, 2021).

**B.     The COVID-19 Virus Damage Forced GWU to Repair and Restore Its Property and to Take Expensive Measures to Mitigate Its Losses.**

97.     As discussed above in Section II.C, the CDC, the EPA, and OSHA have recommended severe and dramatic interventions to protect people from coming into contact with air and material surfaces containing COVID-19 droplets and aerosol particles.  Further, since the onset of the pandemic, GWU has been working diligently to establish and implement health and safety protocols that follow guidelines established by the CDC, EPA, OSHA, and the D.C. Department of Health.  GWU had to implement these and other measures to reduce the amount of the COVID-19 virus present in and on its insured properties and attempt to make its property safe for its intended use.

98.     Restoration of GWU's properties to address the physical loss and damage caused by COVID-19 and the COVID-19 virus included far more than simple cleaning.  Rather those steps included many physical alterations and repairs such as installation of Plexiglas barriers, installation of new, or modification of, HVAC systems, installation of sanitization stations, and changes in the properties' physical configuration.  These are precisely the types of repairs that have been recommended by public health and scientific authorities,[49] and they were necessary to

---

[49]     *See, e.g., Guidance on Preparing Workplaces for COVID-19, supra* note 30 (recommending installing physical barriers such as clear plastic sneeze guards, providing "no-touch" options for items such as trash cans, providing disinfecting products for workers to clean their work surfaces, installation of high-efficiency air filters, increasing ventilation rates, and minimizing contact among workers, clients, and customers); *Core Recommendations for Reducing Airborne Infectious Aerosol Exposure, supra* note 31 (recommending use of filters and air cleaners to achieve MERV 13 of better levels of performance for air recirculation, and mixing of space air without causing strong air currents that increase direct transmission from person-to-person); Environmental Protection Agency, *Implementing a Layered Approach to Address COVID-19 in Public Indoor Spaces,* https://www.epa.gov/coronavirus/implementing-layered-approach-address-covid-19-public-indoor-spaces (last visited Oct. 19, 2021) (recommending, among other things, increasing outside-air ventilation, increasing air filtration, adjusting or reconfiguring air flows, placing portable air cleaners in areas that are hard to ventilate with outside air or that have high density or occupancy, space reconfiguration efforts, installation of

make the properties ready for operations at the same or similar physical and operating conditions

as had existed prior to the damage and loss caused by the presence of the COVID-19 virus on the

surfaces in those properties and in the air at those properties.

99.     GWU made adjustments to HVAC systems to align its buildings with CDC

recommendations for building reopenings and industry-leading guidance from the American

Society of Heating, Refrigerating and Air-Conditioning Engineers for ventilation, filtration and

air exchange. GWU also installed high-efficiency particulate air (HEPA) filters in certain

buildings. Finally, GWU performed full-building air flushes prior to students returning to

campus for the start of the 2021–2022 academic year.[50]

100.    GWU also physically altered interior spaces at its insured properties to mitigate

the spread of COVID-19, and attendant property damage and loss by, including, but not limited

to, installing protective Plexiglas partitions, installing hand sanitizer stations, and reconfiguring

layouts of common areas.

101.    In order to reopen its campuses for in-person instruction for the 2021–2022

academic year, GWU issued a number of protocols to keep students, faculty, and staff safe,

including requiring that all students, faculty, staff, and visitors be fully vaccinated unless deemed

---

partitions or transparent barriers, hand hygiene, and cleaning or disinfection); *Indoor Air and Coronavirus (COVID-19)*, *supra* note 30 (recommending "increasing ventilation with outdoor air and air filtration" as well as "physical distancing, wearing cloth face coverings or masks, surface cleaning, handwashing, and other precautions"); World Health Organization, *Coronavirus disease (COVID-19): Cleaning and Disinfecting Surfaces in Non-Health Care Settings* (May 16, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/coronavirus-disease-covid-19-cleaning-and-disinfecting-surfaces-in-non-health-care-settings (last visited Oct. 19, 2021) (recommending that high-touch surfaces including countertops, bathroom surfaces, toilets, and taps be prioritized for disinfection).

[50]     *Update on Campus Facilities, Health and Safety*, The George Washington University (June 7, 2021), https://coronavirus.gwu.edu/update-campus-facilities-health-and-safety (last visited October 19, 2021).

exempt; requiring that face masks be worn inside all buildings; and requiring that vaccinated individuals be tested every two weeks and exempt individuals be tested every week.[51]

102. GWU has incurred substantial expenses to implement such repairs and modifications to its insured properties as a result of the COVID-19 virus. These extra expenses are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

## C. Government Orders Resulting From Viral Damage Prevented In-Person Learning.

103. To protect individuals from coming into contact with surfaces and air damaged by and containing the COVID-19 virus, local governments across the United States issued orders prohibiting or limiting all non-essential public and private gatherings. Those orders restricted GWU from offering its prior in-person living and learning experience for its students, faculty, and staff, *i.e.*, from using and accessing GWU's property. Below is a survey of certain relevant orders in D.C. and Virginia.

104. **The District of Columbia**, on March 11, 2020, declared a public health emergency and recommended all non-essential mass gatherings be cancelled or postponed.[52] On the same day, the World Health Organization classified COVID-19 as a pandemic.[53] By March 12, 2020, D.C. had ten known positive cases of COVID-19 (though given significant testing

---

[51] *Campus Health*, The George Washington University, https://onward.gwu.edu/campus-health (last visited October 19, 2021).

[52] *Mayor Bowser Declares Public Health Emergency*, Executive Office of the Mayor (Mar. 11, 2020), https://mayor.dc.gov/release/mayor-bowser-declares-public-health-emergency (last visited Oct. 19, 2021).

[53] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 - 11 March 2020*, World Health Organization (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Oct. 19, 2021).

limitations and pre- and asymptomatic carriers, actual numbers were almost certainly much higher).[54] On March 13, 2020, the DC Department of Health prohibited mass gatherings, defined as events bringing more than 250 persons together, including at an "auditorium, theatre . . . large cafeteria, or any other confined indoor or confined outdoor space."[55] On March 17, 2020, the DC Department of Health issued guidance that "[i]n addition to halting all hospital elective procedures, [the Department] is recommending that ALL elective medical procedures, non-urgent hospital and outpatient visits, and non-urgent dental procedures be postponed."[56] Subsequent orders issued throughout 2020 and into 2021 continued to prohibit mass gatherings, and closed all non-essential businesses.[57]

105.    On March 24, 2020, D.C.'s Mayor, Muriel Bowser, further prohibited gatherings of ten or more people because the scientific evidence showed "that the most effective approach to slowing the community transmission of communicable diseases like COVID-19 is through limiting public activities and engaging in social distancing."[58] The Mayor's March 24, 2020

---

[54]    *See* Government of the District of Columbia, *Coronavirus Data Update: March 15* (Mar. 15, 2020), https://coronavirus.dc.gov/release/coronavirus-data-update-march-15 (last visited Oct. 19, 2021).

[55]    *Notice of Emergency Rulemaking*, Department of Health, District of Columbia (Mar. 13, 2020), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/release_content/attachments/DOH_Rulemaking_Mass-Gatherings.pdf (last visited Oct. 19, 2021).

[56]    *Recommendations on Limitations of Elective and Non-Urgent Medical and Dental Procedures*, Department of Public Health, District of Columbia (Mar. 17, 2020), https://dchealth.dc.gov/sites/default/files/dc/sites/doh/page_content/attachments/Letter%20-%20Elective%20Procedures.FINAL_.pdf (last visited Oct. 19, 2021).

[57]    *See, e.g., Mayor's Order 2020-053*, District of Columbia (Mar. 24, 2020) https://coronavirus.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-053%20Closure%20of%20Non-Essential%20Businesses%20and%20Prohibiti....pdf (last visited Oct. 19, 2021).

[58]    *Id.*

37

order required nonessential businesses to close and required "essential businesses" permitted to remain open to follow "Social Distancing Requirements" including "[r]egular cleaning [of] high-touch surfaces."[59] That is, restoring damaged, infectious property to a safe state. The same March 24, 2020 order defined colleges and universities as essential businesses only for the purposes of "[f]acilitating distance learning and facilitating distance operations; or [m]odifying facilities to provide support for addressing COVID-19 or providing support for efforts to address the public emergency and public health emergency declared by the Mayor."[60] Under this order, GWU was prohibited from offering in-person instruction.

106. **Virginia**, by March 22, 2020, had 219 known positive cases of COVID-19.[61] On March 23, 2020, Governor Northam began closing public access to non-essential businesses and restricted gatherings to fewer than ten people.[62] These orders also required businesses to adhere to "enhanced sanitizing practices on common surfaces"[63] to protect people from touching damaged, infectious surfaces.

107. Each such order was issued to, among other things, keep people from coming into contact with damaged property, *i.e.*, property whose surfaces had been altered by the

---

[59]    *See id.*

[60]    *Id.*

[61]    Laura Taylor, *219 Total Coronavirus Cases Confirmed in Virginia*, WSET (Mar. 22, 2020), https://wset.com/news/coronavirus/3-deaths-and-219-total-coronavirus-cases-confirmed-in-virginia (last visited Oct. 19, 2021).

[62]    *See, e.g.*, *Executive Order Number Fifty-Three (2020)*, Commonwealth of Virginia Office of the Governor (Mar. 23, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf (last visited Oct. 19, 2021).

[63]    *Id.*

attachment of the COVID-19 virus or viral droplets, rendering that property unfit for its intended purpose. *See, e.g., supra* Section II.

108.    Government orders prevented GWU from offering in-person instruction for the remainder of the 2019–2020 academic year.  These orders have prohibited, limited, restricted, or impaired access to GWU's insured properties, precluding in-person academic instruction and any other events from occurring under pre-COVID-19 conditions.

109.    Physical damage caused by COVID-19 and the COVID-19 virus to property in and around GWU's insured properties, including the Foggy-Bottom GWU metro station and George Washington University Hospital, made travel difficult and dangerous in and around GWU's campuses.  In particular, the risk of coming into contact with property that had COVID-19 and the COVID-19 virus on its surface created meaningful risks and made traveling to and from GWU's property nearly impossible.

### D.      In Short, COVID-19 and the COVID-19 Virus Caused Physical Loss and Damage to GWU's Insured Locations for Three Independent Reasons.

110.    COVID-19 and the COVID-19 virus caused physical loss and damage to GWU's insured locations for three independent reasons, each of which independently caused substantial physical loss and damage, and each of which also combined with the others to worsen and exacerbate the physical loss and damage.  First, as described above, due to the presence of numerous infectious persons, COVID-19 aerosols and viral droplets were present in large numbers at insured locations, and this presence caused substantial physical loss and damage to air, surfaces and interior spaces of the insured locations, including physical alterations to such air, surfaces and interior spaces.  Such physical loss and damage, and the processes and mechanisms that caused such loss and damage, are described in detail in Paragraphs 71–82.

111.    Second, had GWU allowed students, faculty, and staff back into its insured properties during the relevant time periods (prior to the widespread use of vaccines and other mitigation measures described above), it is certain that COVID-19 and the COVID-19 virus would have been reintroduced in large quantities into these insured locations, and additional and substantial physical loss and damage (of the same type and in the same manner as described above) would have followed.  For this reason, GWU was not able to allow a comprehensive, in-person living and learning experience during the above mentioned periods, and this caused GWU to lose the physical functionality of its insured locations.  Stated differently, due to the external and unforeseen peril of COVID-19 and the COVID-19 virus, such locations were not able to be used for their intended purposes during such periods, and this constituted physical loss and damage to such locations.

112.    Third, as detailed in Paragraphs 103–109, numerous government orders further prevented GWU from offering in-person instruction during the 2019–2020 academic year. These government orders were mandatory—GWU had no choice but to cease all in-person learning.  Thus, these orders also caused GWU to lose the physical functionality of its insured locations, and such locations were not able to be used for their intended purposes during such periods.

## IV.    GWU SUFFERED HUNDREDS OF MILLIONS OF DOLLARS IN LOSSES.

113.    COVID-19 and the COVID-19 virus devastated GWU, causing widespread physical loss and damage that resulted in hundreds of millions of dollars in losses.  Because it depends upon using its properties to provide an in-person living and learning experience, GWU bought insurance to protect itself against the financial consequences (including the loss of revenue and extra expenses) resulting from the inability to provide such in-person instruction

after loss or damage sustained at their properties *and* against the costs of restoring such damaged property.

114.    GWU earns revenue from providing an in-person academic experience, including from tuition, room and board costs, rent from vendors, income from school stores and eateries, conferences, graduation expenses, reunions, and other campus services and ceremonies—all of which rely on students, faculty, staff, and visitors being present on campus.  GWU also earns revenue by offering a number of residential summer programs to high school students and providing housing for the large number of interns that move to D.C. every summer.  These summer programs and housing were impossible for GWU to offer because of COVID-19 and the COVID-19 virus.  Finally, GWU earns revenue from the MFA, the largest academic physician practice in the metro D.C. area, which was forced to cancel patient appointments and elective procedures because of COVID-19 and the COVID-19 virus.  Combined, the foregoing revenues make up a significant portion of GWU's income.

115.    The COVID-19 virus—and the damage to and loss of property it caused—forced GWU to close its campuses to students, faculty, staff, and visitors.

116.    As a result of the lack of in-person instruction, many students chose not to continue their education at GWU, leading to a reduction in enrollment and significant losses.

117.    Because of COVID-19 and the COVID-19 virus, the resulting difficulty and dangers traveling to or from GWU's insured properties, and the associated government orders, GWU could not offer in-person undergraduate, and most graduate, instruction until the Fall 2021 semester.

118.   Because of COVID-19 and the COVID-19 virus, the MFA also suffered

significant losses from their inability to offer elective procedures and a significant decline in

patient appointments.

## V.   THE ALL RISKS POLICY COVERS GWU's LOSSES.

119.   As set forth in the attached copy of the All Risks Policy, GWU and its

subsidiaries are insured under the All Risks Policy.  *See* Ex. A at 8.

120.   Each entity seeking insurance coverage with respect to insured properties is

insured under the All Risks Policy.

121.   As described above, GWU suffered material physical loss and damage to property

insured by the All Risks Policy.  As explained in Sections V.A to V.F below, these losses fall

within the coverage promises of the All Risks Policy.

122.   GWU gave timely notice of its claims under Policy No. 1056630.

123.   GWU paid the full premium for Policy No. 1056630.

124.   GWU has satisfied, is excused from performing, or Factory Mutual has waived or

is estopped from insistence upon performance of, all conditions of the All Risks Policy,

including but not limited to payment of required premiums, provision of timely notice of claim,

and submission of a final Proof of Loss.

125.   The All Risks Policy provides several types of coverage that insure GWU's

massive losses relating to COVID-19.  As detailed below, these include coverages for:

(a) property damage and for the costs to repair property; (b) lost income (called Time Element)

losses and extra expenses resulting from physical loss or damage to property; (c) losses due to

orders of civil authority issued due to COVID-19; (d) losses caused by the inability to access

insured properties due to nearby viral property damage and loss; and (e) losses covered by other

provisions of the All Risks Policy.

126.    GWU's losses are not limited to the Communicable Disease coverage extensions in the All Risks Policy. The All Risks Policy nowhere says that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as GWU's COVID-19 losses—satisfy both the Communicable Disease coverage promise and other coverage promises. Losses that fall under, and are able to satisfy the requirements of, both the coverage for Time Element losses and the coverage for communicable disease are covered by *both*.

A.    **The All Risks Policy Covers GWU's Property Damage and Repair Costs.**

127.    The All Risks Policy specifically "insures" the "Real Property" and "Personal Property" of GWU and its entities "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE." As explained above, the COVID-19 virus caused physical loss and damage to both real and personal property of GWU.

128.    In the event of such damage to or loss of insured property, the All Risks Policy promises that Factory Mutual will pay GWU "the cost to repair" that property or alternatively, will pay GWU the "actual cash value" of such property if it "is useless to the Insured," *i.e.*, the policyholders. In addition, the All Risks Policy promise that Factory Mutual will pay for the "reasonable and necessary costs incurred for the temporary repair of insured physical damage to insured property . . . and to expedite the permanent repair or replacement" thereof. As explained above, the COVID-19 virus caused physical loss and damage to both real and personal property of GWU.

129.    The All Risks Policy covers those restoration steps necessary to return the property to the "operating capacity that existed on the date of loss." That is, those steps necessary to make the property ready to operate at the same level and capacity it had operated at prior to the physical loss and damage caused by the COVID-19 virus.

43

130.   GWU incurred costs to repair physical damage and loss caused to its insured properties including by, among other things, installing upgraded air filtration systems and implementing additional and heightened sanitization procedures.

131.   GWU's repair costs are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

132.   The All Risks Policy nowhere says that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as GWU's COVID-19 losses— satisfy both the Communicable Disease coverage promise and Factory Mutual's promise to insure against "all risks of physical loss or damage." Losses that fall under, and are able to satisfy the requirements of, both are covered by *both*.

### B.   The All Risks Policy Covers GWU's Massive Business Interruption Losses and Extra Expenses.

133.   The All Risks Policy "insures TIME ELEMENT loss . . . directly resulting from physical loss or damage of the type insured" both to insured property and to property "used by the Insured." The Policy computes the Policyholder's TIME ELEMENT loss as the amount that it would have earned had no loss occurred less the amount it did in fact earn. Time Element losses are covered during the PERIOD OF LIABILITY, which for "building and equipment" starts "from the time of physical loss or damage of the type insured," and ends "when with due diligence and dispatch the building and equipment could be: (i) repaired and replaced; and (ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage."[64]

---

[64]   The PERIOD OF LIABILITY applies to "all TIME ELEMENT COVERAGES" with certain exceptions, including for GROSS PROFIT Time Element coverage, which starts "from the time of physical loss or damage of the type insured," and ends "not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section," or a 12

44

134.    Despite the fact that the term "TIME ELEMENT" appears in all capital letters, the All Risks Policy nowhere defines that term.

