**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE GEORGE WASHINGTON UNIVERSITY, <br><br> *Plaintiff*, <br><br> v. <br><br> FACTORY MUTUAL INSURANCE COMPANY, <br><br> *Defendant*. | No. 21-cv-3006 (DLF) |

**<u>MEMORANDUM OPINION</u>**

In this civil action, George Washington University (GWU) sues its insurer, Factory Mutual Insurance Company (Factory Mutual), for breach of contract. Before the Court is Factory Mutual's Motion to Dismiss, Dkt. 11. For the reasons that follow, the Court will grant the Motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.    BACKGROUND[1]

### A.    Policy Details

Plaintiff George Washington University maintains three campuses in Washington, D.C., and Ashburn, Virginia. Compl. ¶ 3, Dkt. 1-2. GWU purchased an "All Risks" insurance policy from defendant Factory Mutual for the period of July 1, 2019 to July 1, 2020. *Id.* ¶¶ 7, 30–31. The policy insured GWU against "All Risk of Physical Loss or Damage" to its property. *Id.* ¶¶ 7, 32. Factory Mutual promised to pay the insured up to $1 billion for each "occurrence . . . arising out of or caused by one discrete event of physical-loss or damage." *Id.* ¶ 15; *see also id.* ¶ 32.

---

[1] On a Rule 12(b)(6) motion, the Court assumes the truth of material factual allegations in the complaint. *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

The contract also enables GWU to collect under a "Time Element" provision, which covers expenses "directly resulting from physical loss or damage of the type insured[]." *Id.* ¶ 37.  This provision allows GWU to recover for loss accrued during the period between the "discrete occurrence" and that time "when with due diligence and dispatch the building and equipment could be: (i) repaired or replaced; and (ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage." *Id.* ¶ 38; Compl. Ex. A, at 41, Dkt. 1-2.  Among the losses covered are "Actual Loss Sustained"—which describes the "total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured"—and "Extra Expense"—which describes "the extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business during the interruption." Compl. ¶ 40.  Time Element coverage also extends to losses suffered when an order of a "civil authority" limited access to the insured location.  *Id.* ¶ 41.

The policy carves several exclusions out of this broad grant of coverage.  Among them is a "Contamination Exclusion," which

> Excludes the following unless directly resulting from other physical damage not excluded by this Policy: 1) contamination, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If contamination due only to the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy, then only physical damage caused by such contamination may be insured.

Compl. Ex. A, at 21.  "Contamination" is defined elsewhere in the policy as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew." *Id.* at 72.

After listing the Exclusions to the broad grant of coverage, the policy then extends additional forms of coverage.  These provisions, listed under an "Additional Coverages" section,

extend limited coverage otherwise carved out by exclusions or not satisfying the threshold requirements.  Most relevant of these "Additional Coverages" is the "Communicable Disease" provision, which

> Covers the reasonable and necessary costs incurred by the Insured['s] . . . location with the actual not suspected presence of communicable disease for the: 1) cleanup, removal and disposal of the actual not suspected presence of communicable diseases from insured property; and 2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of communicable diseases on insured property.

Compl. Ex. A, at 29.  Payout on the Communicable Disease Exception is capped at $1 million.  *Id.* at 10.  Factory Mutual concedes that COVID-19 is a "communicable disease" and has paid GWU $1 million in accordance with the provision.  Compl. ¶ 43.

### B.    COVID-19 Pandemic

Together with government orders, the presence of COVID-19 on campus caused significant interruption to GWU's operations.  *Id.* ¶¶ 12–13, 72, 86–96.  GWU spent "millions" on its property to reach the operating capacity the property enjoyed before the pandemic, including "installation of new, or modification of existing HVAC systems, the installation of barriers (for example, Plexiglas), and rearrangement of interior spaces to limit or reduce the spread of the COVID-19 virus."  *Id.* ¶¶ 14, 97–102.  GWU also suffered "millions of dollars" in losses when it could no longer use its property for in-person instruction.  *Id.* ¶¶ 113–118.