135.    The All Risks Policy also covers "reasonable and necessary extra costs incurred by the Insured . . . during the PERIOD OF LIABILITY . . . to temporarily continue as nearly normal as practicable the conduct of the Insured's business; [and to] temporarily us[e] property or facilities of the Insured or others." Ex. A at 46.

136.    As shown in Section III.A above, GWU has suffered direct physical loss and damage of the type insured under the All Risks Policy to property insured by those policies.

137.    As explained in Section IV above, due directly to physical loss to its insured properties, GWU sustained losses of gross earnings, losses of other operational earnings, and incurred additional operating expenses, extra expenses, increases in the cost of doing business, costs to prevent or mitigate losses, claim preparation costs, leasehold and rental losses, and other covered losses.

138.    GWU has undertaken numerous measures to repair and replace building and equipment and make GWU facilities ready for operations, in response to the presence of the COVID-19 virus.  Some of these measures include modifications to its HVAC systems; Plexiglas barriers; revised arrangements of interior spaces; and continuous deep cleaning.  These alterations and modifications are ongoing, but have not yet allowed GWU to resume operations "under the same or equivalent physical and operating conditions that existed prior to the damage." Ex. A at 48.

---

month period for most properties, "during which period the results of the business shall be directly affected by such damage."

139.    While GWU took steps to reduce and mitigate its losses, damages and expenses, it has not been able to further and materially do so through the use of property or services owned or controlled by others, the use of property or services obtainable from other sources, working extra time or overtime, or the use of inventory.

140.    GWU's Business Interruption losses are ongoing and continuing.

141.    GWU has incurred reasonable and necessary extra expenses to temporarily continue as nearly normal as practicable the conduct of its business due to the suspension of operations, including but not limited to extra expenses for COVID-19 screening and testing, costs related with developing enhanced technology platforms for a remote learning environment, packing and shipping costs associated with students' belongings, costs associated with returning students to their overseas locations, costs associated with cleaning all facilities, and other operational changes.  These expenses were above and beyond those that usually would have been incurred in conducting GWU's business during the same period had no physical loss or damage occurred.

142.    The All Risks Policy nowhere says that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as GWU's COVID-19 losses— satisfy both the Communicable Disease coverage promise and the Time Element coverage promise.  Losses that fall under, and are able to satisfy the requirements of, both are covered by *both*.

C.    **The All Risks Policy Covers GWU's "Civil Authority" Losses.**

143.    The All Risks Policy "covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured location provided such

46

order is the direct result of physical damage of the type insured at the insured location or within
five statute miles/eight kilometres of it."

144.    As set forth in Section III.C above, state and local authorities in each city and/or
state where GWU's property is located, including without limitation the District of Columbia and
Virginia, issued orders that "limit[ed], restrict[ed] or prohibit[ed] partial or total access to insured
location[s]." As set forth in Section III.C above, each such order was issued as "the direct result
of physical damage of the type insured" either at insured locations or within five or fewer statute
miles of such locations.

145.    The governmental orders limiting, restricting, and prohibiting access to GWU's
insured locations were issued because of physical and structural damage caused by the physical
presence of the COVID-19 virus on furniture, doors, floors, bathroom facilities, and other
surfaces; and in the air within offices, restrooms, shops, and HVAC systems at properties within
five miles of GWU's insured locations.

146.    Many of these orders refer to the COVID-19 virus as a basis for prohibiting
access to businesses, including academic buildings and other facilities at issue here. *See supra*
Section III.C. All such orders were issued to, in part, prevent people from coming into contact
with and touching damaged property, the surfaces of which had been altered by the adherence of
COVID-19 viruses, and air, the composition of which had been and would be significantly
altered by aerosolized viral droplets. The physical loss and damage caused by COVID-19 is of
the type insured by the All Risks Policy.

147.    GWU has sustained actual losses due to the orders of civil authority described in
Section III.C above. GWU has incurred reasonable and necessary expenses, due to the orders of

civil authority described in Section III.C above, to temporarily continue as nearly normal as practicable the conduct of its business.

148.    GWU's expenses due to orders of civil authority are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

149.    The All Risks Policy nowhere says that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as GWU's COVID-19 losses—satisfy both the Communicable Disease coverage promise and the Civil Authority coverage promise. Losses that fall under, and are able to satisfy the requirements of, both are covered by *both*.

**D.    The All Risks Policy Covers the Losses GWU Sustained Given the Danger Of Accessing Insured Locations Due to Nearby Viral Property Damage and Loss.**

150.    The All Risks Policy "covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured."

151.    The widespread presence of COVID-19 and the COVID-19 virus, fomites, and respiratory droplets or droplet nuclei made traveling to or from GWU's insured properties significantly more difficult and dangerous, and damaged, among other things, real and personal property necessary for safe travel to and from GWU's facilities.

152.    Said otherwise, due to physical damage—the alteration and damage to surfaces as described above (*see* Section II)—to everything from door knobs and elevator buttons to seats in

48

metros, busses and cars, travel to and from GWU's insured properties became quite dangerous. Likewise, air in metro cars, busses, taxis and ride-sharing vehicles was similarly and significantly altered—damaged—by aerosolized viral droplets.  Travel became quite dangerous and difficult given this damage.

153.    As a result of these partial or total preventions or impairments of ingress to and egress from GWU's facilities, the operations and business of each GWU insured entity was interrupted.

154.    As explained in Section IV above, GWU has sustained actual losses and has incurred extra expenses due to the necessary interruption of its business because of the partial or total physical prevention and impairment of ingress to or egress from insured property as a result of physical damage to the type insured by the policy (including, *inter alia*, the actual presence of communicable disease) to property of the type insured by the policy, namely real and other property, among other things.

155.    GWU's extra expenses due to prevention of ingress/egress are other than those that usually would have been incurred in conducting business during the same period had no physical loss or damage occurred.

156.    The All Risks Policy nowhere says that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as GWU's COVID-19 losses—satisfy both the Communicable Disease coverage promise and the Ingress/Egress coverage promise.  Losses that fall under, and are able to satisfy the requirements of, both are covered by *both*.

**E.    The All Risks Policy Covers the Losses GWU Sustained to Protect Its Property and Mitigate Its Losses.**

157.    The All Risks Policy covers "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property."

158.    GWU incurred reasonable and necessary costs for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage from the COVID-19 virus and COVID-19 to such insured property.

159.    GWU sustained actual loss during the period beginning 48 hours before and lasting until 48 hours after the need to take reasonable action for the temporary protection and preservation of property insured by the All Risks Policy to prevent impending physical loss or damage to such property, including the cost of and losses caused by closing academic buildings, protecting and preserving property at its campuses, and ensuring that insured property is not damaged by the COVID-19 virus or COVID-19.

160.    The All Risks Policy nowhere says that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as GWU's COVID-19 losses— satisfy both the Communicable Disease coverage promise and the Protection and Preservation of Property coverage promise.  Losses that fall under, and are able to satisfy the requirements of, both are covered by *both*.

**F.    Numerous Other Provisions of the All Risks Policy Cover GWU's Losses.**

161.    In addition to the losses and coverages described above, GWU's COVID-19 losses are covered under any and all other coverages under the All Risks Policy that may apply.

These include but are not limited to Contingent Time Element and Claims Preparation Cost coverage.

162. GWU has sustained actual loss of rental income for leases at properties that have become wholly or partially untenantable or unusable due to impairment by the COVID-19 virus and COVID-19 and related concerns, including but not limited to the fair rental value of properties they occupy, reasonably expected rental income from unoccupied or unrented portions of properties, and rental income from the rented portions of such property under leases, contracts or agreements in force at the time of the loss. GWU has also sustained losses in the form of unrealized rent for facilities they have been unable to use because of orders and/or physical loss or damage as described more fully above.

## FIRST CAUSE OF ACTION
### (For Breach of Contract Against Factory Mutual)

163. Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 162 of this Complaint, inclusive, as though set forth fully herein.

164. Factory Mutual's All Risks Policy is a valid and enforceable contract between Plaintiff and Factory Mutual.

165. Plaintiff has satisfied, is excused from performing, or Factory Mutual has waived or is estopped from insistence upon performance of, all conditions of the All Risks Policy, including but not limited to payment of required premiums, provision of timely notice of claim, and submission of a final Proof of Loss.

166. Factory Mutual agreed in its insurance contract to provide insurance coverage for all risks of physical loss or damage not otherwise excluded.

51

167.    The COVID-19 virus have caused and continues to cause physical loss and/or damage to Plaintiff's properties and to properties within five miles of Plaintiff's insured locations.

168.    The Plaintiff has suffered actual losses and incurred extra expense due to physical loss and damage caused by the COVID-19 virus, a risk not excluded by the All Risks Policy.

169.    No exclusion in the All Risks Policy applies to preclude or limit coverage.

170.    As is set forth more fully above, Factory Mutual is contractually obligated under the All Risks Policy to indemnify Plaintiff for the full amount of its losses.

171.    Factory Mutual refused to indemnify Plaintiff for its losses and expenses in breach of the All Risks Policy.

172.    As a direct and proximate result of its breaches of contract, Factory Mutual has deprived Plaintiff of the benefits of the insurance contract for which substantial premiums were paid, which entitles Plaintiff to money damages, including interest according to law.

173.    Plaintiff's losses as a result of Factory Mutual's breaches of contract are continuing, and Plaintiff reserves the right to seek the full and exact amount of its damages at the time of trial.

## SECOND CAUSE OF ACTION
### (For Declaratory Relief Against Factory Mutual)

174.    Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 162 of this Complaint, inclusive, as though set forth fully herein.

175.    Plaintiff seeks a declaration of the parties' rights and duties under Factory Mutual's All Risks Policy in accordance with D.C. Super. Ct. R. Civ. Pro. 57.

176.    An actual and justiciable controversy exists between Plaintiff and Factory Mutual concerning Factory Mutual's contractual duties to indemnify Plaintiff's claims for real property

losses, time element losses, and other losses, costs, and expenses under Factory Mutual's All

Risks Policy.

177.   The controversy between Plaintiff and Factory Mutual is ripe for judicial review.

178.   The controversy is of sufficient immediacy to justify the issuance of declaratory

relief.

179.   Plaintiff accordingly seeks a declaration from the Court that:

- Each coverage provision identified in the Complaint is triggered by Plaintiff's claims;

- No exclusion in the All Risks Policy applies to preclude or limit coverage for Plaintiff's claims;

- Plaintiff has satisfied or been excused from satisfying, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the All Risks Policy;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for its claims of real property losses, time element losses, extra expense, and other losses sustained as a result of direct loss or damage to property due to the COVID-19 virus and/or COVID-19;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for GROSS EARNINGS or GROSS PROFITS loss, at Plaintiff's election, during the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for EXTRA EXPENSE incurred to continue business during the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for its time element losses and extra expense as a result of orders of civil authority that have limited, restricted, or prohibited access to insured properties as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations within five miles thereof;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for its time element losses and extra expense wherever ingress to or egress from insured property has been partially or totally prevented as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for its lost rent and actual loss sustained with respect to rental properties;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for its lost GROSS EARNINGS incurring during the Extended Period of Liability after the end of the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for losses and extra expense associated with physical loss of or damage to contingent time element properties;

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for actual loss sustained to prevent and costs incurred to temporarily protect from actual or impending physical loss or damage to insured property; and

- Factory Mutual is contractually obligated under its All Risks Policy to indemnify Plaintiff for its claims preparation costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

(1)    A declaratory judgment in favor of Plaintiff and against Factory Mutual declaring that:

    a) Each coverage provision identified in the Complaint is triggered by Plaintiff's claims;

    b) No exclusion in the All Risks Policy applies to preclude or limit coverage for Plaintiff's claims;

    c) Plaintiff has satisfied or been excused from satisfying, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the All Risks Policy;

    d) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for their real property losses, time element losses, extra expense, and other losses sustained as a result of direct loss or damage to property due to the COVID-19 virus and/or COVID-19;

    e) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for GROSS EARNINGS or GROSS PROFITS loss, at Plaintiff's election, during the Period of Liability;

    f) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for EXTRA EXPENSE incurred to continue business during the Period of Liability;

    g) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for their time element losses and extra expense as a result of orders of civil authority that have impaired, limited, restricted, or prohibited access to insured properties as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations within five miles;

    h) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for their time element losses and extra expense wherever ingress or access to, or egress from, insured property has been impaired or partially or totally prevented as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations;

    i) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for its lost rent and actual loss sustained with respect to rental properties;

    j) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for its lost GROSS EARNINGS incurring during the Extended Period of Liability after the end of the Period of Liability;

    k) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for losses and extra expense associated with physical loss or damage to contingent time element properties;

    l) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for actual loss sustained to prevent and costs incurred to temporarily protect from actual or impending physical loss or damage to insured property; and

    m) Factory Mutual is contractually obligated under their All Risks Policy to indemnify Plaintiff for their claims preparation costs;

(2)    Compensatory and consequential damages in an amount to be proven at trial;

(3)    Pre-judgment and post-judgment interest as provided by law;

(4)    An award of court costs and attorneys' fees and costs;

(5)    Interest on such court costs and attorneys' fees and costs;

(6)    Exemplary and punitive damages; and

(7)    Such other and further relief as this Court finds just and proper.

Dated:  October 21, 2021                    COVINGTON & BURLING LLP

                                            By:    _/s/ Matthew J. Schlesinger_____
                                                   Matthew J. Schlesinger
                                                   D.C. Bar No. 429689
                                                   Covington & Burling LLP
                                                   One CityCenter
                                                   850 Tenth Street Northwest
                                                   Washington, DC 20001
                                                   (202) 662-6000
                                                   mschlesinger@cov.com

                                                   Attorneys for Plaintiff

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a jury trial of all issues so triable pursuant to D.C. Super. Ct. R.

Civ. Pro. 38.

Dated: October 21, 2021             COVINGTON & BURLING LLP

By:   */s/ Matthew J. Schlesinger* .
          Matthew J. Schlesinger

Attorneys for Plaintiff

# EXHIBIT A

**FM** Global

# MUTUAL CORPORATION
# NON-ASSESSABLE POLICY

Factory Mutual Insurance Company
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

## DECLARATIONS

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| 1056630 | 1041993 | 26 June 2019 |

| Account No. | Replaces Binder No. | |
|---|---|---|
| 1-56297 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

> **INSURED:**
>
> The George Washington University
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the 1st day of July 2019 to the 1st day of July 2020 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this 26th day of June 2019.

_____
Authorized Signature

Secretary

President

Countersigned (if required) this          day of

_____
Agent

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.



Factory Mutual Insurance Company
Johnston, Rhode Island
A Mutual Corporation

This policy is Non-Assessable.

It is important that the written
portions of all policies covering
the same property read exactly
alike. If they do not, they should
be made uniform at once.

In case of loss notify the company
or its local agent at once in writing.

7019 (9/01)

3

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

## EXTRACTS FROM CHARTER OF THIS COMPANY
### Granted by the General Assembly of the State of Rhode Island

SECTION 5:  Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10:  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

## EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
### Adopted July 13, 2000

ARTICLE 1 – MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.

7019 (9/01)



Account No.   1-56297
Policy No.   1056630

## TABLE OF CONTENTS
### (Order In Which They Appear)

Page No.

**DECLARATIONS PAGE**

**DECLARATIONS**
1.   NAMED INSURED AND MAILING ADDRESS ...................................................................1
2.   POLICY DATES ...................................................................................................................1
3.   INSURANCE PROVIDED ...................................................................................................1
4.   PREMIUM............................................................................................................................1
5.   PREMIUM PAYABLE ..........................................................................................................1
6.   LOSS ADJUSTMENT/PAYABLE........................................................................................1
7.   TERRITORY ........................................................................................................................2
8.   JURISDICTION ...................................................................................................................2
9.   CURRENCY .........................................................................................................................2
10.  LIMITS OF LIABILITY .......................................................................................................2
11.  DEDUCTIBLES ...................................................................................................................6

**PROPERTY DAMAGE**
1.   INSURED PROPERTY .........................................................................................................9
2.   EXCLUDED PROPERTY .....................................................................................................9
3.   EXCLUSIONS ....................................................................................................................10
4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ...............................14
5.   VALUATION ......................................................................................................................15
6.   ADDITIONAL COVERAGES ............................................................................................16
     CYBER ADDITIONAL COVERAGES ..............................................................................16
     A.   DATA RESTORATION..............................................................................................16
     B.   DATA SERVICE PROVIDER PROPERTY DAMAGE ............................................18
     OTHER ADDITIONAL COVERAGES ...............................................................................19
     A.   ACCIDENTAL INTERRUPTION OF SERVICES ...................................................19
     B.   ACCOUNTS RECEIVABLE .....................................................................................19
     C.   ANIMALS..................................................................................................................20
     D.   AUTOMATIC COVERAGE .....................................................................................21
     E.   BRANDS AND LABELS ...........................................................................................21
     F.   CLAIMS PREPARATION COSTS ............................................................................21
     G.   COMMUNICABLE DISEASE RESPONSE..............................................................22
     H.   CONSEQUENTIAL REDUCTION IN VALUE.........................................................23
     I.    CONTROL OF DAMAGED PROPERTY .................................................................23
     J.    DEBRIS REMOVAL..................................................................................................23
     K.   DECONTAMINATION COSTS ................................................................................23
     L.   ERRORS AND OMISSIONS .....................................................................................24
     M.   EXPEDITING COSTS................................................................................................24
     N.   INSTALLMENT OR DEFERRED PAYMENTS .......................................................24
     O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL .......25
     P.   LAW AND ORDINANCE..........................................................................................25
     Q.   LOSS PAYMENT INCREASED TAX LIABILITY ..................................................27
     R.   MACHINERY OR EQUIPMENT STARTUP OPTION ............................................27
     S.   MISCELLANEOUS PROPERTY ..............................................................................27
     T.   OPERATIONAL TESTING .......................................................................................28
     U.   PROTECTION AND PRESERVATION OF PROPERTY .........................................28
     V.   SERVICE INTERRUPTION PROPERTY DAMAGE ...............................................29



Account No.   1-56297
Policy No.   1056630

## TABLE OF CONTENTS
### (Order In Which They Appear)

Page No.