GWU requested that Factory Mutual cover these significant expenses.  *Id.* ¶ 17.  In particular, GWU sought payment for both for the damage caused to its facilities and for the losses suffered because of its inability to operate normally.  *Id.* ¶ 39.  Factory Mutual denied coverage, stating that the COVID-19 virus did not cause "physical loss or damage" to GWU's property.  *Id.* ¶ 17.  GWU brought suit to enforce the terms of the insurance policy, asking for declaratory relief

and money damages.  *Id.* ¶ 18.  Factory Mutual moved to dismiss the complaint under Rule 12(b)(6), arguing that GWU failed to allege sufficient facts to show that COVID-19 causes "physical loss or damage" to insured property.  Def.'s Statement of P. & A. in Supp. of Mot. to Dismiss at 1, Dkt. 11.

## II.    LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  An "unadorned, the-defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at

678. Ultimately, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.   ANALYSIS

### A.     "Physical Loss or Damage" Requires a Tangible Alteration

Whether GWU has alleged a claim for breach of contract turns on the meaning of the phrase "physical loss or damage." "Because an insurance policy is a contract, it is governed by principles of contract law." *Tolson v. Hartford Fin. Servs. Grp.*, 278 F. Supp. 3d 27, 33 (D.D.C. 2017) (citing *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002)).  In the District of Columbia, courts must "give the words used in an insurance contract their common, ordinary, and popular meaning." *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1205 (D.C. 1999) (cleaned up).  Those words will control "so long as they are clear and unambiguous." *Id.* at 1206.  Guided by these principles, the Court begins with the text of the policy.

Factory Mutual promised to insure "property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE."  Compl. Ex. A, at 1.  Because the policy does not define the words "physical," "loss," or "damage," the Court must look elsewhere to find their plain meaning.  "Physical" is defined in relevant part as "[o]f or relating to natural phenomena perceived through the senses (as opposed to the mind); of or relating to matter or the material world; natural; tangible, concrete."  Oxford English Dictionary Online (3d ed. 2022).  "Loss" is described as "[p]erdition, ruin, destruction; the condition or fact of being 'lost,' destroyed, or ruined," or "being deprived of." *Id.*  Finally, "damage" means "injury, harm; esp. physical injury to a thing, such as impairs its value or usefulness." *Id.*   Taken together, these definitions suggest a plain,

unambiguous meaning for the phrase "physical loss or damage": Property must undergo a tangible alteration to trigger coverage under this provision of the policy.

This conclusion finds support in District of Columbia caselaw.  In *Proper Ventures, LLC v. Seneca Ins. Co.*, the D.C. Superior Court held that "in the context of business interruption property insurance, the term 'direct loss' implies some form of direct physical change to the insured property."  No. 2020 CA 002194 B, 2021 WL 3841785, at *5 (D.C. Super. Ct. Feb. 18, 2021) (emphasis added).  And in *Rose's 1, LLC v. Erie Ins. Exch.*, No. 2020 CA 002424 B, 2020 WL 4589206 (D.C. Super. Ct. Aug. 6, 2020), the court held that "under a natural reading of the term 'direct physical loss,' the words 'direct' and 'physical' modify the word 'loss.'"  *Id.* at *3. Siding with the insurer, the court required a showing of an "effect on the *material or tangible structure* of the insured properties."  *Id.* at *2 (emphasis added).

Despite unambiguous text and precedent interpreting it, GWU proposes an alternative interpretation.  GWU contends that "loss" should be interpreted to mean "loss of use" or "loss of functionality."  Pl.'s Opp'n at 9, Dkt. 15.  The Court disagrees with plaintiff's attempt to read the word "physical" out of the policy.  Indeed, an overwhelming majority of courts nationwide have rejected this interpretation of the word "loss."  *See Santo's Italian Cafe LLC v. Acuity Ins. Co.*, 15 F.4th 398, 402 (6th Cir. 2021) ("A loss of use simply is not the same as a physical loss."); *Bridal Expressions LLC v. Owners Ins. Co.*, No. 21-3381, 2021 WL 5575753, at *1 (6th Cir. Nov. 30, 2021) ("A direct physical alteration of the property [is] needed to show 'damage to' it, and some form of complete destruction or dispossession [is] needed to show 'loss of' the property."); *Cordish Cos., Inc. v. Affiliated FM Ins. Co.*, No. CV ELH-20-2419, 2021 WL 5448740, at *14 (D. Md. Nov. 22, 2021) ("The term 'physical,' as used in the Policy, clearly indicates that the damage must affect the good itself, rather than the Plaintiff's use of that good.") (internal quotation marks