W.   TEMPORARY REMOVAL OF PROPERTY ....................................................30
X.   TERRORISM.............................................................................................30
Y.   TRANSPORTATION ..................................................................................31
Z.   VALUABLE PAPERS AND RECORDS..........................................................33

**TIME ELEMENT**

1.   LOSS INSURED .............................................................................................35
2.   TIME ELEMENT COVERAGES ........................................................................36
     A.   INSURED OPTION ..................................................................................36
     B.   GROSS EARNINGS..................................................................................36
     C.   GROSS PROFIT ......................................................................................37
     D.   EXTRA EXPENSE....................................................................................39
     E.   LEASEHOLD INTEREST ..........................................................................40
     F.   RENTAL INSURANCE ..............................................................................40
3.   PERIOD OF LIABILITY ...................................................................................41
4.   TIME ELEMENT EXCLUSIONS .......................................................................43
5.   TIME ELEMENT COVERAGE EXTENSIONS......................................................44
     CYBER TIME ELEMENT COVERAGE EXTENSIONS ...........................................44
     A.   DATA SERVICE PROVIDER TIME ELEMENT ...............................................44
     B.   OWNED NETWORK INTERRUPTION .........................................................45
     SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS ................................46
     A.   CIVIL OR MILITARY AUTHORITY ............................................................46
     B.   CONTINGENT TIME ELEMENT EXTENDED ...............................................47
     C.   INGRESS/EGRESS...................................................................................47
     D.   LOGISTICS EXTRA COST .......................................................................48
     E.   SERVICE INTERRUPTION TIME ELEMENT .................................................49
     ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS ...................................51
     A.   ATTRACTION PROPERTY .......................................................................51
     B.   CRISIS MANAGEMENT............................................................................51
     C.   DELAY IN STARTUP ...............................................................................52
     D.   EXTENDED PERIOD OF LIABILITY ...........................................................52
     E.   INTERRUPTION BY COMMUNICABLE DISEASE ..........................................53
     F.   ON PREMISES SERVICES ........................................................................53
     G.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT...................54
     H.   RELATED REPORTED VALUES ................................................................54
     I.   RESEARCH AND DEVELOPMENT ..............................................................54
     J.   SOFT COSTS..........................................................................................55

**LOSS ADJUSTMENT AND SETTLEMENT**

1.   REQUIREMENTS IN CASE OF LOSS ................................................................56
2.   CURRENCY FOR LOSS PAYMENT...................................................................57
3.   PARTIAL PAYMENT OF LOSS SETTLEMENT....................................................57
4.   COLLECTION FROM OTHERS .......................................................................57
5.   SUBROGATION............................................................................................57
6.   COMPANY OPTION......................................................................................57
7.   ABANDONMENT..........................................................................................57
8.   APPRAISAL.................................................................................................57
9.   SUIT AGAINST THE COMPANY .....................................................................58
10.  SETTLEMENT OF CLAIMS ............................................................................58



Account No.  1-56297
Policy No.  1056630

## TABLE OF CONTENTS
### (Order In Which They Appear)

Page No.

**GENERAL PROVISIONS**

1.   CANCELLATION/NON-RENEWAL ..........................................................................................60
2.   INSPECTIONS ........................................................................................................................60
3.   PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS ................................................60
4.   LIBERALIZATION ..................................................................................................................62
5.   MISREPRESENTATION AND FRAUD ...................................................................................62
6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS ................63
7.   OTHER INSURANCE .............................................................................................................64
8.   POLICY MODIFICATION ........................................................................................................64
9.   REDUCTION BY LOSS ..........................................................................................................65
10.  SUSPENSION .......................................................................................................................65
11.  TITLES ..................................................................................................................................65
12.  ASSIGNMENT .......................................................................................................................65
13.  DEFINITIONS ........................................................................................................................65
SCHEDULE OF LOCATIONS .............................................................................................. APPENDIX A
SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, Form
FMG7308
RISK IMPROVEMENT COVERAGE ENDROSEMENT, Form FMG7332
CYBER OPTIMAL RECOVERY ENDORSEMENT, Form FMG7588



Account No.  1-56297
Policy No.  1056630

# DECLARATIONS

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

**1.  NAMED INSURED AND MAILING ADDRESS**

The George Washington University and any subsidiary, and The George Washington University's interest in any partnership or joint venture in which The George Washington University has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured," including legal representatives. .

2025 F Street, NW
Washington, DC 20052

**2.  POLICY DATES**

The term of this Policy is:

FROM: 01 July 2019 at 12:01 a.m., Standard Time;
TO:    01 July 2020 at 12:01 a.m., Standard Time,

at the **location** of property involved as provided in this Policy.

**3.  INSURANCE PROVIDED**

The coverage under this Policy applies to property described on the Schedule of Locations or covered under the terms and conditions of the AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY provisions, unless otherwise provided.

Schedule of Locations are as listed on the Schedule of Locations attached to this Policy.

**4.  PREMIUM**

This Policy is issued in consideration of an initial premium.

**5.  PREMIUM PAYABLE**

Marsh USA, Inc. pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of Marsh USA, Inc.

**6.  LOSS ADJUSTMENT/PAYABLE**

Loss, if any, will be adjusted with and payable to The George Washington University, or as may be directed by The George Washington University.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.



When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance.  The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

## 7.   TERRITORY

Coverage as provided under this Policy applies in Canada, the United States of America and the Commonwealth of Puerto Rico.

As respects MISCELLANEOUS PROPERTY, coverage as provided under this Policy applies worldwide except does not apply in:

Afghanistan; Albania; Algeria; Angola; Armenia; Azerbaijan; Bangladesh; Belarus; Belize; Benin; Bhutan; Bolivia; Bosnia and Herzegovina; Botswana; Burkina Faso; Burundi; Cambodia; Cameroon; Central African Republic; Chad; Cote D'Ivoire; Cuba; Democratic Republic of the Congo; Djibouti; Egypt; Equatorial Guinea; Eritrea; Ethiopia; Fiji; Gabon; Gambia; Georgia; Ghana; Grenada; Guinea; Guinea-Bissau; Guatemala; Guyana; Haiti; Honduras; Jammu and Kashmir in India; Iran; Iraq; Israel; Gaza Strip, West Bank and territories north of Latitude 32.80 N in Israel; Kenya; Laos; Lebanon; Lesotho; Liberia; Libya; Madagascar; Malawi; Mali; Mauritania; Mauritius; Moldova; Mongolia; Montenegro; Montserrat; Mozambique; Myanmar; Namibia; Nepal; Niger; Nigeria; North Korea; Pakistan; Papua New Guinea; Aksai Chin and Trans-Karakoram Tract in People's Republic of China; Republic of the Congo; Chechen Republic of the Russian Federation; Rwanda; Senegal; Seychelles; Sierra Leone; Somalia; Sri Lanka; South Sudan; Sudan; Swaziland; Syria; Tajikistan; Tanzania; Timor-Leste; Togo; Tunisia; Agri, Batman, Bingol, Bitlis, Diyarbakir, Elazig, Hakkari, Igdir, Mardin, Mus, Sanliurfa, Siirt, Sirnak and Van in Turkey; Turkmenistan; Uganda; Ukraine; Crimea Region of Ukraine; Uzbekistan; Venezuela; Yemen; Zambia; and Zimbabwe.

## 8.   JURISDICTION

This Policy will be governed by the laws of the United States of America.

Any disputes arising hereunder will be exclusively subject to the jurisdiction of the United States of America.

## 9.   CURRENCY

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Organization for Standardization (ISO) 4217, edition in effect at the inception of this Policy.

## 10.   LIMITS OF LIABILITY

The Company's maximum limit of liability in an **occurrence**, including any insured TIME ELEMENT loss, will not exceed the Policy limit of liability of USD 1,000,000,000, not to exceed USD500,000,000 for TIME ELEMENT loss, subject to the following provisions:

A.    Limits of liability and time limits stated below or elsewhere in this Policy are part of, and not in addition to, the Policy limit of liability.



Account No.  1-56297
Policy No.  1056630

B.  Limits of liability apply per **occurrence**, unless otherwise stated.

C.  Limits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

    1)  when a limit of liability applies as an **annual aggregate**, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

    2)  when a limit of liability applies to a **location** or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all **locations** arising from physical loss or damage at such **location** or to such other specified property.

D.  Should an **occurrence** result in liability payable under more than one policy issued to the Named Insured by the Company, or its **representative company(ies)**, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy.

Applicable Limits of Liability/Time Limits:

| | |
|---|---|
| ANIMALS | USD 10,000,000, not to exceed USD 5,000,000 for overhead, laboratory, research and experimentation costs, not to exceed USD 50,000 per animal |
| ATTRACTION PROPERTY | 30 days |
| AUTOMATIC COVERAGE | 90 days, not to exceed USD 50,000,000 per **location** |
| CIVIL OR MILITARY AUTHORITY | 30 days |
| CLAIMS PREPARATION COSTS | USD 500,000 |
| COMMUNICABLE DISEASE RESPONSE | USD 1,000,000 **annual aggregate**<br><br>The Company's maximum limit of liability for INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD 1,000,000 **annual aggregate**. |
| CONTINGENT TIME ELEMENT EXTENDED | USD 25,000,000 |
| CRISIS MANAGEMENT | 30 days |
| **cyber event** | 1.    USD 1,000,000 **annual aggregate** for DATA RESTORATION and OWNED NETWORK INTERRUPTION combined<br><br>2.    USD 1,000,000 **annual aggregate** for DATA |

 FM Global

Account No.   1-56297
Policy No.   1056630

| | |
|---|---|
| | SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined<br><br>3.    USD 25,000,000 **annual aggregate** for physical loss or damage to stock in process or finished goods manufactured by or for the Insured caused by or resulting from a **cyber event** that impacts the processing, manufacturing, or testing of such property or while it is otherwise being worked on |
| DATA RESTORATION | USD 10,000,000 **annual aggregate** |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined | USD 5,000,000 **annual aggregate** |
| **earth movement** | USD 250,000,000 **annual aggregate** |
| ERRORS AND OMISSIONS | USD 50,000,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD 50,000,000 |
| EXTENDED PERIOD OF LIABILITY | 365 days |
| fines or penalties for breach of contract or for late or noncompletion of orders combined | USD 100,000 |
| **flood** | USD 250,000,000 |
| GROSS PROFIT | 12 months |
| **historic buildings** | 125% of the last reported building value |
| INGRESS/EGRESS | 30 days |
| INTERRUPTION BY COMMUNICABLE DISEASE | 365 days, not to exceed USD 1,000,000 **annual aggregate**<br><br>The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD 1,000,000 **annual aggregate**. |



**Account No.  1-56297**
**Policy No.   1056630**

| | |
|---|---|
| LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL | USD 250,000 **annual aggregate** |
| landscape gardening | USD 2,500,000 |
| LEASEHOLD INTEREST | USD 50,000,000 |
| LOGISTICS EXTRA COST | 180 days, not to exceed 200% of the **normal cost** |
| MISCELLANEOUS PROPERTY | 1.   USD 50,000,000 per **location**, not to exceed  USD 2,500,000 per **location** for property located outside the United States of America, Canada and the Commonwealth of Puerto Rico for property at a **location**<br><br>2.   USD 12,500,000, not to exceed USD 2,500,000 for property located outside the United States of America, Canada and the Commonwealth of Puerto Rico for property not at a **location** |
| racing shells, support launches and sailing dinghies | USD 2,500,000, not to exceed USD 500,000 while on water |
| RESEARCH AND DEVELOPMENT | USD 50,000,000 |
| SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined | USD 50,000,000 |
| TERRORISM | USD 5,000,000 **annual aggregate**, not to exceed the following:<br><br>1.   USD 5,000,000 **annual aggregate** for AUTOMATIC COVERAGE, ERRORS AND OMISSIONS, MISCELLANEOUS PROPERTY and TEMPORARY REMOVAL OF PROPERTY combined<br><br>2.   USD 5,000,000 **annual aggregate** for **flood** when caused by or resulting from **terrorism**<br><br>The limits for TERRORISM shall not include the **actual cash value** portion of fire damage caused by **terrorism**.<br><br>The limits for TERRORISM do not apply to the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S). |



**Account No.   1-56297**
**Policy No.   1056630**

| valuable papers and records | USD 25,000,000, not to exceed USD 50,000 per item for **irreplaceable valuable papers and records** not on a schedule on file with the Company |
|---|---|

## 11.   DEDUCTIBLES

Subject to the deductible general provisions stated below, in each case of loss covered by this Policy the following deductibles apply per **occurrence**, for all coverages involved, unless otherwise stated:

| Location No. 15, ID no. 0060 as described on the Schedule of Locations | 1.   For the combustion **turbine unit:**<br><br>Property Damage: USD 100,000<br><br>Time Element: 45 **day equivalent contribution**<br><br>2.   For the steam **turbine units:**<br><br>Property Damage: USD 50,000<br><br>Time Element: 20 **day equivalent contribution** |
|---|---|
| **cyber event** | USD 250,000 for DATA RESTORATION and OWNED NETWORK INTERRUPTION |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT | USD 250,000 |
| LOGISTICS EXTRA COST | USD 100,000 |
| **wind** | As respects **wind** loss associated with or occurring in conjunction with a storm or weather disturbance identified by name by any meteorological authority, whether or not named prior to the loss for property located at Location No. 01, ID No. 0166 as described on the Schedule of Locations:<br><br>Property Damage: 1%, per building, per **location**<br><br>Time Element: 1%, per building, per **location**<br><br>The above are subject to a minimum of USD 100,000 for Property Damage and Time Element combined per **location**. |
| All Other Loss | USD 100,000 |



Deductible General Provisions:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified above, and only for its share of that greater amount.

A.    For SERVICE INTERRUPTION loss, when a deductible is not specifically stated as applying to SERVICE INTERRUPTION, the deductible applied to the SERVICE INTERRUPTION loss will be the deductible that would apply if the cause of the interruption happened at the insured **location** that sustains the interruption of the specified services.

B.    For CONTINGENT TIME ELEMENT EXTENDED loss, when a deductible is not specifically stated as applying to CONTINGENT TIME ELEMENT EXTENDED, the deductible for CONTINGENT TIME ELEMENT EXTENDED loss will be determined as though the **contingent time element location** was an insured **location** under this Policy.

C.    The stated earthquake deductible will be applied to earthquake loss. The stated **flood** deductible will be applied to **flood** loss. The stated **wind** deductible will be applied to **wind** loss. The provisions of item E below will also be applied to each.

D.    When this Policy insures more than one **location**, the deductible will apply against the total loss covered by this Policy in an **occurrence** except that a deductible that applies on a per **location** basis, if specified, will apply separately to each **location** where the physical damage happened regardless of the number of **locations** involved in the **occurrence**.

E.    Unless stated otherwise, if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable. For the purposes of this provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible. If two or more deductibles apply on a per **location** basis in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**.

F.    When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:

Property Damage – % of the value, per the Valuation clause(s) of the PROPERTY DAMAGE section, of the property insured at the **location** where the physical damage happened.

Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.

G.    For insured physical loss or damage:

1)    to insured fire protection equipment; or

2)    from water or other substance discharged from fire protection equipment of the type insured,



Account No. 1-56297
Policy No. 1056630

the applicable deductible applying to items 1 or 2 above only will be reduced by fifty percent (50%), per **occurrence**. However, this provision will not apply to loss or damage resulting from fire or **earth movement** regardless of whether claim is made for such fire or **earth movement**.



Account No. 1-56297
Policy No. 1056630

## PROPERTY DAMAGE

### 1. INSURED PROPERTY

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, to the extent of the interest of the Insured in such property:

A. Real Property, including new buildings and additions under construction, in which the Insured has an insurable interest.

B. Personal Property:

   1) owned by the Insured.

   2) consisting of the Insured's interest as a tenant in improvements and betterments. In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

   3) of officers and employees of the Insured.

   4) of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

   5) of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to Personal Property. The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage. The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an insured **location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property. Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

### 2. EXCLUDED PROPERTY

The following exclusions apply unless otherwise stated in this Policy:

This Policy excludes:

A. accounts, bills, currency, deeds, evidences of debt or title, fine arts, money, notes, rare books or securities.

B. precious metal in bullion form.

C. land and any substance in or on land. However, this exclusion does not apply to:

   1) landscape gardening.



    2) car parks, parking lots, pavement, roadways, railways, transformer enclosures or walkways.

    3) fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures.

D. water. However, this exclusion does not apply to:

    1) water that is contained within any enclosed tank, piping system or any other processing equipment.

E. animals except as provided by the ANIMALS coverage of the Policy, standing timber or growing crops.

F. watercraft or aircraft, except when unfueled and manufactured by the Insured or watercraft consisting of racing shells, support launches and sailing dinghies.