6

and citation omitted), *aff'd*, No. 21-2055, 2022 WL 1114373 (4th Cir. Apr. 14, 2022); *Town Kitchen LLC v. Certain Underwriters at Lloyd's, London*, 522 F. Supp. 3d 1216, 1222 (S.D. Fla. 2021) ("[T]he key difference between . . . loss of use theory and something clearly covered—like a hurricane—is that the property did not change."), *aff'd*, No. 21-10992, 2022 WL 1714179 (11th Cir. May 27, 2022). "Put simply, [p]laintiff seeks to recover from economic losses caused by something physical—not physical losses." *Town Kitchen*, 522 F. Supp. 3d at 1222.

It is no answer that because some harmful gases, fumes, and odors can cause damage that would be covered under the policy, COVID-19 should be, too. It is true, as GWU points out, that substances like mold, asbestos, sulfuric gas, urine odor, and gasoline vapor have been held to cause "physical loss or damage." Pl.'s Opp'n at 10–11 (citing cases). The crucial fact in those instances, however, is not loss of use, but the change in physical character. Each of those substances cause long-lasting change to the physical character of the property. *See Carilion Clinic v. Am. Guarantee & Liab. Ins. Co.*, No. 7:21-CV-00168, 2022 WL 347617, at *12 (W.D. Va. Feb. 4, 2022) ("Whether it be methamphetamine, gasoline, ammonia, or asbestos contamination, a rock fall or failed drainpipe, there was some physical loss associated with the insured property itself."); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 333 (7th Cir. 2021) ("[T]he reasoning in the asbestos cases indicates that the courts deemed 'physical injury' to be present because asbestos causes a physical alteration to property, not because the asbestos leads only to loss of use."). By comparison, COVID-19 is short-lived. *See* Compl. ¶ 78 ("[T]he COVID-19 virus remains viable—*i.e.*, capable of infecting persons who come in contact with it—for at least seven days on a range of common surfaces.").[2] While COVID-19 poses a serious risk to humans, it does not

---

[2] The COVID-19 virus may not even live for one week. Indeed, in its complaint, GWU cites a CDC report that cuts against its claim that COVID-19 causes long-lasting damage. Compl. at 30

threaten the integrity of physical structures.  Cases involving harmful gases, fumes, and odors provide no reason to abandon the conclusion compelled by text and precedent: "physical loss or damage" requires a tangible alteration.

GWU points to four cases holding that a "tangible alteration" is not required to show "physical loss or damage."  *See* Pl.'s Opp'n at 12.  But some of those courts concluded that the phrase "physical loss or damage" is ambiguous, not that its plain meaning clearly precludes Factory Mutual's interpretation.  *See Regents of Univ. of Colo. v. Factory Mut. Ins. Co.*, No. 2021-cv-30206, 2022 WL 245327, at *4 (Colo. Dist. Ct. Jan. 26, 2022) ("The ambiguity in the phrase 'physical loss or damage' is enough to demonstrate that the present matter cannot be determined by the pleadings alone."); *see also Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 376 (E.D. Va. 2020).  Moreover, the cases highlighted by GWU represent only a small minority of COVID-19 insurance cases and are dwarfed by "the overwhelming majority of courts [that] have found no coverage when interpreting similar language."  *Crescent Plaza Hotel Owner L.P. v. Zurich Am. Ins. Co.*, 520 F. Supp. 3d 1066, 1069 (N.D. Ill.), *aff'd*, 20 F.4th 303 (7th