G. vehicles of officers or employees of the Insured or vehicles otherwise insured for physical loss or damage.

H. underground mines or mine shafts or any property within such mine or shaft.

I. dams or dikes.

J. property in transit, except as otherwise provided by this Policy.

K. property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the INSTALLMENT OR DEFERRED PAYMENTS coverage of this Policy.

L. electronic data, programs or software, except when incorporated into physical goods intended to be sold as:

    1) finished goods manufactured by the Insured; or

    2) other merchandise not manufactured by the Insured,

    or as otherwise provided by the DATA RESTORATION coverage of this Policy.

M. personal property of students.

## 3. EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

A. This Policy excludes:

    1) indirect or remote loss or damage.

    2) interruption of business, except to the extent provided by this Policy.

    3) loss of market or loss of use.



Account No. 1-56297
Policy No. 1056630

4) loss or damage or deterioration arising from any delay.

5) mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6) loss from enforcement of any law or ordinance:

   a) regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

   b) requiring the demolition of any property, including the cost in removing its debris;

   except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy.

7) loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretence.

B. This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   1) nuclear reaction or nuclear radiation or radioactive contamination. However:

      a) if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

      b) this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured **location**. This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

      This exclusion B1 and the exceptions in B1a and B1b do not apply to any act, loss or damage which also comes within the terms of exclusion B2b of this EXCLUSIONS clause.

   2) a) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

         (i) government or sovereign power (de jure or de facto);

         (ii) military, naval or air force; or

         (iii) agent or authority of any party specified in i or ii above.

      b) discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.



c) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d) seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e) risks of contraband, or illegal transportation or trade.

f) **terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the TERRORISM coverage of the Policy. However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to property insured. This coverage exception for such resulting fire loss or damage does not apply to:

   (i) direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

   (ii) any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided in this Policy.

   Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

   If any act which satisfies the definition of **terrorism** also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

   If any act which satisfies the definition of **terrorism** also comes within the terms of item B2b of this EXCLUSIONS clause then item B2b applies in place of this item B2f exclusion.

   If any act which satisfies the definition of **terrorism** also comes within the terms of item B2c of this EXCLUSIONS clause then item B2c applies in place of this item B2f exclusion.

   If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

3) any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

   a) by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

   b) by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.



This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured.  This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause.  In no event does this Policy cover loss by theft by any individual specified in a or b above.

4)  lack of the following services:

a)  incoming electricity, fuel, water, gas, steam or refrigerant;

b)  outgoing sewerage;

c)  incoming or outgoing voice, data or video,

all when caused by an event off the insured **location**, except as provided in the DATA SERVICE PROVIDER and SERVICE INTERRUPTION coverages of this Policy.  But, if the lack of such a service directly causes insured physical damage on the insured **location**, then only that resulting damage is insured.

5)  **earth movement** for Location No. 23 as described on the Schedule of Locations.

C.  This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1)  faulty workmanship, material, construction or design from any cause.

2)  loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3)  deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

4)  settling, cracking, shrinking, bulging, or expansion of:

a)  foundations (including any pedestal, pad, platform or other property supporting machinery).

b)  floors.

c)  pavements.

d)  walls.

e)  ceilings.

f)  roofs.

5)  a)  changes of temperature damage (except to machinery or equipment); or

b)  changes in relative humidity damage,

 **FM Global**

Account No.   1-56297
Policy No.   1056630

all whether atmospheric or not.

6)  insect, animal or vermin damage.

7)  loss or damage to the interior portion of buildings under construction'from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

D.  This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)  **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

2)  shrinkage.

3)  changes in color, flavor, texture or finish.

4.  **APPLICATION OF POLICY TO DATE OR TIME RECOGNITION**

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows.

A.  This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

B.  Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage.  This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such covered resulting physical loss or damage does not include any loss, cost or expense described in A or B above.  If such covered resulting physical loss or damage happens, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.



## 5. VALUATION

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the place of the loss, and for no more than the interest of the Insured.

Unless stated otherwise in an Additional Coverage, adjustment of physical loss to property will be subject to the following:

A. On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B. On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C. On raw materials, supplies or other merchandise not manufactured by the Insured:

    1) if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

    2) if not repaired or replaced, the **actual cash value**.

D. On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

E. On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss. Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy and shall be subject to the limit(s) of liability for TERRORISM, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

F. On books (other than rare books), pre-recorded audio or video tapes, records or laser discs, microforms, periodicals, music scores, pamphlets, slides, maps, photographs and charts that are not **valuable papers and records**, the cost of repairing or replacing such property with like kind or quality including the costs of acquisition, processing and cataloging

G. On the following **locations**, the **actual cash value**:

Location No. 15, ID No. 0010, 0023, 0078, 0114, 0115 and 0200 as described on the Schedule of Locations.

H. On all other property, the lesser of the following:

    1) The cost to repair.

    2) The cost to rebuild or replace on the same site with new materials of like size, kind and quality.



3) The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4) The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5) The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6) The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

7) The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8) The **actual cash value** if such property is:

   a) useless to the Insured; or

   b) not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured **location** under this Policy. This item does not extend to LAW AND ORDINANCE.

6. **ADDITIONAL COVERAGES**

This Policy includes the following Additional Coverages for insured physical loss or damage.

These Additional Coverages:

1) are subject to the applicable limit of liability;

2) will not increase the Policy limit of liability; and

3) are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

**CYBER ADDITIONAL COVERAGES**

A. **DATA RESTORATION**

This Policy covers insured **physical loss or damage to electronic data, programs or software**.



With respect to **physical loss or damage to electronic data, programs or software** caused by or resulting from a **cyber event**, this Additional Coverage will apply when the time to recreate or restore such data, programs or software with due diligence and dispatch is in excess of 48 hours.

For the purposes of this Additional Coverage, insured data, programs or software can be anywhere worldwide, including while in transit, except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

This Additional Coverage also covers:

1) the cost of the following reasonable and necessary actions taken by the Insured provided such actions are taken due to actual insured **physical loss or damage to electronic data, programs or software**:

   a) actions to temporarily protect and preserve insured electronic data, programs or software.

   b) actions taken for the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   c) actions taken to expedite the permanent repair or replacement of such damaged property.

2) the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**.  In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when incorporated into physical goods intended to be sold as:

1) finished goods manufactured by the Insured; or

2) other merchandise not manufactured by the Insured.

DATA RESTORATION Exclusions: As respects DATA RESTORATION, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, B1, B2, B3a B4 and B5.

2) the following additional exclusions apply:

   This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

   a) errors or omissions in processing or copying.



b) loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

c) deterioration, inherent vice, vermin or wear and tear.

DATA RESTORATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) the cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2) if not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

## B.   DATA SERVICE PROVIDER PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Additional Coverage:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Additional Coverage will apply when the period of interruption of **off-premises data processing or data transmission services** as described below is in excess of 24 hours.

The period of interruption of **off-premises data processing or data transmission services** is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

DATA SERVICE PROVIDER PROPERTY DAMAGE Exclusions: As respects DATA SERVICE PROVIDER PROPERTY DAMAGE, the following applies:

1) Items B4 and C5 of the EXCLUSIONS clause in this section do not apply except for B4 with respect to:



    a) incoming electricity, fuel, water, gas, steam or refrigerant; and

    b) outgoing sewerage.

2) The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

    a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone.**

    b) **terrorism**.

## OTHER ADDITIONAL COVERAGES

## A. ACCIDENTAL INTERRUPTION OF SERVICES

This Policy covers physical damage resulting from changes in temperature or relative humidity to insured property at an insured **location** when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at the insured **location**.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

## B. ACCOUNTS RECEIVABLE

This Policy covers the following directly resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit:

1) any shortage in the collection of accounts receivable.

2) the interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum. Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

3) the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.

4) any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.



Accounts receivable records will include accounts receivable records stored as electronic data.

In the event of loss, the Insured will:

1) use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2) reduce loss by use of any suitable property or service:

   a) owned or controlled by the Insured; or

   b) obtainable from other sources.

3) reconstruct, if possible, accounts receivable records so that no shortage is sustained.

The settlement of loss will be made within 90 days from the date of physical loss or damage. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company. All recoveries exceeding the amount paid will belong to the Insured.

ACCOUNTS RECEIVABLE Exclusions: As respects ACCOUNTS RECEIVABLE, the following additional exclusions apply:

This Policy does not insure against shortage resulting from:

1) bookkeeping, accounting or billing errors or omissions; or

2) a) alteration, falsification, manipulation; or

   b) concealment, destruction or disposal,

   of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

## C.  ANIMALS

This Policy covers insured physical loss or damage to animals.

ANIMALS Exclusions: As respects ANIMALS, the following additional exclusions apply:

This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1) death, destruction, or injury from natural causes.

2) escape.

3) sickness, disease, infection, infestation or illness.

4) error or omission in processing and/or failure on the part of the Insured to provide nourishment, medicine or sanitary conditions.



5)  **contamination** of animals, food or medicine.

ANIMALS Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1)  the purchase price of commercially available laboratory animals, including overhead, laboratory, research and experimentation costs.

## D.  AUTOMATIC COVERAGE

This Policy covers insured physical loss or damage to insured property at any **location** purchased, leased, rented or otherwise acquired by the Insured after the inception date of this Policy.

This Additional Coverage applies:

1)  from the date of purchase, lease, rental or acquisition.

2)  until the first of the following:

    a)  the **location** is bound by the Company.

    b)  agreement is reached that the **location** will not be insured under this Policy.

    c)  the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The time limit begins on the date that University Risk Manager has received notification of the purchase, lease, rental, acquisition or utilization of the property.

## E.  BRANDS AND LABELS

If branded or labeled insured property is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

1)  stamp "salvage" on the property or its containers; or

2)  remove or obliterate the brands or labels,

if doing so will not damage the property.

The Insured must relabel such property or its containers to be in compliance with any applicable law.

## F.  CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1)  of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2)  the cost of using the Insured's employees,



Account No. 1-56297
Policy No. 1056630

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1) attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2) loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.

### G. COMMUNICABLE DISEASE RESPONSE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1) cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions: As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) **terrorism**.



### H.   CONSEQUENTIAL REDUCTION IN VALUE

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from insured physical loss or damage to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

### I.   CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by or for the Insured as follows:

1)   the Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2)   the Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3)   property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4)   any salvage proceeds received will go to the:

    a)   Company at the time of loss settlement; or

    b)   Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

### J.   DEBRIS REMOVAL

This Policy covers the reasonable and necessary costs incurred to remove debris from an insured **location** that remains as a direct result of insured physical loss or damage.

This Additional Coverage does not cover the costs of removal of:

1)   contaminated uninsured property; or

2)   the **contaminant** in or on uninsured property,

whether or not the **contamination** results from insured physical loss or damage.  This Additional Coverage covers the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

### K.   DECONTAMINATION COSTS

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal



Account No.   1-56297
Policy No.   1056630

of such contaminated insured property in a manner to satisfy such law or ordinance. This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** results from an insured event.

## L.   ERRORS AND OMISSIONS

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1)   in the description of where insured property is physically located;

2)   to include any **location**:

   a)   owned, leased or rented by the Insured on the effective date of this Policy; or

   b)   purchased, leased or rented by the Insured during the term of this Policy; or

3)   that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## M.   EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1)   for the temporary repair of insured physical damage to insured property;

2)   for the temporary replacement of insured equipment suffering insured physical damage; and

3)   to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

## N.   INSTALLMENT OR DEFERRED PAYMENTS

This Policy covers insured physical loss or damage to personal property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer. Coverage is limited to the unpaid balance for such property.



In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1) pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2) from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

3) to the extent the buyer continues payments.

4) not within the TERRITORY of this Policy.

INSTALLMENT OR DEFERRED PAYMENTS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1) total amount of unpaid installments less finance charges.

2) **actual cash value** of the property at the time of loss.

3) cost to repair or replace with material of like size, kind and quality.

## O. LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of the actual not suspected presence of **contaminant(s)** from uninsured property consisting of land, water or any other substance in or on land at the insured **location** if the release, discharge or dispersal of such **contaminant(s)** is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of **contamination** from such property:

1) at any **location** insured for Personal Property only.

2) at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY coverage provided by this Policy.

3) when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

## P. LAW AND ORDINANCE

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

1) such law or ordinance is enforced as a direct result of insured physical loss or damage at an insured **location**;



2)   such law or ordinance is in force at the time of such loss or damage; and

3)   such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

1)   demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

2)   repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

The Company's maximum liability for this Coverage A at each insured **location** in any **occurrence** will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

1)   the reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

2)   the cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

LAW AND ORDINANCE Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced, the loss amount will be the difference between:

1)   the **actual cash value**; and

2)   the cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

LAW AND ORDINANCE Exclusions: As respects LAW AND ORDINANCE, the following additional exclusions apply:

This Policy does not cover:

1)   any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.



Account No. 1-56297
Policy No. 1056630

2) any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

### Q. LOSS PAYMENT INCREASED TAX LIABILITY

This Policy covers the increase in tax liability as described herein incurred by the Insured.

Coverage A:

The increase in tax liability from an insured loss at an insured **location** if the tax treatment of:

1) the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or

2) the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss happened.

### R. MACHINERY OR EQUIPMENT STARTUP OPTION

After insured machinery or equipment that has sustained insured physical loss or damage is repaired or replaced and such machinery or equipment is undergoing startup, the following applies:

If physical loss or damage of the type insured directly results to such machinery or equipment from such startup, the Insured shall have the option of claiming such resulting insured damage as part of the original event of physical loss or damage or as a separate **occurrence**.

This Additional Coverage applies only:

1) to the first startup event after the original repair or replacement; and

2) when the first startup event happens during the term of this Policy or its renewal issued by the Company.

For the purposes of this Additional Coverage, startup means:

1) the introduction into machinery or equipment of feedstock or other materials for processing or handling;

2) the commencement of fuel or energy supply to machinery or equipment.

### S. MISCELLANEOUS PROPERTY

This Policy covers insured physical loss or damage to:

1) insured property;

2) property of the type insured that is under contract to be used in a construction project at an insured **location**:



   a)   from the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier;

   b)   while such property is located at a storage site; and

   c)   while such property is in transit from a storage site to another storage site or to a construction project at an insured **location**,

that does not include any such property owned or rented by the contractor;

while anywhere within this Policy's TERRITORY, including while in transit.

This Additional Coverage excludes property covered elsewhere in this Policy.

MISCELLANEOUS PROPERTY Exclusions: As respects MISCELLANEOUS PROPERTY, the following additional exclusions apply:

1)   This Policy excludes:

   a)   **transmission and distribution systems** not at a **location**.

   b)   property insured under import or export ocean marine insurance.

   c)   property shipped between continents.

   d)   airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

   e)   property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

2)   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

## T.   OPERATIONAL TESTING

This Policy covers insured physical loss or damage to insured property during the **period of operational testing**.

This Additional Coverage excludes property, including stock or material, manufactured or processed by the Insured.

## U.   PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:



1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2) reasonable and necessary:

   a) fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

   b) costs incurred of restoring and recharging fire protection systems following an insured loss.

   c) costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in this section of the Policy.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## V. SERVICE INTERRUPTION PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION PROPERTY DAMAGE Exclusions: As respects SERVICE INTERRUPTION PROPERTY DAMAGE, the following applies:

1) The exclusions in the EXCLUSIONS clause in this section do not apply except for:

   a) A1, A2, A3, A6, B1, B2, and



    b)   B4 with respect to incoming or outgoing voice, data or video, and

    c)   D1 except with respect to fungus, mold or mildew.

2)   The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

    a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

    b)   **terrorism**.

## W.    TEMPORARY REMOVAL OF PROPERTY

When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

1)   while at the premises to which such property has been moved; and

2)   for physical loss or damage as provided at the insured **location** from which such property was removed.

This Additional Coverage does not apply to property:

1)   insured, in whole or in part, elsewhere in this Policy.

2)   insured, in whole or in part, by any other insurance policy.

3)   removed for normal storage, processing or preparation for sale or delivery.

## X.    TERRORISM

This Policy covers physical loss or damage to property as described in the INSURANCE PROVIDED provision caused by or resulting from **terrorism**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage does not cover loss or damage which also comes within the terms of either item B2a or B2c of the EXCLUSIONS clause in this section of the Policy.

This Additional Coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event,



whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

1) that involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, or radioactive force, whether in time of peace or war and regardless of who commits the act; or

2) that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3) in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

4) that involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## Y.   TRANSPORTATION

This Policy covers the following personal property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

1) owned by the Insured.

2) shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

3) of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

4) of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

   a) when shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer.

   b) when shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer.

Coverage Attachment and Duration:

1) This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.

2) However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

This Additional Coverage:

1) covers general average and salvage charges on shipments covered while waterborne.



   2) insures physical loss or damage caused by or resulting from:

      a) unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

      b) improper parties having gained possession of property through fraud or deceit.

Additional General Provisions:

1) This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

2) The Insured has permission, without prejudicing this insurance, to accept:

      a) ordinary bills of lading used by carriers;

      b) released bills of lading;

      c) undervalued bills of lading; and

      d) shipping or messenger receipts.

3) The Insured may waive subrogation against railroads under side track agreements.

Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

TRANSPORTATION Exclusions: As respects TRANSPORTATION, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1 through A4, B1 through B5, C1, C3, C5, C6, D1 through D3.

2) the following additional exclusions apply:

This Policy excludes:

      a) samples in the custody of salespeople or selling agents.

      b) property insured under import or export ocean marine insurance.

      c) waterborne shipments, unless:

         (i) by inland water; or

         (ii) by coastal shipments.

      d) waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

      e) airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.



f) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

g) any transporting vehicle.

TRANSPORTATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured. Included in the value are accrued costs and charges legally due. Charges may include the Insured's commission as selling agent.

2) Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount. Prepaid or advanced freight costs are included.

3) Property not under invoice will be valued:

a) for property of the Insured, at the valuation provisions of this Policy applying at the place from which the property is being transported; or

b) for other property, at the actual cash market value at the destination point on the date of loss,

less any charges saved which would have become due and payable upon arrival at destination.

## Z.  VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to **valuable papers and records** while anywhere within this Policy's TERRITORY, including while in transit.

VALUABLE PAPERS AND RECORDS Exclusions: As respects VALUABLE PAPERS AND RECORDS, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, A7, B1, B2, B3a and B4.

2) the following additional exclusions apply:

.This Policy excludes:

a) currency, money, securities.

b) errors or omissions in processing or copying of **valuable papers and records**, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

c) deterioration, inherent vice, or wear and tear, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

d) fungus, mold or mildew unless directly resulting from other physical damage not excluded by this Policy.



VALUABLE PAPERS AND RECORDS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1) the cost to repair or restore such property to the physical condition that existed on the date of loss.

2) the cost to replace.

3) the value, if any, designated for the item on the schedule on file with the Company.



## TIME ELEMENT

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS of this section of the Policy:

A.    is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION; and

B.    will not increase the Policy limit of liability; and

C.    is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## 1.    LOSS INSURED

A.    This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:

   1)    to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

   2)    used by the Insured, or for which the Insured has contracted use;

   3)    while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or

   4)    while in transit as provided by this Policy, and

   5)    during the Periods of Liability described in this section,

   provided such loss or damage is not at a **contingent time element location**.

B.    This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

   1)    the use of any property or service owned or controlled by the Insured;

   2)    the use of any property or service obtainable from other sources;

   3)    working extra time or overtime; or

   4)    the use of inventory,

   all whether at an insured **location** or at any other premises. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.

C.    This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.



Account No.   1-56297
Policy No.   1056630

D.   In determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY. The probable experience will consider any increase or decrease in demand for the Insured's goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused physical loss or damage starting the PERIOD OF LIABILITY.

## 2.   TIME ELEMENT COVERAGES

### A.   INSURED OPTION

The Insured has the option to make claim based on either

a)   GROSS EARNINGS and EXTENDED PERIOD OF LIABILITY; or

b)   GROSS PROFIT,

as described in the TIME ELEMENT section of this Policy and subject to the applicable terms and conditions as may be shown elsewhere.

Such option may be exercised at any time prior to the conditions set forth in the SETTLEMENT OF CLAIMS clause in the LOSS ADJUSTMENT AND SETTLEMENT section of this Policy.

If such claim involves more than one insured **location**, including interdependency at one or more insured **locations**, such claim will be adjusted by using the single coverage option chosen above.

### B.   GROSS EARNINGS

Measurement of Loss:

1)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a)   Gross Earnings;

b)   less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

c)   plus all other earnings derived from the operation of the business.

2)   For the purposes of the Measurement of Loss, Gross Earnings is:

for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.



Account No.  1-56297
Policy No.  1056630

Any amount recovered under property damage coverage at selling price will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

3)   In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

4)   There is recovery hereunder to the extent that the Insured is:

   a)   wholly or partially prevented from producing goods or continuing business operations or services;

   b)   unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

   c)   unable to continue such operations or services during the PERIOD OF LIABILITY; and

   d)   able to demonstrate a loss of sales for the operations, services or production prevented.

## C.   GROSS PROFIT

Measurement of Loss:

1)   The recoverable GROSS PROFIT loss is the Actual Loss Sustained by the Insured of the following due to the necessary interruption of business during the PERIOD OF LIABILITY: a) Reduction in Sales and b) Increase in Cost of Doing Business.  The amount payable as indemnity hereunder will be:

   a)   with respect to Reduction in Sales:  The sum produced by applying the Rate of Gross Profit to the amount by which the sales during the PERIOD OF LIABILITY will fall short of the Standard Sales.  In determining the Reduction in Sales, any amount recovered under property damage coverage at selling price will be credited against lost sales.

   b)   with respect to Increase in Cost of Doing Business:

      (i)   the additional expenditure necessarily and reasonably incurred for the sole purpose of avoiding or diminishing the reduction in sales which, but for that expenditure, would have taken place during the PERIOD OF LIABILITY; but

      (ii)   not exceeding the sum produced by applying the Rate of Gross Profit to the amount of the reduction thereby avoided,

   all less any sum saved during the PERIOD OF LIABILITY with respect to such of the Insured Fixed Charges as may cease or be reduced because of such interruption of business.

2)   For the purposes of the Measurement of Loss:



Account No. 1-56297
Policy No. 1056630

Gross Profit is:

The amount produced by adding to the Net Profit the amount of the Insured Fixed
Charges, or if there be no Net Profit the amount of the Insured Fixed Charges less that
proportion of any loss from business operations as the amount of the Insured Fixed
Charges bears to all fixed charges.

Net Profit is:

The net operating profit (exclusive of all capital receipts and accruals and all outlay
properly chargeable to capital) resulting from the business of the Insured at the insured
**locations** after due provision has been made for all fixed charges and other expenses
including depreciation but before the deduction of any taxes on profits.

Insured Fixed Charges is:

All fixed charges unless specifically excluded herein.

Sales is:

The money paid or payable to the Insured for goods sold and delivered and for services
rendered in the conduct of the business at an insured **location**.

Rate of Gross Profit is:

The rate of Gross Profit earned on the sales during the twelve full calendar months
immediately before the date of the physical loss or damage to the described property.

Standard Sales is:

The sales during that period in the twelve months immediately before the date of the
physical loss or damage to the described property which corresponds with the PERIOD
OF LIABILITY.

3) In determining the indemnity payable as the Actual Loss Sustained:

   a) if any fixed charges of the business are not insured hereunder, then, in computing the
      amount recoverable hereunder as Increase in Cost of Doing Business, that proportion
      only of the additional expenditure will be recoverable hereunder which the sum of
      the Net Profit and the Insured Fixed Charges bears to the sum of the Net Profit and
      all the fixed charges.

   b) if during the PERIOD OF LIABILITY goods will be sold or services will be
      rendered elsewhere than at the insured **locations** for the benefit of the business,
      either by the Insured or by others on the Insured's behalf, the money paid or payable
      in respect of such sales or services will be included in arriving at the amount of sales
      during the PERIOD OF LIABILITY.

4) The Insured will act with due diligence and dispatch in repairing or replacing physically
   damaged buildings and equipment to the same or equivalent physical and operating
   conditions that existed prior to the damage; and take whatever actions are necessary and
   reasonable to minimize the loss payable hereunder.



GROSS PROFIT Exclusions: As respects GROSS PROFIT, the TIME ELEMENT EXCLUSIONS B and C of this section do not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under GROSS PROFIT for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the PERIOD OF LIABILITY.

### D.   EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1)   extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2)   extra costs of temporarily using property or facilities of the Insured or others; and

3)   costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the INSURED OPTION clause, the PERIOD OF LIABILITY for EXTRA EXPENSE coverage will be the PERIOD OF LIABILITY applicable to the Time Element coverage option selected.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1)   TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)   The following additional exclusions apply:

   This Policy does not insure:

   a)   any loss of income.

   b)   costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

   c)   costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

   d)   any expense recoverable elsewhere in this Policy.



### E. LEASEHOLD INTEREST

Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

1) If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

2) If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

3) . As used above, the following terms mean:

Net Lease Interest:
That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

Lease Interest:
The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, the following applies:

1) This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

2) TIME ELEMENT EXCLUSIONS A, B and C do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

### F. RENTAL INSURANCE

Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

1) the fair rental value of any portion of the property occupied by the Insured;

2) the income reasonably expected from rentals of unoccupied or unrented portions of such property; and

3) the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,



all not to include noncontinuing charges and expenses.

RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

**3. PERIOD OF LIABILITY**

A.  The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except GROSS PROFIT and LEASEHOLD INTEREST and as shown below or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

1)  For building and equipment, the period:

a)  starting from the time of physical loss or damage of the type insured; and

b)  ending when with due diligence and dispatch the building and equipment could be:

(i)  repaired or replaced; and

(ii)  made ready for operations,

under the same or equivalent physical and operating conditions that existed prior to the damage.

c)  not to be limited by the expiration of this Policy.

2)  For building and equipment under construction:

a)  the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

b)  due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

3)  For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

a)  to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

b)  to replace physically damaged mercantile stock.

This item does not apply to RENTAL INSURANCE.

4)  For raw materials and supplies, the period of time:



    a) of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

    b) limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5) If water:

    a) used for any manufacturing purpose, including but not limited to as a raw material or for power;

    b) stored behind dams or in reservoirs; and

    c) on any insured **location,**

is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6) For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation. This time does not include research, engineering or any other time necessary to restore or recreate lost information.

This item does not apply to RENTAL INSURANCE.

7) For physically damaged or destroyed property covered under DATA RESTORATION, the period:

    a) starting from the time of **physical loss or damage to electronic data, programs or software**; and

    b) ending when with due diligence and dispatch the electronic data, programs or software could have been recreated or restored under the same or equivalent physical and operating conditions that existed prior to the physical loss or damage.

This item does not apply to RENTAL INSURANCE.

B. The PERIOD OF LIABILITY applying to GROSS PROFIT is as follows:

1) The period:

    a) starting from the time of physical loss or damage of the type insured; and

    b) ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,



during which period the results of the business shall be directly affected by such damage.

    c) not to be limited by the expiration of this Policy.

  2) For property under construction, the period:

    a) starting on the date that production, business operation or service would have commenced if physical damage of the type insured had not happened; and

    b) ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

    during which period the results of the business shall be directly affected by such damage.

    c) not to be limited by the expiration of this Policy.

    The Rate of Gross Profit and Standard Sales will be based on the experience of the business after construction is completed and the probable experience during the PERIOD OF LIABILITY.

C. The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

  1) making changes to the buildings, structures, machinery or equipment except as provided in the LAW AND ORDINANCE clause in the PROPERTY DAMAGE section.

  2) restaffing or retraining employees. However, this item does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is completed within 90 consecutive days after the new machinery or equipment has been installed.

  If two or more Periods of Liability apply such periods will not be cumulative.

## 4. TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure:

A. Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

  1) physical loss or damage not insured by this Policy on or off of the insured **location**.

  2) planned or rescheduled shutdown.

  3) strikes or other work stoppage.



Account No. 1-56297
Policy No. 1056630

4) any other reason other than physical loss or damage insured under this Policy.

B. Any increase in loss due to:

1) suspension, cancellation or lapse of any lease, contract, license or orders.

2) damages for breach of contract or for late or noncompletion of orders.

3) fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

4) any other consequential or remote loss.

C. Any loss resulting from physical loss or damage to finished goods manufactured by the Insured, or the time required for their reproduction.

D. Any loss resulting from the **actual cash value** portion of direct physical loss or damage by fire caused by or resulting from **terrorism**.

## 5. TIME ELEMENT COVERAGE EXTENSIONS

This Policy also insures TIME ELEMENT loss, as provided by the TIME ELEMENT COVERAGES of this Policy, for the TIME ELEMENT COVERAGE EXTENSIONS described below.

### CYBER TIME ELEMENT COVERAGE EXTENSIONS

### A. DATA SERVICE PROVIDER TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption at an insured **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Extension:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Extension will apply when the period of interruption of **off-premises data processing or data transmission services** is in excess of 24 hours.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.



2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured covered by OWNED NETWORK INTERRUPTION coverage as provided in this section of the Policy.

DATA SERVICE PROVIDER TIME ELEMENT Exclusions: As respects DATA SERVICE PROVIDER TIME ELEMENT, the following applies:

1)   Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

   a)   incoming electricity, fuel, water, gas, steam or refrigerant; and

   b)   outgoing sewerage.

2)   The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone.**

   b)   **terrorism.**

As used above, the period of interruption of **off-premises data processing or data transmission services:**

1)   is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2)   is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3)   does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## B.   OWNED NETWORK INTERRUPTION

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption directly resulting from:



1) the failure of the Insured's **electronic data processing equipment or media** to operate, provided that such failure is the direct result of a **cyber event** directed at the NAMED INSURED; or

2) the Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending **cyber event** directed at the NAMED INSURED, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

For the purposes of this Extension, the Insured's **electronic data processing equipment or media** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

As respects item 1 above, this Extension will apply when the period of interruption is in excess of 48 hours.

As used above, the period of interruption:

1) is the period starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure.

2) does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS

### A.   CIVIL OR MILITARY AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.



Account No.   1-56297
Policy No.    1056630

**B.   CONTINGENT TIME ELEMENT EXTENDED**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the
Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage
of the type insured to property of the type insured at **contingent time element locations**
located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1)   Time Element loss recoverable under this Extension is extended to include the following
     TIME ELEMENT COVERAGE EXTENSIONS:

     CIVIL OR MILITARY AUTHORITY
     CONTINGENT TIME ELEMENT EXTENDED
     DATA SERVICE PROVIDER TIME ELEMENT
     DELAY IN STARTUP
     EXTENDED PERIOD OF LIABILITY
     INGRESS/EGRESS
     ON PREMISES SERVICES
     SERVICE INTERRUPTION TIME ELEMENT

2)   The Insured will influence and cooperate with the **contingent time element location** in
     every way and take any reasonable and necessary action to mitigate the loss payable
     hereunder.

3)   TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions: As respects CONTINGENT
TIME ELEMENT EXTENDED, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing transmission of voice, data or video.

2)   **earth movement** as respects a direct or indirect customer, supplier, contract
     manufacturer or contract service provider located in California, in the **New Madrid
     Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

3)   physical loss or damage caused by or resulting from **terrorism**, regardless of any other
     cause or event, whether or not insured under this Policy, contributing concurrently or in
     any other sequence of loss.

**C.   INGRESS/EGRESS**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the
Insured during the PERIOD OF LIABILITY due to the necessary interruption of the
Insured's business due to partial or total physical prevention of ingress to or egress from an
insured **location**, whether or not the premises or property of the Insured is damaged,
provided that such prevention is a direct result of physical damage of the type insured to
property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional
exclusions apply:



This Policy does not insure loss resulting from:

1) lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2) picketing or other action by strikers except for physical damage not excluded by this Policy.

3) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

## D.    LOGISTICS EXTRA COST

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:

1) directly between insured **locations**; or

2) directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,

provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

1) extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.

This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

LOGISTICS EXTRA COST Exclusions: As respects LOGISTICS EXTRA COST, the following additional exclusions apply:



Account No.   1-56297
Policy No.   1056630

This Policy does not insure:

1) any loss resulting from disruption in the movement of goods or materials between **contingent time element locations**.

2) any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

3) any loss of income.

4) costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** movement of goods or materials.

5) costs of permanent repair or replacement of property that has been damaged or destroyed.

6) any expense recoverable elsewhere in this Policy.

7) any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

8) any loss resulting from disruption caused by loss or damage from **earth movement** in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

9) any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of physical loss or damage causing the disruption of the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured, and

2) ending not later than:

a) when with due diligence and dispatch the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured could be resumed; or

b) the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

E.   **SERVICE INTERRUPTION TIME ELEMENT**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured **location** when the loss is



caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

This Extension will apply when the period of service interruption is in excess of 24 hours.

Additional General Provisions:

1)  The Insured will immediately notify the suppliers of services of any interruption of such services.

2)  The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION TIME ELEMENT Exclusions: As respects SERVICE INTERRUPTION TIME ELEMENT, the following applies:

1)  The exclusions in the EXCLUSIONS clause in the PROPERTY DAMAGE section do not apply except for:

   a)  A1, A2, A3, A6, B1, B2, and

   b)  B4 with respect to incoming or outgoing voice, data or video, and

   c)  D1 except with respect to fungus, mold or mildew.

2)  The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a)  **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b)  **terrorism**.

As used above, the period of service interruption:

1)  is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2)  is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3)  does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).



## ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS

### A.  ATTRACTION PROPERTY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**.

ATTRACTION PROPERTY Exclusions: As respects ATTRACTION PROPERTY, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1)  physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of such physical damage; and

2)  ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

### B.  CRISIS MANAGEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location**, provided such order is a direct result of:

1)  a violent crime, suicide, attempted suicide, or armed robbery; or

2)  a death or bodily injury caused by a workplace accident;

at such insured **location**.

For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the PERIOD OF LIABILITY is in excess of 4 hours.

CRISIS MANAGEMENT Exclusions: As respects CRISIS MANAGEMENT, the following additional exclusion applies:



This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) **terrorism**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting with the time the civil or military authority prohibits access; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

## C. DELAY IN STARTUP

GROSS EARNINGS or GROSS PROFIT and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

## D. EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1) the interruption of business as covered by GROSS EARNINGS;

2) for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

3) commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included in this Policy.

However, this Extension does not apply to GROSS EARNINGS loss resulting from physical loss or damage caused by or resulting from **terrorism**.

EXTENDED PERIOD OF LIABILITY Exclusions: As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.



Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## E.  INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

2) loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of the order of the authorized governmental agency or the Officer of the Insured; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

## F.   ON PREMISES SERVICES

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage



of the type insured to the following property located within 1,000 feet/300 metres of the insured **location**:

1)   Electrical equipment and equipment used for the transmission of voice, data or video.

2)   Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

## G.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Extension does not cover the Actual Loss Sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in the PROPERTY DAMAGE section.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## H.   RELATED REPORTED VALUES

If reported TIME ELEMENT values include:

1)   **locations** used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such **locations**,

3)   from insured physical loss or damage at an insured **location**,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such insured **location**.