---

n.44.  This CDC report states that "[d]ata from surface survival studies indicate that a 99% reduction in infectious SARS-CoV-2 and other coronaviruses can be expected under typical indoor environmental conditions within 3 days (72 hours) on common non-porous surfaces like stainless steel, plastic, and glass."  *Id.*  Although the Court "must accept as true plaintiff's well-pleaded allegations," Pl.'s Opp'n at 17, a court "may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2).  This Court has previously concluded that the CDC website is such a source, *Loucka v. Lincoln Nat'l Life Ins. Co.*, 334 F. Supp. 3d 1, 9 (D.D.C. 2018) ("[T]he CDC's Lyme-testing criteria and procedures are a matter of public record, and it cannot be reasonably questioned that the agency's website is an accurate source for those standards"); *see also Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of CDC website when it was "unclear to what extent the information on the CDC's website [was] formally part of the record").  For these reasons, the Court credits the contents of the CDC article cited in the complaint, titled *Science Brief SARS-CoV-2 and Surface (Fomite) Transmission/or Indoor Community Environments.* (Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.

Cir. 2021); *see also* Def.'s Reply at 19, Dkt. 18 (citing cases).[3]   The Court thus concludes that "physical loss or damage" requires a tangible alteration to the insured property.

### B.      COVID-19 Does Not Cause a Tangible Alteration to Property

In the alternative, GWU argues that COVID-19 falls within the "physical loss or damage" provision of the policy because its droplets materially alter the objects they touch.  *See* Pl.'s Opp'n at 15–18; Compl. ¶ 77 (alleging that COVID-19 "changes the chemical composition of air" and creates "a surface with quantifiably different physical properties").   But GWU states only in conclusory fashion that this surface-level change—*i.e.*, the virus's physical presence on, or attachment to, objects—"is a form of physical damage" to the property itself.  Compl. ¶ 75.  That conclusion is simply not plausible.   *See, e.g.*, CDC, *Guidance for Cleaning and Disinfecting* 2 (Sept.      16,      2020),      https://www.cdc.gov/coronavirus/2019-ncov/community/pdf/ reopening_america_guidance.pdf ("Coronaviruses on surfaces and objects naturally die within hours to days."); CDC, *Cleaning and Disinfecting Your Facility* (Nov. 15, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html   ("If no one with confirmed or suspected COVID-19 has been in a space cleaning once a day is usually enough to remove virus that may be on surfaces. . . . If more than 3 days have passed since the person who is sick or diagnosed with COVID-19 has been in the space, no additional cleaning (beyond regular cleaning practices) is needed.").  Rather, at most, viral droplets "create[] a new surface" on the material they touch.  Compl. ¶ 77.  In this regard, COVID-19 functions in much the same way as "sweat [or] skin oil" does, *id.*—it can be cleaned without permanently harming property *qua* property, *see Woolworth LLC v. Cincinnati Ins. Co.*, 535 F. Supp. 3d 1149, 1154

---

[3] GWU asserts that the absence of the word "direct" from GWU's policy distinguishes this case from others.  *See* Pl.'s Opp'n at 13 n.5.  But the inclusion or lack of the word "direct" is irrelevant to the requirement of physical alteration.

(N.D. Ala. 2021), *appeal dismissed*, No. 21-11847-CC, 2021 WL 3870691 (11th Cir. June 16, 2021) ("A virus can simply be wiped off the surface with disinfectant, so there is no 'physical damage' or 'physical loss' of property.") (cleaned up).   At bottom, GWU conflates the risk COVID-19 poses to people with the effect it has on property.