## I.   RESEARCH AND DEVELOPMENT

The GROSS EARNINGS and GROSS PROFIT coverages are extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and ordinary payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the PERIOD OF LIABILITY, however, this additional coverage does not cover any overhead, laboratory, research and experimental costs insured elsewhere in this Policy.

The PERIOD OF LIABILITY for this Extension will be the period from the time of direct physical loss or damage of the type insured to the time when the property could be repaired or replaced and made ready for operations, but not to be limited by the date of expiration of this Policy.



J.    **SOFT COSTS**

This Policy covers the Actual Loss Sustained incurred by the Insured of **soft costs** during the
PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions
under construction directly resulting from physical loss or damage of the type insured to
insured property under construction at an insured **location**.



## LOSS ADJUSTMENT AND SETTLEMENT

1.   **REQUIREMENTS IN CASE OF LOSS**

The Insured will:

1)   give immediate written notice to the Company of any loss.

2)   protect the property from further loss or damage.

3)   promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4)   give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company.  The proof of loss must state the knowledge and belief of the Insured as to:

   a)   the time and origin of the loss.

   b)   the Insured's interest and that of all others in the property.

   c)   the **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d)   any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e)   by whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5)   include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6)   further, the Insured, will as often as may be reasonably required:

   a)   exhibit to any person designated by the Company all that remains of any property;

   b)   submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c)   produce for examination at the request of the Company:

      (i)   all books of accounts, business records, bills, invoices and other vouchers; or

      (ii)   certified copies if originals are lost,

   at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.



2.  **CURRENCY FOR LOSS PAYMENT**

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the Insured.

3.  **PARTIAL PAYMENT OF LOSS SETTLEMENT**

In the event of insured physical loss or damage determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s), subject to the Policy's provisions. To obtain such partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.

4.  **COLLECTION FROM OTHERS**

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

5.  **SUBROGATION**

The Insured is required to cooperate in any subrogation proceedings. The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)   any applicable deductible; and/or

2)   any provable uninsured loss,

bears to the entire provable loss amount.

6.  **COMPANY OPTION**

The Company has the option to take all or any part of damaged property at the agreed or appraised value. The Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

7.  **ABANDONMENT**

There may be no abandonment of any property to the Company.

8.  **APPRAISAL**

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1)   the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and



2) the Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1) pay its chosen appraiser; and

2) bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

## 9. SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1) the Insured has fully complied with all the provisions of this Policy; and

2) legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

## 10. SETTLEMENT OF CLAIMS

The amount of loss for which the Company may be liable will be paid within 30 days after:

A. proof of loss as described in this Policy is received by the Company; and

B. when a resolution of the amount of loss is made either by:

1) written agreement between the Insured and the Company; or

2) the filing with the Company of an award as provided in the APPRAISAL clause of this section.



Account No.   **1-56297**
Policy No.   **1056630**



## GENERAL PROVISIONS

### 1. CANCELLATION/NON-RENEWAL

This Policy may be:

A.   cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.   cancelled by the Company by giving the Insured not less than:

   1)   60 days' written notice of cancellation; or

   2)   10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.   non-renewed by the Company by giving the Insured not less than 60 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

### 2. INSPECTIONS

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.  The Company does not address life, safety or health issues.

The Company's:

A.   right to make inspections;

B.   making of inspections; or

C.   providing recommendations or other information in connection with any inspections,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

### 3. PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS

A.   If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for insured **locations** within such jurisdictions.



**Account No. 1-56297**
**Policy No. 1056630**

B.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of provinces in Canada.  The endorsements modify this Policy with respect to any insured property located in the province in which the endorsement applies.

C.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America.  The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

D.   In respect of any insured property located in France or in French territories, coverage is provided for loss or damage caused by or resulting from acts of terrorism committed within France or within French territories, in accordance with articles L126-2, R126-1 and R126-2 of the Insurance Code and decree 2001-1337 dated 28 December 2001.

E.   Notwithstanding anything contained in this Policy to the contrary, there is no coverage for loss or damage and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of this Policy, caused by or resulting from the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

   1)   **terrorism** for property located in **Great Britain**.

F.   Coverage is provided for physical loss or damage and any resulting TIME ELEMENT loss as provided in the TIME ELEMENT section of this Policy to insured property in Northern Ireland occasioned by or happening through or in consequence directly or indirectly of:

   1)   riot, civil commotion and (except in respect of loss or damage and resulting TIME ELEMENT loss by fire or explosion) strikers, locked-out workers or persons taking part in labor disturbances or malicious persons; and

   2)   **terrorism**,

   subject to liability of the Company only to be for the extent of the loss not recoverable by the Insured under the "Criminal Damage (Compensation) (Northern Ireland) Order 1977" or subsequent legislation; and to all other terms, conditions and limits of this Policy.

G.   For any insured property located in Norway, this Policy insures against loss or damage to insured property resulting from Natural Catastrophe perils as designated in the Act of Natural Perils of June 16th, 1989.

H.   With respect to any insured property in South Africa, the following conditions additionally apply:

   Notwithstanding anything contained herein to the contrary:

   1)   This Policy does not cover loss of or damage directly or indirectly to property related to or caused by:

      a)   civil commotion, labour disturbances, riot, strike, lockout or public disorder or any act or activity which is calculated or directed to bring about any of the above;

      b)   war, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not) or civil war;

      c)   (i)   mutiny, military rising, military or usurped power, martial law or state of siege,



or any other event or cause which determines the proclamation or maintenance of martial law or siege;

(ii) insurrection, rebellion or revolution.

d) any act (whether on behalf of any organization, body or person, or group of persons) calculated or directed to overthrow or influence any state or government, or any provincial, local or tribal authority with force, or by means of fear, terrorism or violence;

e) any act which is calculated or directed to bring about loss or damage in order to further any political aim, objective or cause or to bring about any social or economic change, or in protest against any state or government, or any provincial, local or tribal authority, or for the purpose of inspiring fear in the public, or any section thereof;

f) any attempt to perform any act referred to in clause d or e above;

g) The act of any lawfully established authority in controlling, preventing, suppressing or in any other way dealing with any event referred to in clause a, b, c, d, e or f above.

If the Insurers allege that by reason of clauses a, b, c, d, e, f, or g of this exclusion, loss or damage is not covered by this Policy, the burden of proving the contrary will rest on the Insured.

2) This Policy does not cover loss or damage caused directly or indirectly by or through or in consequence of any event for which a fund has been established in terms of the War Damage Insurance and Compensation Act 1976 (No. 85 of 1976) or any similar Act operative in any of the territories to which this Policy applies.

I. As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy shall be considered an act of **terrorism** within the terms of this Policy. Coverage recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) is excluded from any other coverage under this Policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) and this Policy is not recoverable under this Policy.

## 4. LIBERALIZATION

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## 5. MISREPRESENTATION AND FRAUD

This entire Policy will be void if, whether before or after a loss, an Insured has:



Account No. 1-56297
Policy No. 1056630

A. willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

B. made any attempt to defraud the Company.

C. made any false swearing.

## 6. LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

A. The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B. The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

1) any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

2) foreclosure, notice of sale, or similar proceedings with respect to the property.

3) change in the title or ownership of the property.

4) change to a more hazardous occupancy.

The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C. If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1) sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2) this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D. The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.



E.   The Company has the right to invoke this Policy's SUSPENSION clause.  The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension.  The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

F.   If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage.  No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim.  At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

G.   If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.   Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 7.   OTHER INSURANCE

A.   If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.   In no event will this Policy apply as contributing insurance.

C.   The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy.  Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.   The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy.  The existence of such other insurance will not prejudice recovery under this Policy.  If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.   If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with the Company.

## 8.   POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy.  This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:



A.   create a waiver, or change any part of this Policy; or

B.   prevent the Company from asserting any rights under the provisions of this Policy.

## 9.   REDUCTION BY LOSS

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any **annual aggregate** limit.

## 10.   SUSPENSION

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured. The suspended insurance may be reinstated by the Company. Any unearned premium resulting from such suspension will be returned by the Company.

## 11.   TITLES

The titles in this Policy are only for reference. The titles do not in any way affect the provisions of this Policy.

## 12.   ASSIGNMENT

Assignment of this Policy will not be valid except with the written consent of the Company.

## 13.   DEFINITIONS

The following terms when appearing in **boldface** in this Policy mean:

**actual cash value:**
the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**annual aggregate:**
the Company's maximum amount payable during any policy year.

**communicable disease:**
disease which is:

A.   transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B.   Legionellosis.

**contaminant:**
anything that causes **contamination**.

**contamination:**
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.



Account No. 1-56297
Policy No. 1056630

**contingent time element location**:
A. any **location**:

   1) of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

   2) of any company under a royalty, licensing fee or commission agreement with the Insured;

B. any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**cyber event**:
any act involving the malicious or unauthorized access to, operation of, or use of **electronic data processing equipment or media**, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **cyber event** will not be considered to be loss by **cyber event** within the terms and conditions of this Policy.

**date or time recognition**:
the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**day equivalent contribution**:
an amount equivalent to the number of days stated times the following:

the 100% daily Time Element value for the property experiencing the physical loss or damage including all dependent operations impaired as a result of the physical loss or damage. The 100% daily Time Element value of the property experiencing the physical damage will be its percentage contribution to the daily Time Element value that would have been earned following the **occurrence** at the **location** where the physical damage happened and all other **locations** where TIME ELEMENT loss ensues.

**earth movement**:
any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage, or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media**:
any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**flood**:
flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or



man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.  Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy.  However, physical loss or damage by fire; explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**historic buildings**:
buildings which are declared by a local, state or federal authority to be of historical significance or historical value and such property is regulated by the enforcement of any law or ordinance regulating the construction, repair, replacement or use of buildings or structures at an insured **location.**

**location**:
A.    as specified in the Schedule of Locations, or

B.    if not so specified in the Schedule of Locations:

1)    a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing),

a)    bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres wide.  Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**New Madrid Seismic Zone:**
Arkansas, United States of America, counties of:
Arkansas, Clay, Craighead, Crittenden, Cross, Fulton, Greene, Independence, Izard, Jackson, Lawrence, Lee, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Randolph, Sharp, St. Francis, White, Woodruff

Illinois, United States of America, counties of:
Alexander, Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jasper, Jefferson, Johnson, Lawrence, Madison, Marion, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Richland, Saline, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson

Indiana, United States of America, counties of:
Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick

Kentucky, United States of America, counties of:
Ballard, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Henderson, Hickman, Hopkins, Livingston, Lyon, Marshall, McCracken, McLean, Muhlenberg, Todd, Trigg, Union, Webster

Mississippi, United States of America, counties of:
Alcorn, Benton, Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tippah, Tunica

Missouri, United States of America, counties of:
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Jefferson, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, St. Francois, St. Louis, City of St. Louis, Ste. Genevieve, Stoddard, Washington, Wayne



Tennessee, United States of America, counties of:
Benton, Carroll, Chester, Crockett, Decatur, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Houston, Humphreys, Lake, Lauderdale, Madison, McNairy, Montgomery, Obion, Perry, Shelby, Stewart, Tipton, Weakley

**normal**:
the condition that would have existed had no physical loss or damage happened.

**normal cost**:
the cost associated with the movement of goods or materials suffering the disruption that the Insured would have incurred had no physical loss or damage causing disruption happened.

**occurrence**:
the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

A.   **terrorism: occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

B.   **earth movement: occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services**:
the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**Pacific Northwest Seismic Zone**:
Oregon, United States of America, counties of:
Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill

Washington, United States of America, counties of:
Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

British Columbia (includes Vancouver Island), Canada:
South of 50° N latitude and west of 120° W longitude

**period of operational testing**:
the period of time beginning 24 hours prior to the earlier of the following:

A.   introduction, into a system, of feedstock or other materials for processing or handling;

B.   commencement of fuel or energy supply to a system,

and ending with the earlier of the following:

A.   the expiration date or cancellation date of this Policy.



B. if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**physical loss or damage to electronic data, programs or software**:
the destruction, distortion or corruption of electronic data, programs or software.

**representative company(ies)**:
Factory Mutual Insurance Company, FM Insurance Company Limited or FM Insurance Europe S.A.; Affiliated FM Insurance Company; Appalachian Insurance Company or any other company issuing a local policy at the direction of the Company.

**soft costs**:
costs over and above those that are **normal** at an insured **location** undergoing renovation or in the course of construction, limited to the following:

A. construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

B. commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

C. additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

D. property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

**terrorism**:
any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

when the effect or apparent purpose is:

A. to influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

B. to further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems**:
transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data, and video. Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**turbine unit**:
any turbine unit including any:



Account No. 1-56297
Policy No. 1056630

A.   driving turbine(s);

B.   electric generator or other driven object;

C.   combustor, precooler, intercooler, regenerator or heat exchanger of any gas turbine unit;

D.   any auxiliary apparatus, mounted on the turbine unit, or in the vicinity of the unit and used predominantly in support of the turbine unit;

E.   shaft which forms a part of the unit or which connects parts of the unit, together with any coupling, clutch, bearing, gear or gear set on said shaft; and

F.   interconnecting wiring, piping or ducts between parts of the unit and which are mounted on the unit;

but shall not include any:

A.   electronic computer or electronics data processing equipment used to govern or control the unit;

B.   machine or apparatus except as included in section A-F above;

C.   condenser, its connecting pipe or adapter;

D.   penstock or draft tube; nor

E.   boiler utilizing exhaust gases from any gas turbine unit.

**valuable papers and records**:
written, printed or otherwise inscribed documents and records, including maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

**wind**:
direct action of wind including substance driven by wind. **Wind** does not mean or include anything defined as **flood** in this Policy.



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0166 | | GWU Hampton Roads Center | 1 Old Oyster Point Road Suite 200 | Newport News | Virginia | 23602-7121 | Newport News (City) | United States of America |
| 2 | 0138 | 043871.24 | Washington Research Library Consortium Warehouse, Upper | 901 Commerce Drive | Upper Marlboro | Maryland | 20774-8701 | Prince George's | United States of America |
| 3 | 0141 | 044430.81 | Northern VA Campus - The Virginia Science & Technology Campus | 44983 Knoll Square | Ashburn | Virginia | 20147-2692 | Loudoun | United States of America |
| | 0198 | 044430.81 | Northern VA Campus - VSTC Incubator and Conservation Facility | 44930 Knoll Square | Ashburn | Virginia | 20147-2692 | Loudoun | United States of America |
| | 0142 | 044430.81 | Northern VA Campus - The Virginia Science & Technology Campus - Exploration Hall | 20101 Academic Way | Ashburn | Virginia | 20147-2604 | Loudoun | United States of America |
| | 0143 | 044430.81 | Northern VA Campus - The Virginia Science & Technology Campus - Innovation Hall | 45085 University Drive | Ashburn | Virginia | 20147-2766 | Loudoun | United States of America |
| 4 | 0162 | 001434.81 | Biostatistics Center Asset Learning | 6110 Executive Boulevard | Rockville | Maryland | 20852-3903 | Montgomery | United States of America |
| 07 | 0163 | 001791.71 | College of Professional Studies | 1925 Ballenger Avenue #250 | Alexandria | Virginia | 22314-6820 | Alexandria (City) | United States of America |
| 09 | 0165 | | | 8712 Spectrum Drive | Landover | Maryland | 20785 | Prince George's | United States of America |
| 12 | 0169 | 002349.52 | The Regent | 950 North Glebe Road | Arlington | Virginia | 22203-1824 | Arlington | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| 13 | 0170 | 002349.53 | University Professional Center Condo | 45155 Research Place, Suite 100 | Ashburn | Virginia | 20147-4192 | Loudoun | United States of America |
| | 0171 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 105 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0172 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 115 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0173 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 140 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0174 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 150 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0175 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 145 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0176 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 155 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0177 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 160 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0178 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 165 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0179 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 205 | Ashburn | Virginia | 20147 | Loudoun | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0180 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 210/ 220 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0181 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 215 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0182 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 225 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0183 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 235 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0184 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 240 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0185 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 245 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0186 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 250 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0187 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 255 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0188 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 260 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0189 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 265 | Ashburn | Virginia | 20147 | Loudoun | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0190 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 275 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0191 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 300 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0192 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 340 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0193 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 350 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0194 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 355 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0195 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 360 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0196 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 365 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| | 0197 | 002349.53 | University Professional Center Condo. | 45155 Research Place, Suite 375 | Ashburn | Virginia | 20147 | Loudoun | United States of America |
| 14 | 0199 | 002945.96 | Corcoran School of the Arts and Design | 500 17th Street Northwest | Washington | District of Columbia | 20006-4899 | District of Columbia | United States of America |
| 15 | 0001 | 043732.07 | Main Campus - Mitchell Hall Dorm. | 514 19th Street Northwest | Washington | District of Columbia | 20052-0047 | District of Columbia | United States of America |
| | 0161 | 043732.07 | United Church/Building YY & XX | 812 & 814 20th Street | Washington | District of Columbia | 20006 | District of Columbia | United States of America |