Although District of Columbia courts have not considered whether COVID-19 can cause physical loss or damage, Pl.'s Opp'n at 13–15, the overwhelming majority of courts that have considered the question have held that COVID-19 does not materially alter the property it touches. *See S.A. Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1358 (11th Cir. 2022) ("As far as we can tell, every federal and state appellate court that has decided the meaning of 'physical loss of or damage to' property (or similar language) in the context of the COVID-19 pandemic has come to the same conclusion and held that some tangible alteration of the property is required."); *100 Orchard St., LLC v. Travelers Indem. Ins. Co. of Am.*, 542 F. Supp. 3d 227, 229 (S.D.N.Y. 2021) (noting that "most courts that have decided the issue have held that the physical presence of COVID-19 does not constitute property loss or damage"); *Out W. Rest. Grp. Inc. v. Affiliated FM Ins. Co.*, 527 F. Supp. 3d 1142, 1148 (N.D. Cal. 2021) ("The overwhelming majority of courts have concluded that neither COVID-19 nor the governmental orders associated with it cause or constitute property loss or damage for purposes of insurance coverage.").   Courts have reached this conclusion even at the motion to dismiss stage.  *See, e.g.*, *TP Racing LLLP v. Am. Home Assurance Co.*, No.21-cv-118, 2021 WL 4851430, at *4 (D. Ariz. Oct. 13, 2021) (explaining that the "claim that virus droplets 'structurally change' the surfaces upon which they land is belied by the ease with which the virus may be eliminated from any surface"); *100 Orchard St.*, 542 F. Supp. 3d at 229 ("[W]hile the presence of COVID-19 may render property potentially harmful to people, it does not constitute harm *to* the property itself.");

*Woolworth*, 535 F. Supp. 3d at 1154 ("A virus does not physically alter the property it rests on.  A virus does not require property to be repaired, rebuilt, or replaced."); *Karmel Davis & Assocs., Att'ys-at-Law, LLC v. Hartford Fin. Servs. Grp., Inc.*, 515 F. Supp. 3d 1351, 1357 (N.D. Ga. 2021) ("The mere fact that it may rest unseen on surfaces before it can be cleaned up with a disinfectant is not . . . direct physical change.").

The few cases to which GWU points to support its claim that COVID-19 materially alters the surfaces it touches, *see* Pl.'s Opp'n at 16, are either distinguishable or unpersuasive.  For example, in *Inns by the Sea v. California Mutual Insurance Co.*, 71 Cal. App. 5th 688 (2021), the court sided with the insurer, explaining that "despite [the plaintiff's] allegation that the COVID-19 virus was present on its premises, it has not identified any direct physical damage to property that caused it to suspend its operations."  *Id.* at 705.  In other cases, courts accepted, without explanation, conclusory assertions that COVID-19 necessarily damages whatever property it touches.  *See* Pl.'s Opp'n at 16 (citing cases).  For example, one court credited, without analysis, a conclusion that COVID-19 "stay[s] on surfaces and in the air for up to a month [and] physically alters the air and surfaces to which it attaches."  *Goodwill Indus. of Orange Cnty. v. Phila. Indem. Ins. Co.*, No. 30-2020-01169032, 2021 WL 476268, at *3 (Cal. Super. Jan. 28, 2021).  Another credited unsupported statements that the virus "altered the structure of the property by contaminating objects and lingering in the air."  *Regents of Univ. of Colo.*, 2022 WL 245327, at *4.  Both courts accepted that viral droplets attach to surfaces, but they failed to explain how COVID-19—which can be cleaned—plausibly causes long-lasting damage.  It is because of this missing link that the Court finds these cases unpersuasive.

11

In sum, GWU cannot meet the threshold requirement for coverage under the insurance policy because COVID-19 does not cause "physical loss or damage" to property.  Accordingly, the Court will grant Factory Mutual's motion to dismiss.[4]

## CONCLUSION

For the foregoing reasons, the Court grants Factory Mutual's Motion to Dismiss and dismisses the case.  A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

September 6, 2022

---

[4] GWU also claims that the "Imminent Risk That the COVID-19 Virus Would Re-Enter GWU's Property Also Qualifies as 'Physical Loss or Damage.'"  Pl.'s Opp'n at 18.  This argument fails for the same reason that "loss of use" does—the policy requires that the policyholder suffer a tangible alteration to its property.  Because the Court holds that COVID-19 cannot cause physical damage, GWU also cannot recover under the policy's Civil Authority provision which requires that there be "physical damage of the type insured" to its property or to nearby property.  *See supra* section III.B.  Finally, the Court need not address Factory Mutual's second argument for dismissal—that coverage is barred by the Contamination Exclusion.