 **FM Global**

**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0137 | 043732.07 | Main Campus | 2142 F Street Northwest | Washington | District of Columbia | 20037-2709 | District of Columbia | United States of America |
| | 0135 | 043732.07 | Main Campus | 2146 F Street Northwest | Washington | District of Columbia | 20037-2712 | District of Columbia | United States of America |
| | 0136 | 043732.07 | Main Campus | 2150 F Street Northwest | Washington | District of Columbia | 20037-2712 | District of Columbia | United States of America |
| | 0200 | 043732.07 | District House | 2121 H Street Northwest | Washington | District of Columbia | 20052-0080 | District of Columbia | United States of America |
| | 0002 | 043732.07 | Main Campus - Burns Memorial Law Library | 716 20th Street Northwest, 700 20th Street | Washington | District of Columbia | 20052-0035 | District of Columbia | United States of America |
| | 0003 | 043732.07 | Main Campus - Stockton Hall | 720 20th Street Northwest | Washington | District of Columbia | 20052-0036 | District of Columbia | United States of America |
| | 0004 | 043732.07 | Main Campus - Key Hall | 600 20th Street Northwest | Washington | District of Columbia | 20052-0005 | District of Columbia | United States of America |
| | 0005 | 043732.07 | Main Campus - Law Clinic | 650 20th Street Northeast | Washington | District of Columbia | 20002-4718 | District of Columbia | United States of America |
| | 0006 | 043732.07 | Main Campus - Scholar Village Townhouse E | 605 21st Street Northwest | Washington | District of Columbia | 20052-0049 | District of Columbia | United States of America |
| | 0007 | 043732.07 | Main Campus - Strong Hall Dorm | 620 21St & 2100 G St | Washington | District of Columbia | 20006 | District of Columbia | United States of America |
| | 0008 | 043732.07 | Main Campus - Marvin Center | 800 21st Street Northwest | Washington | District of Columbia | 20052-0028 | District of Columbia | United States of America |
| | 0010 | 043732.07 | Main Campus - Davis-Hodgkins House | 609 21st Street Northeast | Washington | District of Columbia | 20002-4721 | District of Columbia | United States of America |
| | 0011 | 043732.07 | Main Campus | 600 21st Street Northwest | Washington | District of Columbia | 20052-0048 | District of Columbia | United States of America |
| | 0012 | 043732.07 | Main Campus - P/O Lenthall Houses | 606 21st Street Northeast | Washington | District of Columbia | 20002-4722 | District of Columbia | United States of America |



| | | SCHEDULE OF LOCATIONS | APPENDIX A | | | | Account No. 1-56297 | Policy No. 1056630 | |
|---|---|---|---|---|---|---|---|---|---|

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0013 | 043732.07 | Main Campus - Scholar Village Townhouse | 607 21st Street Northwest | Washington | District of Columbia | 20052-0049 | District of Columbia | United States of America |
| | 0014 | 043732.07 | Main Campus - P/O Lenthall Houses | 610 21st Street Northwest | Washington | District of Columbia | 20052-0048 | District of Columbia | United States of America |
| | 0015 | 043732.07 | Main Campus - Quigley's | 619 21st Street NW, 2036 G Street | Washington | District of Columbia | 20052-0096 | District of Columbia | United States of America |
| | 0016 | 043732.07 | Main Campus - GWU Museum And Textile Museum | 701 21st Street Northeast | Washington | District of Columbia | 20002-4107 | District of Columbia | United States of America |
| | 0017 | 043732.07 | Main Campus - Hall Of Government | 710 21st Street Northwest | Washington | District of Columbia | 20052-0050 | District of Columbia | United States of America |
| | 0018 | 043732.07 | Main Campus - New Alumni House Off | 714 21st Street Northwest | Washington | District of Columbia | 20052-0050 | District of Columbia | United States of America |
| | 0019 | 043732.07 | Main Campus - Lisner Auditorium | 730 21st Street Northwest, 725 21st Street | Washington | District of Columbia | 20052-0053 | District of Columbia | United States of America |
| | 0020 | 043732.07 | Main Campus - Media & Public Affairs - Jack Morton Auditorium | 805 21st Street Northwest | Washington | District of Columbia | 20052-0031 | District of Columbia | United States of America |
| | 0021 | 043732.07 | Main Campus - Corcoran Hall Offices and Classroom | 719-35 21St St | Washington | District of Columbia | 20006 | District of Columbia | United States of America |
| | 0023 | 043732.07 | Main Campus | 609 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |
| | 0024 | 043732.07 | Main Campus - Smith Center Ogg/Gym | 600 22nd Street Northwest | Washington | District of Columbia | 20052-0055 | District of Columbia | United States of America |
| | 0025 | 043732.07 | Main Campus - Townhouse | 605 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |

FM Global

**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0026 | 043732.07 | Main Campus - Abba Eban House | 607 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |
| | 0027 | 043732.07 | Main Campus - Townhouse | 611 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |
| | 0028 | 043732.07 | Main Campus | 613 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |
| | 0029 | 043732.07 | Main Campus | 615 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |
| | 0030 | 043732.07 | Main Campus | 617 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |
| | 0031 | 043732.07 | Main Campus - Scholar Village Townhouse A | 619 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |
| | 0032 | 043732.07 | Main Campus - Staughton Hall Office | 707 22nd Street Northwest | Washington | District of Columbia | 20052-0057 | District of Columbia | United States of America |
| | 0033 | 043732.07 | Main Campus - Madison Hall Dorm | 736 22nd Street Northwest | Washington | District of Columbia | 20052-0059 | District of Columbia | United States of America |
| | 0034 | 043732.07 | Main Campus - Science and Engineering Hall | 800 22nd Street Northwest | Washington | District of Columbia | 20052-0066 | District of Columbia | United States of America |
| | 0035 | 043732.07 | Main Campus - Science And Engineering Parking Garage | 800 22nd Street Northwest | Washington | District of Columbia | 20052-0066 | District of Columbia | United States of America |
| | 0036 | 043732.07 | Main Campus - Academic Center Office and Classrooms | 801 22nd Street Northwest | Washington | District of Columbia | 20052-0062 | District of Columbia | United States of America |
| | 0037 | 043732.07 | Main Campus | 837 22nd Street Northwest | Washington | District of Columbia | 20052-0058 | District of Columbia | United States of America |



## SCHEDULE OF LOCATIONS
## APPENDIX A

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0038 | 043732.07 | Main Campus | 522 22nd Street Northwest | Washington | District of Columbia | 20052-0054 | District of Columbia | United States of America |
| | 0039 | 043732.07 | Main Campus | 603 22nd Street Northwest | Washington | District of Columbia | 20052-0056 | District of Columbia | United States of America |
| | 0040 | 043732.07 | Main Campus - Scholar Village Townhouse C | 526 22nd Street Northwest | Washington | District of Columbia | 20037-2710 | District of Columbia | United States of America |
| | 0041 | 043732.07 | Main Campus - Scholar Village Townhouse | 520 22nd Street Northwest | Washington | District of Columbia | 20052-0054 | District of Columbia | United States of America |
| | 0042 | 043732.07 | Main Campus - Townhouse Row | 607 23rd Street Northwest | Washington | District of Columbia | 20052-0061 | District of Columbia | United States of America |
| | 0043 | 043732.07 | Main Campus - Mark Shenkman Hall | 616 23rd Street Northwest | Washington | District of Columbia | 20037-2714 | District of Columbia | United States of America |
| | 0044 | 043732.07 | Main Campus - Tompkins Hall - Engineering | 725 23rd Street Northwest | Washington | District of Columbia | 20052-0064 | District of Columbia | United States of America |
| | 0045 | 043732.07 | Main Campus - Jefferson House Condo Unit #217 | 922 24th Street Northwest | Washington | District of Columbia | 20037-2203 | District of Columbia | United States of America |
| | 0046 | 043732.07 | Main Campus - Elliott School | 1957 E Street Northwest | Washington | District of Columbia | 20052-0041 | District of Columbia | United States of America |
| | 0047 | 043732.07 | Main Campus - Elliott Hall | 1959 E Street Northwest | Washington | District of Columbia | 20052-0041 | District of Columbia | United States of America |
| | 0049 | 043732.07 | Main Campus - Lafayette Hall | 2100 I Street Northeast | Washington | District of Columbia | 20002-3220 | District of Columbia | United States of America |
| | 0050 | 043732.07 | Main Campus - Rice Hall Off | 2121 I Street Northeast | Washington | District of Columbia | 20002-3249 | District of Columbia | United States of America |
| | 0051 | 043732.07 | Main Campus | 2129-33 I Street | Washington | District of Columbia | 20006 | District of Columbia | United States of America |



SCHEDULE OF LOCATIONS
APPENDIX A

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0053 | 043732.07 | Main Campus - The Presidents Condo Unite #513 | 2141 I Street Northwest | Washington | District of Columbia | 20037-2320 | District of Columbia | United States of America |
| | 0054 | 043732.07 | Main Campus - Munson Hall Dorm | 2212 I Street Northwest | Washington | District of Columbia | 20052-0013 | District of Columbia | United States of America |
| | 0055 | 043732.07 | Main Campus - Kennedy Onassis | 2222 I Street Northwest | Washington | District of Columbia | 20052-0014 | District of Columbia | United States of America |
| | 0056 | 043732.07 | Main Campus | 2011 I Street Northwest | Washington | District of Columbia | 20006-1808 | District of Columbia | United States of America |
| | 0057 | 043732.07 | Main Campus - Ross Hall Medical School | 2300 I Street Northwest | Washington | District of Columbia | 20052-0011 | District of Columbia | United States of America |
| | 0058 | 043732.07 | Main Campus - Animals - Ross Hall | 2300 I Street Northwest | Washington | District of Columbia | 20052-0011 | District of Columbia | United States of America |
| | 0059 | 043732.07 | Main Campus - Ross Hall Central Utility Plant | 2300 I Street Northwest | Washington | District of Columbia | 20052-0011 | District of Columbia | United States of America |
| | 0060 | 043732.07 | Main Campus - Ross Hall Cogeneration | 2300 I Street Northwest | Washington | District of Columbia | 20052-0011 | District of Columbia | United States of America |
| | 0061 | 043732.07 | Main Campus - Paul Himmelfarb Medical Library | 2300 I Street Northwest | Washington | District of Columbia | 20052-0011 | District of Columbia | United States of America |
| | 0062 | 043732.07 | Main Campus - GW University Club | 1918 F Street Northwest | Washington | District of Columbia | 20052-0042 | District of Columbia | United States of America |
| | 0063 | 043732.07 | Main Campus - Building J-Dorm & Sororities | 2031 F Street Northwest | Washington | District of Columbia | 20052-0045 | District of Columbia | United States of America |
| | 0064 | 043732.07 | Main Campus | 2121 F Street Northwest | Washington | District of Columbia | 20037-2753 | District of Columbia | United States of America |
| | 0065 | 043732.07 | Main Campus | 2123 F Street Northwest | Washington | District of Columbia | 20037-2729 | District of Columbia | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0066 | 043732.07 | Main Campus - Thurston Hall Dorm | 1900-06 F Street Northwest | Washington | District of Columbia | 20006 | District of Columbia | United States of America |
| | 0067 | 043732.07 | Main Campus - The F Street House | 1925 F Street Northwest | Washington | District of Columbia | 20052-0067 | District of Columbia | United States of America |
| | 0068 | 043732.07 | Main Campus - Square 80 - South Hall | 2135 F Street Northwest | Washington | District of Columbia | 20037-2729 | District of Columbia | United States of America |
| | 0069 | 043732.07 | Main Campus - Support Building | 2025 F Street Northwest | Washington | District of Columbia | 20052-0044 | District of Columbia | United States of America |
| | 0070 | 043732.07 | Main Campus | 2033 F Street Northwest | Washington | District of Columbia | 20052-0044 | District of Columbia | United States of America |
| | 0071 | 043732.07 | Main Campus | 2035 F Street Northwest | Washington | District of Columbia | 20052-0044 | District of Columbia | United States of America |
| | 0072 | 043732.07 | Main Campus | 2037 F Street Northwest | Washington | District of Columbia | 20052-0044 | District of Columbia | United States of America |
| | 0073 | 043732.07 | Main Campus - Hillel at the GWU | 2101 F Street Northwest | Washington | District of Columbia | 20052-0069 | District of Columbia | United States of America |
| | 0074 | 043732.07 | Main Campus - Student Occupancy | 2109 F Street Northwest | Washington | District of Columbia | 20037-2713 | District of Columbia | United States of America |
| | 0075 | 043732.07 | Main Campus - Guthridge Hall Dorm | 2115 F Street Northwest | Washington | District of Columbia | 20052-0069 | District of Columbia | United States of America |
| | 0076 | 043732.07 | Main Campus | 2147 F Street., NW | Washington | District of Columbia | 20006 | District of Columbia | United States of America |
| | 0077 | 043732.07 | Main Campus - Potomac House | 2021 F Street Northwest | Washington | District of Columbia | 20052-0044 | District of Columbia | United States of America |
| | 0078 | 043732.07 | Main Campus - The Dakota | 2100 F Street Northwest | Washington | District of Columbia | 20052-0068 | District of Columbia | United States of America |
| | 0079 | 043732.07 | Main Campus - Old Main | 1922 F Street Northwest | Washington | District of Columbia | 20052-0042 | District of Columbia | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0080 | 043732.07 | Main Campus - Scholar Village Townhouse B | 2208 F Street Northwest | Washington | District of Columbia | 20037-2728 | District of Columbia | United States of America |
| | 0081 | 043732.07 | Main Campus | 2140 F Street Northwest | Washington | District of Columbia | 20037-2712 | District of Columbia | United States of America |
| | 0082 | 043732.07 | Main Campus - Townhouse | 2206 F Street Northwest | Washington | District of Columbia | 20037-2728 | District of Columbia | United States of America |
| | 0083 | 043732.07 | Main Campus | 2112 F Street Northwest | Washington | District of Columbia | 20037-2715 | District of Columbia | United States of America |
| | 0084 | 043732.07 | Main Campus | 2144 F Street Northwest | Washington | District of Columbia | 20052-0090 | District of Columbia | United States of America |
| | 0085 | 043732.07 | Main Campus | 2145 G Street Northwest | Washington | District of Columbia | 20037-2731 | District of Columbia | United States of America |
| | 0086 | 043732.07 | Main Campus - Lisner Hall | 2023 G Street Northwest | Washington | District of Columbia | 20052-0023 | District of Columbia | United States of America |
| | 0087 | 043732.07 | Main Campus - Funger Hall Classrooms | 2201 G Street Northwest | Washington | District of Columbia | 20052-0037 | District of Columbia | United States of America |
| | 0088 | 043732.07 | Main Campus - Hortense Amsterdam House | 2110 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0089 | 043732.07 | Main Campus - Building W | 2025-26 G Street Northwest | Washington | District of Columbia | 20002-4212 | District of Columbia | United States of America |
| | 0090 | 043732.07 | Main Campus | 2000 G Street Northwest | Washington | District of Columbia | 20052-0007 | District of Columbia | United States of America |
| | 0092 | 043732.07 | Main Campus - Bell Hall | 2029 G Street Northwest | Washington | District of Columbia | 20052-0024 | District of Columbia | United States of America |
| | 0093 | 043732.07 | Main Campus - Woodhull House | 2033 G Street Northwest | Washington | District of Columbia | 20052-0025 | District of Columbia | United States of America |
| | 0094 | 043732.07 | Main Campus | 2106 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0095 | 043732.07 | Main Campus | 2108 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0096 | 043732.07 | Main Campus | 2112 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0097 | 043732.07 | Main Campus | 2114 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0098 | 043732.07 | Main Campus - Monroe Hall | 2115 G Street Northwest | Washington | District of Columbia | 20052-0073 | District of Columbia | United States of America |
| | 0099 | 043732.07 | Main Campus | 2125 G Street Northwest | Washington | District of Columbia | 20052-0073 | District of Columbia | United States of America |
| | 0100 | 043732.07 | Main Campus | 2127 G Street Northwest | Washington | District of Columbia | 20052-0073 | District of Columbia | United States of America |
| | 0101 | 043732.07 | Main Campus | 2129 G Street Northwest | Washington | District of Columbia | 20052-0073 | District of Columbia | United States of America |
| | 0102 | 043732.07 | Main Campus | 2131 G Street Northwest | Washington | District of Columbia | 20052-0075 | District of Columbia | United States of America |
| | 0103 | 043732.07 | Main Campus | 2136 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0104 | 043732.07 | Main Campus | 2138 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0105 | 043732.07 | Main Campus | 2140 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0106 | 043732.07 | Main Campus - Judaic Studies | 2142 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0107 | 043732.07 | Main Campus - Health & Wellness Center | 2301 G Street Northwest | Washington | District of Columbia | 20052-0079 | District of Columbia | United States of America |
| | 0108 | 043732.07 | Main Campus - Stuart Hall | 2013 G Street Northwest | Washington | District of Columbia | 20052-0022 | District of Columbia | United States of America |
| | 0110 | 043732.07 | Main Campus - The Aston | 1129 New Hampshire Avenue Northwest | Washington | District of Columbia | 20037-1533 | District of Columbia | United States of America |



| | SCHEDULE OF LOCATIONS | | | | | Account No. 1-56297 | | |
| | APPENDIX A | | | | | Policy No. 1056630 | | |

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0111 | 043732.07 | Main Campus | 2004 G Street Northwest | Washington | District of Columbia | 20006-4200 | District of Columbia | United States of America |
| | 0112 | 043732.07 | Main Campus | 2129 G Street Northwest Rear | Washington | District of Columbia | 20052-0076 | District of Columbia | United States of America |
| | 0113 | 043732.07 | Main Campus - Duques Hall | 2201 G Street Northwest | Washington | District of Columbia | 20052-0037 | District of Columbia | United States of America |
| | 0114 | 043732.07 | Main Campus - The Jacob Burns Community Legal Clinic | 2002 G Street Northwest, 2003 G Street Northwest | Washington | District of Columbia | 20052-0003 | District of Columbia | United States of America |
| | 0115 | 043732.07 | Main Campus - | 2134 G Street Northwest | Washington | District of Columbia | 20052-0072 | District of Columbia | United States of America |
| | 0116 | 043732.07 | Main Campus - Lerner Hall | 2000 H Street Northwest | Washington | District of Columbia | 20052-0027 | District of Columbia | United States of America |
| | 0117 | 043732.07 | Main Campus - Gelman Library | 2130 H Street Northwest | Washington | District of Columbia | 20052-0081 | District of Columbia | United States of America |
| | 0118 | 043732.07 | Main Campus - Fulbright Hall | 2223 H Street Northwest | Washington | District of Columbia | 20052-0082 | District of Columbia | United States of America |
| | 0119 | 043732.07 | Main Campus - New Hall - Amsterdam Hall | 2350 H Street Northwest | Washington | District of Columbia | 20052-0083 | District of Columbia | United States of America |
| | 0120 | 043732.07 | Main Campus - Samson Hall Office | 2036 H St & 729 21St St | Washington | District of Columbia | 20037 | District of Columbia | United States of America |
| | 0091 | 043732.07 | Main Campus - G Street Parking Garage | 2028 G Street Northwest | Washington | District of Columbia | 20052-0008 | District of Columbia | United States of America |
| | 0109 | | Main Campus | 1776 G St NW | Washington | District of Columbia | 20006-4705 | District of Columbia | United States of America |
| | 0121 | 043732.07 | Main Campus | 2033 K Street Northwest | Washington | District of Columbia | 20006-1002 | District of Columbia | United States of America |

 **FM**Global

**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
|  | 0123 | 043732.07 | Main Campus | 2141 K Street Northwest | Washington | District of Columbia | 20037-1810 | District of Columbia | United States of America |
|  | 0124 | 043732.07 | Main Campus | 2175 K Street Northwest | Washington | District of Columbia | 20037-1831 | District of Columbia | United States of America |
|  | 0126 | 043732.07 | Main Campus | 2029 K Street Northwest | Washington | District of Columbia | 20006-1004 | District of Columbia | United States of America |
|  | 0130 | 043732.07 | Main Campus | 2021 L Street Northwest | Washington | District of Columbia | 20036-4977 | District of Columbia | United States of America |
|  | 0133 | 043732.07 | Main Campus - International House | 2201 Virginia Avenue Northwest | Washington | District of Columbia | 20052-0093 | District of Columbia | United States of America |
|  | 0132 | 043732.07 | Main Campus - Milken School Of Public Health | 950 New Hampshire Avenue NW | Washington | District of Columbia | 20037-2301 | District of Columbia | United States of America |
| 16 | 0139 | 043732.20 | Medical Faculty Associates- Burns Memorial Building | 2150 Pennsylvania Avenue Northwest | Washington | District of Columbia | 20037-2396 | District of Columbia | United States of America |
|  | 0140 | 043732.20 | Medical Faculty Association/Burns Memorial Building - Ambulatory Care Center | 123A 22nd and I Streets NW, 2140 Pennsylvania NW | Washington | District of Columbia | 20037 | District of Columbia | United States of America |
|  | 0226 |  | Medical Faculty Associates | 9715 Medical Center Drive 2nd floor, suite 202 | Rockville | Maryland | 20850-6305 | Montgomery | United States of America |
|  | 0227 |  | Medical Faculty Associates | 9715 Medical Center Drive 2nd floor, suite 230 | Rockville | Maryland | 20850-6303 | Montgomery | United States of America |
|  | 0228 |  | Medical Faculty Associates | 7321 Hanover Pkwy Ste A | Greenbelt | Maryland | 20770-3616 | Prince George's | United States of America |
|  | 0229 |  | Medical Faculty Associates | 7321 Hanover Pkwy Ste B | Greenbelt | Maryland | 20770-3616 | Prince George's | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0230 | | Medical Faculty Associates - OBGYN | 4920 Elm Street, suite 225 | Bethesda | Maryland | 20814-2924 | Montgomery | United States of America |
| | 0231 | | Medical Faculty Associates - Dermatology | 4920 Elm St Ste 250 | Bethesda | Maryland | 20814-2995 | Montgomery | United States of America |
| | 0232 | | Medical Faculty Associates | 8807 Colesville Rd Ste 400 | Silver Spring | Maryland | 20910-4346 | Montgomery | United States of America |
| | 0233 | | Medical Faculty Associates | 1800 Town Center Drive Ste 218 | Reston | Virginia | 20190-3238 | Fairfax | United States of America |
| | 0234 | | Medical Faculty Associates | 1800 Town Center Drive Ste 222 | Reston | Virginia | 20190-3238 | Fairfax | United States of America |
| | 0235 | | Medical Faculty Associates | 19785 Crystal Rock Drive Ste 208 | Germantown | Maryland | 20874-4715 | Montgomery | United States of America |
| | 0236 | | Medical Faculty Associates | 11500 Old Georgetown Road, suite A-B | Rockville | Maryland | 20852-2735 | Montgomery | United States of America |
| | 0237 | | Medical Faculty Associates | 8700 Georgia Avenue Ste 400 | Silver Spring | Maryland | 20910-3605 | Montgomery | United States of America |
| | 0238 | | Medical Faculty Associates | 6355 Walker Lane Ste 408 | Alexandria | Virginia | 22310-3250 | Fairfax | United States of America |
| | 0239 | | Medical Faculty Associates | 5513 Connecticut Avenue NW Ste 210 | Washington | District of Columbia | 20015-2649 | District of Columbia | United States of America |
| | 0240 | | Medical Faculty Associates | 106 Irving St NW Ste 4100 | Washington | District of Columbia | 20010-2971 | District of Columbia | United States of America |
| | 0241 | | Medical Faculty Associates | 3580 Joseph Siewick Drive Ste 401 | Fairfax | Virginia | 22033-1764 | Fairfax | United States of America |
| | 0242 | | Medical Faculty Associates | 2902 Porter Street, NW, unit 1 | Washington | District of Columbia | 20008-3286 | District of Columbia | United States of America |
| | 0243 | | Medical Faculty Associates | 1101 15th Street, NW, suite 150 | Washington | District of Columbia | 20005-5002 | District of Columbia | United States of America |

FM[logo]

**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0244 | | Medical Faculty Associates | 15215 Shady Grove Rd Ste 306 | Rockville | Maryland | 20850-0202 | Montgomery | United States of America |
| | 0245 | | Medical Faculty Associates | 4910 Massachusetts Avenue NW Ste 307 | Washington | District of Columbia | 20016-4382 | District of Columbia | United States of America |
| | 0246 | | Medical Faculty Associates | 7901 Maple Avenue, 1st floor, suite A | Takoma Park | Maryland | 20912-6331 | Montgomery | United States of America |
| | 0247 | | Medical Faculty Associates | 7902 Maple Avenue, 1st floor, suite B | Takoma Park | Maryland | 20912 | Montgomery | United States of America |
| | 0248 | | Medical Faculty Associates | 7901 Maple Avenue, 2nd floor | Takoma Park | Maryland | 20912-6331 | Montgomery | United States of America |
| | 0249 | | Medical Faculty Associates | 7500 Hanover Pkwy, suite 204 | Greenbelt | Maryland | 20770 | Prince George's | United States of America |
| | 0250 | | Medical Faculty Associates | 1234 19th St NW Ste 900 | Washington | District of Columbia | 20036-2439 | District of Columbia | United States of America |
| | 0251 | | Medical Faculty Associates | 2300-2350 Washington Pl NE, suite 110-11N | Washington | District of Columbia | 20018-1071 | District of Columbia | United States of America |
| | 0252 | | Medical Faculty Associates | 277 S Washington St Ste 100 | Alexandria | Virginia | 22314-3678 | Alexandria (City) | United States of America |
| | 0253 | | Medical Faculty Associates | 1011 New Hampshire Avenue NW | Washington | District of Columbia | 20037-1803 | District of Columbia | United States of America |
| | 0254 | | Medical Faculty Associates | 1500 N Beauregard St Ste 100 | Alexandria | Virginia | 22311-1715 | Alexandria (City) | United States of America |
| | 0211 | | Medical Faculty Associates | 2150 Pennsylvania Avenue NW | Washington | District of Columbia | 20037-2396 | District of Columbia | United States of America |
| | 0212 | | Medical Faculty Associates | 3811 Fairfax Dr, 10th floor | Arlington | Virginia | 22203 | Arlington | United States of America |
| | 0213 | | Medical Faculty Associates | 3811 Fairfax Dr, 8th floor | Arlington | Virginia | 22203 | Arlington | United States of America |
| | 0214 | | Medical Faculty Associates | 3811 Fairfax Dr, 5th floor | Arlington | Virginia | 22203 | Arlington | United States of America |

 FM Global

SCHEDULE OF LOCATIONS
APPENDIX A

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0215 | | Medical Faculty Associates | 900 23rd Street NW, 1st floor | Washington | District of Columbia | 20037-2342 | District of Columbia | United States of America |
| | 0216 | | Medical Faculty Associates | 2021 K St NW Ste 104 | Washington | District of Columbia | 20006-1059 | District of Columbia | United States of America |
| | 0217 | | Medical Faculty Associates | 2021 K St NW Ste 408 | Washington | District of Columbia | 20006-1003 | District of Columbia | United States of America |
| | 0218 | | Medical Faculty Associates | 2300 M St NW | Washington | District of Columbia | 20037-1434 | District of Columbia | United States of America |
| | 0219 | | Medical Faculty Associates | 2120 L St NW Ste 200 | Washington | District of Columbia | 20037-1554 | District of Columbia | United States of America |
| | 0220 | | Medical Faculty Associates | 2120 L St NW Ste 450 | Washington | District of Columbia | 20037-1541 | District of Columbia | United States of America |
| | 0221 | | Medical Faculty Associates | 2120 L Street, suite 530 | Washington | District of Columbia | 20037 | District of Columbia | United States of America |
| | 0222 | | Medical Faculty Associates | 2120 L St NW Ste 600 | Washington | District of Columbia | 20037-1540 | District of Columbia | United States of America |
| | 0223 | | Medical Faculty Associates | 1860 Town Center Drive Ste 420 | Reston | Virginia | 20190-5901 | Fairfax | United States of America |
| | 0224 | | Medical Faculty Associates | 10215 Fernwood Rd Ste 404 | Bethesda | Maryland | 20817-1191 | Montgomery | United States of America |
| | 0225 | | Medical Faculty Associates | 5215 Loughboro Rd NW Ste 210 | Washington | District of Columbia | 20016-2625 | District of Columbia | United States of America |
| 17 | 0127 | 003248.40 | Main Campus | 3524 K Street Northwest | Washington | District of Columbia | 20007-3503 | District of Columbia | United States of America |
| | 0128 | 003248.40 | Main Campus | 3526 K Street Northwest | Washington | District of Columbia | 20007-3503 | District of Columbia | United States of America |
| 18 | 0131 | 003248.41 | Main Campus - GW Medical Faculty Associates | 2300 M Street Northwest | Washington | District of Columbia | 20037-1434 | District of Columbia | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| 19 | 0144 | 000463.79 | Mount Vernon College - Academic Building | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1150 | District of Columbia | United States of America |
| | 0145 | 000463.79 | Mount Vernon College - Acheson Hall | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0146 | 000463.79 | Mount Vernon College - Ames Hall | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0148 | 000463.79 | Mount Vernon College - Athletic Parking Garage | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0149 | 000463.79 | Mount Vernon College - Chapel | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0150 | 000463.79 | Mount Vernon College - Clark Dorm | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0151 | 000463.79 | Mount Vernon College - Cole Hall | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0152 | 000463.79 | Mount Vernon College - Eckles Library | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0153 | 000463.79 | Mount Vernon College - Gate House | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0154 | 000463.79 | Mount Vernon College - Hensley Dorm | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0155 | 000463.79 | Mount Vernon College - Lloyd Hall (Gym) | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0156 | 000463.79 | Mount Vernon College - Merriweather Dorm | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |



**SCHEDULE OF LOCATIONS**
**APPENDIX A**

Account No. 1-56297
Policy No. 1056630

| Loc. No. | ID | Index No. | Name | Street Address | City | State | Postal Code | County | Country |
|---|---|---|---|---|---|---|---|---|---|
| | 0158 | 000463.79 | Mount Vernon College - Somers Dorm | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0159 | 000463.79 | Mount Vernon College - West Hall | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| | 0160 | 000463.79 | Mount Vernon College - Webb Admin/Alumnae Center | 2100 Foxhall Road Northwest | Washington | District of Columbia | 20007-1199 | District of Columbia | United States of America |
| 20 | 0201 | 043256.92 | Iron Mountain/Capital District | 8200 Preston Court | Jessup | Maryland | 20794-9367 | Howard | United States of America |
| 21 | 0202 | | | 1930 Martin Luther King Jr Avenue SE | Washington | District of Columbia | 20020-7006 | District of Columbia | United States of America |
| 22 | 0203 | | | 4200 S Four Mile Run Drive | Arlington | Virginia | 22206-1189 | Arlington | United States of America |
| 22 | 0205 | 043732.07 | | 2000 Pennsylvania Avenue NW | Washington | District of Columbia | 20006-1812 | District of Columbia | United States of America |
| 23 | 0204 | | Gateway Plaza | 170 Newport Center Drive Ste 260 | Newport Beach | California | 92660-6914 | Orange | United States of America |
| 23 | 0206 | | | 3301 Pennsy Drive | Landover | Maryland | 20875 | Prince George's | United States of America |
| 24 | 0207 | | | 2600 Virginia Avenue NW | Washington | District of Columbia | 20037-1906 | District of Columbia | United States of America |
| 25 | 0208 | | | 1919 Pennsylvania Avenue NW | Washington | District of Columbia | 20006-3400 | District of Columbia | United States of America |
| 26 | 0209 | | | 1930 Martin Luther King Jr Avenue SE | Washington | District of Columbia | 20020-7006 | District of Columbia | United States of America |
| 27 | 0210 | 043732.07 | | 2013 H St NW | Washington | District of Columbia | 20006-4201 | District of Columbia | United States of America |

Account No. 1-56297
Policy No. 1056630

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured Locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of USD214,452, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein. This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed USD100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed USD100,000,000,000. If the aggregate insured losses for all insurers exceed USD100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 85% (and beginning on January 1, 2016, shall then decrease by 1 percentage point per calendar year until equal to 80 percent) of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy. The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application:  The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and

Form FMG7308                              Page 1 of 2                          Edition January 2015

extended in 2005, 2007, and in 2015.  The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

a.   The act resulted in aggregate losses in excess of USD5,000,000; and

b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.



Account No. 1-56297
Policy No. 1056630

## RISK IMPROVEMENT COVERAGE ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein. All other terms and conditions of the Policy remain unchanged.

Coverage provided under this Endorsement only applies to property described on Appendix A.

COVERAGE:

In consideration of the premium charged and subject to the terms, conditions, exclusions and limitations of the Policy, as provided in the Valuation clauses of the Policy when insured property is repaired or replaced as a direct result of insured physical loss or damage, the Policy is extended to cover:

A. The reasonable and necessary extra cost incurred by the Insured within two years of the physical loss or damage, at the place where the physical loss or damage happened or, if damaged property is rebuilt, repaired or replaced at another site, at such other site, to satisfy physical protection loss prevention recommendations in the FM Global Property Loss Prevention Data Sheets current at the time of the physical loss or damage utilizing FM Approved products and materials where applicable.

LIMIT OF LIABILITY: This Company's liability in a single occurrence under this Endorsement shall not exceed 10% of the amount of PROPERTY DAMAGE loss at the insured location, not to exceed USD500,000.

The amount of PROPERTY DAMAGE loss for purposes of the provision above does not include:

1) the application of any deductible(s) under the Policy.
2) the costs recoverable under this Endorsement.
3) stock, work in process, raw materials, finished goods or merchandise.
4) process water.
5) molds and dies.
6) property in the open.
7) property of others for which the Insured is legally liable.
8) personal property of employees and officers of the Insured.

RISK IMPROVEMENT COVERAGE ENDORSEMENT Exclusions: As respects this Endorsement, the following additional exclusions apply:

This Endorsement does not cover:

1) stock, work in process, raw materials, finished goods or merchandise.
2) process water.
3) molds and dies.
4) property in the open.
5) property of others for which the Insured is legally liable.
6) personal property of employees and officers of the Insured.

Form **FMG7332**
Factory Mutual Insurance Company

Page 1 of 2

7)  property adjusted on a basis other than repair or replacement as provided in the Valuation clauses of the Policy.

8)  any loss recoverable elsewhere in the Policy.

ADDITIONAL CONDITION

Notwithstanding the provisions of the Valuation clauses of this Policy, the Insured must repair or replace the insured real and/or personal property lost, damaged or destroyed as a condition for coverage under this Endorsement.

TIME ELEMENT:

This Endorsement does not cover TIME ELEMENT loss.



Account No. 1-56297
Policy No. 1056630

## CYBER OPTIMAL RECOVERY ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein. All other terms and conditions of the Policy remain unchanged.

INSURED OPTION:

The Insured acknowledges having purchased a cyber policy.

As respects loss or damage that is covered by both this Policy and the cyber policy, and notwithstanding anything contained in the OTHER INSURANCE clause in the GENERAL PROVISIONS section of this Policy, the Insured may elect, within 180 days of notifying this Company of the loss, to apportion the loss between this Policy and the cyber policy and to designate this Policy as primary, excess or contributing insurance to the cyber policy with respect to each portion of the loss, provided designating it as such is necessary to maximize the total indemnity available for the loss under both this Policy and the cyber policy.

This election option shall be subject to the following additional conditions:

ADDITIONAL CONDITIONS

1) The Insured will provide this Company with a copy of any cyber policy in force at the time of loss.

2) Any coverage provided by the cyber policy that is not provided by this Policy does not extend to this Policy.

3) The insolvency, inability or unwillingness to pay of the company issuing the cyber policy shall in no event increase this Company's liability or delay settlement under this Policy.